UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| TAYLOR ENERGY COMPANY LLC, | * | CIVIL ACTION NO.: |
| | * | |
| **Plaintiff,** | * | SECTION: |
| | * | |
| V. | * | MAGISTRATE: |
| | * | |
| UNITED STATES DEPARTMENT OF THE | * | |
| INTERIOR, RYAN ZINKE, IN HIS OFFICIAL | * | |
| CAPACITY AS SECRETARY OF THE | * | |
| UNITED STATES DEPARTMENT OF THE | * | |
| INTERIOR, AND THE BUREAU OF | * | |
| OCEAN ENERGY MANAGEMENT, | * | |
| | * | |
| **Defendants** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT

Plaintiff, Taylor Energy Company LLC ("Taylor Energy"), brings this civil action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, for judicial review related to the arbitrary, capricious and not otherwise in accordance with law decisions of the United States Department of the Interior ("Interior") through the Interior Board of Land Appeals ("IBLA"), and through the Bureau of Ocean Energy Management ("BOEM," formerly known as the U.S. Minerals Management Service ("MMS")), in connection with the decommissioning of oil and gas facilities at Mississippi Canyon Block 20 ("MC20") in the Gulf of Mexico, and avers as follows:

### I.    NATURE OF THE ACTION

1.    Taylor Energy seeks judicial review of the IBLA's October 29, 2018 final decision ("IBLA Decision") upholding BOEM's failure to follow "common-law principles of contract law" and the express mandates of the Outer Continental Shelf Lands Act ("OCSLA"),

the Oil Pollution Act, federal regulations implementing these statutes, and three related agreements: (1) a March 19, 2008 Trust Agreement ("Trust Agreement"); (2) an Agreement to Provide Additional Bond ("Bond Agreement"); and (3) an Agreement Between Taylor Energy and the MMS to Implement Article IV-Disbursements of the Trust Agreement ("Disbursement Agreement") (collectively referred to as "the Agreements").[1]  Taylor Energy entered into all three of the Agreements as part of a "settlement" with the MMS to fund certain defined "Obligations" under the Trust Agreement to decommission an oil and gas platform and wells destroyed at MC20 in 2004 in the wake of Hurricane Ivan.

2.      Specifically, Taylor Energy seeks review of the IBLA Decision that affirmed two BOEM decisions related to BOEM's interpretation of the Agreements: (1) BOEM's August 28, 2009 decision ("2009 Decision") in which BOEM took the position that Taylor Energy was required to: (a) deposit supplemental funds into the Trust Account; and (b) "reimburse" the Trust Account for "duplicative" insurance proceeds received; and (2) BOEM's November 7, 2011 decision ("2011 Decision") denying Taylor's Energy's request for disbursement of Trust Account funds related to rig down time, a necessary cost related to securing a continuous contract for a drilling rig required to decommission the wells.

3.      The net effect of BOEM's 2009 and 2011 Decisions was to improperly deny Taylor Energy a $10,433,905.12 disbursement of its own funds from the Trust Account.  The Trust Account presently and incorrectly contains Taylor Energy's funds deposited to "secure" "Obligations" that Taylor Energy has already performed. The IBLA Decision affirming BOEM's

---

[1] Because Taylor Energy's claims relate to Defendants' violation of the Agreements, Taylor Energy has also filed suit against Defendants in the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491 *et seq.*  This suit is filed in an abundance of caution in the event jurisdiction is determined to be improper in the Court of Federal Claims.  Taylor Energy intends to seek a stay of this proceeding pending that determination.

decisions denying Taylor Energy its rightful reimbursements is therefore arbitrary, capricious, and not in accordance with law.

## II.   PARTIES

4.   Plaintiff Taylor Energy is a Louisiana limited liability company with its principal place of business in New Orleans, Louisiana.  Its sole member is Phyllis M. Taylor, a Louisiana resident domiciled in Orleans Parish, Louisiana.

5.   Defendant United States Department of the Interior is the federal agency with authority, through the Secretary, to supervise and manage BOEM,[2] a successor agency to the MMS, the party that executed the Agreements.

6.   Defendant Ryan Zinke is sued in his official capacity as Interior Secretary.  He is the chief officer of Interior charged with overseeing the proper administration and implementation of OCSLA.  The IBLA makes decisions final for Interior on delegated authority from the Secretary. 43 C.F.R. § 4.1.

7.   Defendant BOEM is the bureau with authority, pursuant to OCSLA, to ensure the financial state of lessees and to administer the Agreements.

## III.   JURISDICTION

8.   This Court has subject matter jurisdiction over this action pursuant to the APA, 5 U.S.C. §§ 701-706 and 28 U.S.C. § 1331 (federal question).  The APA waives the Government's sovereign immunity and specifically authorizes suits against the Government for the relief set forth herein.

9.   Venue lies in this Court under 28 U.S.C. § 1391(e) because a substantial part of the events giving rise to this action and the underlying claims occurred in the Eastern District of

---

[2] The predecessor to BOEM is the Minerals Management Service ("MMS") of the DOI.  From mid-June 2010 to October of 2011, DOI renamed MMS the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").  On October 1, 2011, DOI replaced MMS with BOEM and another Bureau.

Louisiana.  Defendant BOEM has an office in New Orleans, Louisiana, which is within the Eastern District of Louisiana and therefore resides in this District.  Venue is also dictated in the Eastern District of Louisiana by Section 12(a)(1) of the Bond Agreement.

## IV.    LEGAL BACKGROUND

10.    The APA allows persons and organizations to challenge final agency actions in federal court. 5 U.S.C. §§ 702, 704.

11.    The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

12.    "[A]gency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C.§ 551(13).

13.    The APA provides that a court shall hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

14.    The APA also allows an affected party to challenge final agency actions in federal court. 5 U.S.C. §§ 702, 704.

15.    BOEM manages the federal government's outer continental shelf oil and gas leasing program, including requiring financial assurance from lessees and operators for, among other things, the decommissioning of their oil and gas facilities.

## V.    RELEVANT FACTS

16.    Taylor Energy was the lessee and operator of: (a) the Outer Continental Shelf (OCS) lease covering MC20, Lease OCS-G 04935 ("MC20 Lease"); and (b) part of two former

OCS leases covering Mississippi Canyon Block 21 and South Pass Block 73, Lease OCS-G 15459 and Lease OCS-G 15371, respectively, on which a platform, 28 wells and associated facilities were located.

17.     Taylor Energy acquired its interest in the MC20 Lease dated, effective December 1, 1981, by assignment from BP Exploration & Oil Inc. ("BP"), effective April 1, 1994.

18.     On September 16, 2004, Hurricane Ivan, a storm that alternated between a Category 4 and a Category 5 storm, struck the MC20 Site resulting in a massive seafloor shift that toppled the MC20 platform, scattered debris on and under the seafloor and severely damaged all of Taylor Energy's oil and gas wells at MC20.  As a result of the unprecedented seafloor collapse, the platform now lies about 550 feet down slope and southeast from its original location.  The associated well bores now rest in a tangled web buried under mud and sediment. All production at MC20 permanently ceased several days before Hurricane Ivan hit in preparation for the storm.

19.     Taylor Energy, in collaboration with the responsible federal agencies, including BOEM, and the United States Coast Guard, promptly began efforts to identify a technologically feasible, safe, and unprecedented plan to decommission the MC20 facilities.  This plan involved drilling intervention wells which provided the only means of plugging and abandoning the wells.

20.     In furtherance of this goal, Taylor Energy and the United States, acting by and through the MMS, entered into the Agreements in 2008 to comply with OCSLA and federal regulations, and to secure a source of funds for Taylor Energy's performance of its "Obligations" under the Trust Agreement to decommission the oil and gas facilities at MC20.

21.     Under the terms of the Agreements, Taylor Energy deposited $666,280,000 of its own funds into a Trust Account to cover the specific enumerated decommissioning

"Obligations" at MC20 listed on Exhibit A to the Trust Agreement.  The Agreements specifically allocated the $666,280,000 to 29 separate commitments to: plug and abandon 25 of 28 wells; decommission a pipeline; remove the platform deck and flare boom; remove seafloor debris; and remove contaminated soil.

22.     Since the deposit by Taylor Energy was to be made over time, the Bond Agreement expressly provided that Taylor Energy was entitled to an offset, or reduction, from its remaining supplemental deposits for any work that Taylor Energy completed prior to the due date for any supplemental deposit.

23.     Upon the completion of each of the specified 29 commitments, Taylor Energy would seek a disbursement of its deposited funds for actual costs up to a designated amount: $25.5 million per well to plug and abandon (for a total of $637.5 million for all 25 wells), $6.245 million to remove the platform deck and flare boom, $6.535 million to remove seafloor debris, $3 million to decommission a pipeline, and $13 million to remove contaminated soil.

24.     The Agreements provided that Taylor Energy would make the $666,280,000 deposit in several installments.  To account for the fact that Taylor Energy might complete some of the specified decommissioning work before the later installments were due, and consistent with the clear wording under the Trust Agreement that Taylor Energy deposit a maximum of $666,280,000 into the Trust Account, the Bond Agreement provided for an "offset" or reduction of later installment deposits for any work completed prior to the date those deposits were due. The offset provision recognized that there would be no need to "secure" funds to guarantee performance of specified decommissioning work that Taylor Energy had already completed.

25.     The Agreements also required Taylor Energy to seek reimbursement from Taylor Energy's insurance policies for work performed at MC20.   The Agreements specifically

provided that while Taylor Energy would not be entitled to disbursements from the Trust Account for costs reimbursed by insurance, for any work performed <u>prior</u> to the due date of the final installment deposits, using money from any source (including insurance), Taylor Energy would be entitled to a reduction or offset in the amount it was required to deposit into the Trust Account equal to the designated amount stated in the Trust Agreement for the already completed work.

26.     In compliance with the Agreements, Taylor Energy secured contracts to begin the required work, and submitted invoices to its insurance underwriter as well as disbursement requests to BOEM for its completion of these commitments.   In most instances, BOEM concurred with Taylor Energy's certification of the completed work and released Taylor Energy's corresponding funds from the Trust Account.   However, as to certain disbursement requests, BOEM erroneously denied Taylor Energy's requests.

### *A. The 2009 Decision*

27.     In August of 2009, BOEM maintained, contrary to the clear and plain terms of the Agreements, that because Taylor Energy received proceeds from insurance which BOEM believed may have been for the same work as the disbursement, Taylor Energy was not entitled to an offset from its remaining supplemental deposits for that work.  This was so notwithstanding that the work had been performed and was "completed" prior to the date of the supplemental deposit.

28.     Thereafter, on August 13, 2009, Taylor Energy documented its process to follow the Agreements so that it would fully fund the Trust Account, but retain its lawfully-procured insurance proceeds.  Taylor Energy acknowledged that the Trust Account should be fully funded and, therefore, deposited all the supplemental deposits to the Trust Account, but notified BOEM

that the final deposits were made "under protest" pending resolution of BOEM's erroneous and unlawful interpretation of the Agreements.

29.     On August 28, 2009, BOEM issued a decision denying Taylor Energy's protest and declared that Taylor Energy was required to: (a) deposit supplemental funds into the Trust Account; and (b) "reimburse" the Trust Account for "duplicative" insurance proceeds received. *See* 2009 Decision attached hereto as Exhibit "1."

30.     Essentially, BOEM's 2009 Decision required Taylor Energy to provide an additional deposit to the Trust Account to refund money for work Taylor Energy had already paid for and completed.  BOEM's 2009 Decision required Taylor Energy to deposit the full amount ($666,280,000) into the Trust Account plus "reimburse" the Trust Account for insurance proceeds received.  This determination by BOEM required Taylor Energy to "over fund" and double-pay for a commitment already completed, and denied Taylor Energy's request for even one disbursement for the same commitment.  BOEM's interpretation and 2009 Decision is contrary to the clear and plain language of the Agreements.

31.     Additionally, BOEM ignored and rendered meaningless the deposit "offset provision" set forth in the Bond Agreement through its interpretation of the Agreements.

### *B. The 2011 Decision*

32.     On August 15, 2011, September 6, 2011, and November 2, 2011, Taylor Energy requested disbursements of its own funds from the Trust Account for rig-down time costs.

33.     On November 7, 2011, BOEM denied Taylor Energy's request for disbursement of Trust Account funds related to rig-down time arising out of the inability to continue operations during hurricane season, a necessary cost related to securing a continuous contract for a drilling rig required to plug and abandon certain of the 25 wells.  *See* 2011 Decision attached hereto as Exhibit "2."

34.     BOEM's 2011 Decision applies the same flawed logic as the 2009 Decision.  It is also arbitrary and capricious and not otherwise in accordance with law in light of the clear and plain terms of the Agreements, as it requires Taylor Energy to "ensure" the availability of funds to pay for the commitment to plug and abandon one well multiple times—first by paying to drill the intervention well, second by paying into the Trust Account via a supplemental deposit after work on that well was already complete, and a third time because BOEM denied Taylor Energy's disbursement for work completed.

35.     Contrary to the 2011 Decision, Taylor Energy has not been "overcompensated" or received "excess disbursements" or "overpayments" for this obligation under the Trust Agreement.   In fact, contrary to the Agreements Taylor Energy has actually received disbursements of _less than_ the allocated $25.5 million for each of the wells that it decommissioned.

36.     In essence, the 2011 Decision, like the 2009 Decision, retains Taylor Energy's funds in the Trust Account to "secure" the completion of "Obligations" that Taylor Energy already fulfilled.  BOEM's interpretation and the 2011 Decision runs contrary to the clear and plain terms of the Agreements.  The net effect of BOEM's 2009 and 2011 Decisions was to improperly withhold $10,433,905.12 of Taylor Energy's funds.

### C. The IBLA Decision

37.     Taylor Energy timely appealed BOEM's 2009 and 2011 Decisions to the IBLA thereby exhausting the administrative remedies as required by 30 C.F.R. § 590.8.  On October 29, 2018, the IBLA affirmed BOEM's 2009 and 2011 Decisions, which constitutes final agency action under 5 U.S.C. § 704.  _See_ 193 IBLA 167, attached hereto as Exhibit "3."

38.     Like BOEM, the IBLA rendered meaningless the deposit "offset provision" contained in the Bond Agreement through its interpretation in connection with the 2009

Decision.  Further, in connection with the 2011 Decision its <u>conclusions that</u> Taylor Energy had been "overcompensated" on one well (IW-21) and that the Trust Account needs to "remain fully funded" is erroneous.  This conclusion improperly requires that funds remain in the Trust Account despite "not currently allocated to any future decommissioning work."

## VI.    CAUSE OF ACTION

### THE IBLA DECISION IS ARBITRARY, CAPRICIOUS AND OTHERWISE NOT IN ACCORDANCE WITH LAW

39.    Taylor Energy incorporates by reference each of the allegations set forth above.

40.    The IBLA Decision affirming the 2009 Decision and 2011 Decision of BOEM is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  The 2009 and 2011 Decisions are contrary to the plain and clear terms of the Agreements and unlawfully withheld Taylor Energy's funds to "secure" obligations that Taylor Energy has already completed.

41.    As a result of the IBLA Decision affirming the BOEM 2009 and 2011 Decisions, Taylor Energy is suffering and will continue to suffer harm.

## VII.    RELIEF REQUESTED

Taylor Energy respectfully requests that this Court order the following relief:

1.    Reverse, set aside, and vacate the IBLA Decision affirming BOEM's 2009 and 2011 Decisions;

2.    Declare that the 2009 Decision and 2011 Decision are arbitrary, capricious, contrary to law and an abuse of discretion;

3.    Remand to BOEM with instructions to direct the disbursement of the funds ($10,433,905.12 plus applicable interests) owed to Taylor Energy;

4.    All reasonable costs and attorneys' fees as authorized by law; and

5.    For such further relief as the Court deems just, proper, and equitable.

Dated:  December 20th, 2018

          Respectfully submitted,

      By: _s/ Carl D. Rosenblum_
        Carl D. Rosenblum, T.A. (La. Bar No. 2083)
        Edward D. Wegmann (La. Bar No. 13315)
        Alida C. Hainkel (La. Bar No. 24114)
        Lauren C. Mastio (La. Bar No. 33077)
        JONES WALKER LLP
        201 St. Charles Avenue, 49th Floor
        New Orleans, Louisiana 70170-5100
        Telephone:  (504) 582-8296
        Facsimile: (504) 589-8296
        crosenblum@joneswalker.com

        ***Attorneys for Taylor Energy Company LLC,
Plaintiff***