

United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203

703-235-3750                               703-235-8349 (fax)

TAYLOR ENERGY COMPANY LLC

IBLA 2010-12 & 2012-70                    Decided October 29, 2018

    Consolidated appeals from decisions of the Regional Director, Gulf of Mexico OCS Region, Bureau of Ocean Energy Management, denying request to retain insurance proceeds, together with disbursements, in lieu of offset against supplemental deposits to trust account, and denying request to disburse trust account funds, for decommissioning work in the Outer Continental Shelf of the Gulf of Mexico.  MS 5000 & MS 5422.

    Decisions affirmed.

    1.    Outer Continental Shelf Lands Act: Decommissioning;
          Outer Continental Shelf Lands Act: Oil and Gas Leases

          Contracts entered into by the United States are construed by the same standards as any contract between private parties.  The Board's task in adjudicating contract disputes is to give effect to the intent of the parties expressed in the language of the contract they agreed to, based on our understanding of its ordinary and commonly accepted meaning.  The parties' intent must be gleaned from the four corners of their contract, which is controlling unless the language of the contract is reasonably susceptible to at least two different constructions or is otherwise ambiguous.  In adjudicating contract disputes, the Board exercises *de novo* review to read, interpret, apply, and issue a final decision for the Department on the proper interpretation of that contract.

APPEARANCES:  Peter J. Schaumberg, Esq., James M. Auslander, Esq., and Fred R. Wagner, Esq., Washington, D.C., and Bret A. Sumner, Esq., Michael K. Cross, Esq., Michael L. Beatty, Esq., William E. Sparks, Esq., and Malinda Morain, Esq., Denver, Colorado, for Taylor Energy Company LLC; Lori R.F. Monroe, Esq., Office of the

IBLA 2010-12 & 2012-70

Solicitor, U.S. Department of the Interior, Washington, D.C., for the Bureau of Ocean Energy Management.

OPINION BY ADMINISTRATIVE JUDGE JACKSON

Taylor Energy Company LLC (Taylor) appeals from and petitions for a stay of the August 28, 2009, decision (2009 Decision) of the Regional Director, Gulf of Mexico OCS Region, Bureau of Ocean Energy Management (BOEM), denying Taylor's request to retain insurance proceeds and disbursements from its Trust Account, in lieu of offsetting them against supplemental deposits to the Trust Account. Taylor also appeals from a November 7, 2011, BOEM decision (2011 Decision) denying its request for additional disbursements from the Trust Account for rig downtime costs associated with its plugging and abandoning multiple wells.[1] The Board docketed Taylor's two appeals as IBLA 2010-12 and IBLA 2010-12, respectively. By Order dated January 30, 2012, we granted Taylor's request to consolidate its appeals, which are now ripe for decision.[2]

BOEM's decisions interpreted and applied the terms and conditions of a Trust Agreement by and between Taylor, BOEM, and JPMorgan Chase Bank (Trust Agreement), an Agreement to Implement Article IV of the Trust Agreement between Taylor and BOEM (Disbursement Agreement), and their Agreement to Provide Additional Bond (Bond Agreement), hereinafter collectively referred to as the Agreements.[3] The Agreements provide for funding and managing disbursements from the Trust Account for decommissioning activities on OCS leases where Taylor was the lessee and operator.[4]

*SUMMARY*

When BOEM enters into contracts with a third party, it is bound by the contract's terms and conditions in the same manner and to the same extent as is the third party. In deciding appeals involving contract language, terms, or conditions,

---

[1] References herein to BOEM include its predecessors, the Minerals Management Service (MMS) and the Bureau of Ocean Energy Management, Regulation and Enforcement, as appropriate.
[2] *See* Order dated April 26, 2018; Statement of Reasons filed May 27, 2016 (SOR); Answer filed July 26, 2016; Reply filed Aug. 8, 2016.
[3] *See* Trust Agreement dated Mar. 19, 2008, Administrative Record (AR) 569-592; Disbursement Agreement dated Nov. 20, 2009, AR 593-600; Bond Agreement dated Mar. 19, 2008, AR 601-610.
[4] *See* Trust Agreement at 1 (Lease OCS-G 04931 (Mississippi Canyon Block 20), Lease OCS-G 15459 and 5 wells (Mississippi Canyon Block 21), Lease OCS-G 15371 and 1 well (South Pass Block 73)).

the Board will give them their natural and most commonly understood meaning, so long as our doing so does not lead to absurd results and is not contrary to the contracting parties' clearly expressed intent. When such contracts establish a trust fund as a guaranteed source of funding to complete multiple tasks and allow required deposits to be reduced if a task is completed without trust funds, the contracting party is not entitled to reduce a future deposit unless the record shows it completed a task without trust funds. And where a contracting party does not substantiate its costs in the manner required by contract and show they were not paid by insurance proceeds, it may be required to repay disbursements it was not entitled to receive under its contract.

## BACKGROUND

When Hurricane Ivan slammed into the Gulf of Mexico during September of 2004, it caused catastrophic damage to wells, facilities, and operations on Taylor's OCS Leases for Mississippi Canyon Blocks 20 and 21 and South Pass Block 73. Ivan shifted the sea floor, toppled a platform, buried wells beneath 150 feet of mud, and caused oil leaks in the area. In collaboration with BOEM, the Department's Bureau of Safety and Environmental Enforcement (BSEE), and the U.S. Coast Guard, Taylor developed a "technologically feasible, safe, and unprecedented plan to decommission the [offshore] . . . facilities,"[5] which relied heavily on the drilling of "intervention wells" (IWs) because they were the "only means" for plugging and abandoning 25 producing wells on its OCS leases.[6] Ultimately, Taylor decided to relinquish its OCS leases, decommission their facilities, and sell all assets used in its oil and gas business.[7]

---

[5] SOR at 5.
[6] Id.; see Plan of Operations for MC20A Decommissioning dated May 19, 2008 (Plan), AR 377. Intervention (or relief) wells were identified by reference to the well they were paired with for plugging and abandoning purposes (e.g., IW-21 was paired with A-21, a producing well drilled from Platform A).
[7] See Answer at 2 ("BOEM realized that once Taylor sold its income producing assets and distributed the proceeds to its shareholder, it might not have sufficient funds to perform . . . decommissioning, therefore in late 2007 and early 2008, BOEM issued two Supplemental Bonding Orders to Taylor, requiring Taylor to post security in the amount of $666,280,000 to ensure sufficient funds to pay for the cost of decommissioning the MC20 site.").

IBLA 2010-12 & 2012-70

*The Trust, Disbursement, and Bond Agreements*

Taylor and BOEM entered into the Agreements to establish a lease-specific abandonment account under rules implementing the Outer Continental Shelf Lands Act (OCSLA).[8] In lieu of lease and areawide bonds under 30 C.F.R. § 556.900(a), this abandonment account provides a secure source of funds to pay for decommissioning undertaken by Taylor or by BOEM the event of default by Taylor.[9] The rule at 30 C.F.R. § 250.1703 (What are the general requirements for decommissioning?) requires OCS lessees and operators to: "Permanently plug all wells"; "Remove all platforms and other facilities"; "Decommission all pipelines"; and "Clear the seafloor of all obstructions created by your lease[.]" Each of these regulatory obligations is a defined Obligation under the Trust Agreement and identified in its Schedule A:

1. permanently plug and abandon 25 wells in accordance with C.F.R. §§ 250.1710-1717 "@ $25,500,000 per well";
2. remove deck and flare broom in accordance with 30 C.F.R. §§ 250.1725-1730 for $6,245,000;
3. clear the seafloor in accordance with 30 CF.R. §§ 250.1740-1743 for $6,535,000;
3. remove pipelines in accordance with 30 CF.R. §§ 250.1750-1754 for $3,000,000; and
4. remove contaminated soil in accordance with 30 CF.R. § 250.300.[10]

Schedule A concludes by stating "Total Cost Estimate: $666,280,000."[11]

The Trust Agreement provides a mechanism for making disbursements from the Trust Account "for the actual costs of the Work performed and costs incurred to satisfy the Obligations, [but these disbursements] cannot exceed the cost estimates

---

[8] *See* 30 C.F.R. § 556.904 (Lease-specific abandonment accounts); Answer at 2; *see generally* 30 C.F.R. Part 556, Subpart I (Bonding).
[9] *See* 30 C.F.R. § 556.904(a)(2) ("You must fully fund the lease-specific abandonment account to cover all cases of leases abandonment and site clearance as estimated by BOEM.").
[10] Trust Agreement Schedule A.1 through A.5; *see* Trust Agreement § 1.2(d) (Obligations defined).
[11] Trust Agreement Schedule A at AR 590; *see* 30 C.F.R. § 556.904(a)(2) ("You must fully fund the lease-specific abandonment account to cover all decommissioning costs as estimated by BOEM within the timeframe the Regional Director prescribes.").

shown in Schedule A."[12] It also allows for partial disbursements of up to half the estimated cost of the Work when an executed contract is presented to BOEM for that Work, with the remaining half to be disbursed when that Work is completed.[13]

The Disbursement Agreement establishes special procedures for approving and making Trust Account disbursements for well decommissioning, pipeline decommissioning, platform decommissioning, and other Obligations under the Trust Agreement.[14] Of particular importance here, it addresses downtime for drilling rigs engaged in well decommissioning by adjusting their daily rig fee "on an equal proportionate basis to each day the rig operated on a [Taylor] well," which entitles Taylor to an "additional disbursement for the rig fee for each day the rig operated on that well, *provided*, that the total disbursement for any well shall not exceed $25,500,000."[15]

The Bond Agreement specifies that making all deposits required of Taylor "will be considered compliance with the [Supplemental Bond Order for $200,000,000, dated November 30, 2007, and the Areawide Bond Order for $466,280,000, dated March 10, 2009]."[16] It requires Taylor to make an initial deposit of $400,000,000, followed by supplemental deposits on June 3, 2008 ($38,250,000), March 23, 2009 ($150,000,000), September 8, 2009 ($3,000,000), and September 21, 2009 ($75,030,000).[17] As to insurance, it states:

> Taylor will seek reimbursement from available insurance policies of all funds it spends performing the performing the work required under the [approved plan to complete the Obligations set forth in Schedule A]. Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies, but the amount of the deposit required in section 2.3 shall reflect an offset equivalent to the

---

[12] Trust Agreement, § 4.1 (Disbursements for Obligations performed); *see id.* § 4.3 (Payment of Obligation Costs in Excess of the "Schedule A" Cost Estimates).
[13] *Id.* §§ 4.1 (Disbursements for Obligations performed), 4.2 (Partial Payments for Work Phase completion).
[14] Disbursement Agreement Parts I (Well Decommissioning), II (Pipeline Decommissioning), III (Platform Decommissioning), and IV (Other Obligations).
[15] *Id.* Part I.D.1; *see* Trust Agreement Schedule A.1 ("$25,500,000 per well").
[16] Bond Agreement § 2.5.
[17] *Id.* §§ 2.1 to 2.3; Trust Agreement § 2.2 (Funding of Trust Agreement); SOR at 7; Answer at 3, 5 n.2; Reply at 3.

amount designated for work in Schedule A when that work is completed with funds from any source.[18]

Thus, if Work was completed before a supplemental deposit was due, Taylor was entitled to reduce its mandatory deposit by "the amount designated for work in Schedule A."[19]

*Taylor's Proposal and Request for Offsets under the Agreements*

Taylor secured contracts, began decommissioning work, submitted insurance claims required by the Bond Agreement, and requested disbursements from its Trust Account under the Trust Agreement. Prior to the due date for making its final supplemental deposits under the Bond Agreement, Taylor completed pipeline decommissioning, requested and received disbursements of $3 million from its Trust Account for that work, and later received $1.25 million in insurance proceeds to reimburse it for its decommissioning costs.[20] BOEM initially sought to "claw back" $1.25 million of the $3 million in Trust Account disbursements, but it did not pursue the matter once it realized the actual cost to decommission the pipeline exceeded both disbursements and insurance proceeds for that work.[21]

---

[18] Bond Agreement § 2.4; *see* Trust Agreement § 4.1 ("No disbursements will be given for amounts reimbursed to [Taylor] by insurance proceeds.").

[19] *Id.*; *see* SOR at 2 ("To account for the fact that Taylor might complete some of the specified decommissioning work before the later installments were due, the Bond Agreement provided for an 'offset' of later installment deposits for any work completed prior to the date those deposits were due. The offset provision recognized that there would be no need to 'secure' funds for the performance of specified decommissioning work that Taylor had already paid for and performed."), 15 ("*BOEM would not need* to ensure 'compliance' of an obligation already performed").

[20] *See* SOR at 3; Answer at 18 n.6.

[21] *See* Answer at 13-14; Letter from BOEM dated May 22, 2009, at AR 368 ("[If Taylor's] actual costs exceed the maximum amount of Trust disbursements permitted by the Trust Agreement for a particular activity, then [Taylor] may retain insurance proceeds equal to the costs greater than the disbursement. In that situation, there is no duplication of payments[.]"); Taylor Letter dated Nov. 2, 2011, AR 45 ("BOEM and Taylor are in agreement that Taylor is *entitled to receive the full amount of disbursements* to which it is entitled under the Trust Agreement for an activity if it can demonstrate that the total cost of the work completed exceeds the total allowable Trust Account disbursement for that activity by an amount that is greater than the insurance proceeds Taylor received for that same work.").

By letter dated August 13, 2009, Taylor informed BOEM it received an additional $62.6 million in insurance proceeds that might arguably be associated with some of its work under the Trust Agreement, adding that the situation was complicated by its insurer not identifying whether and to what extent these insurance payments were made for decommissioning work required by the Trust Agreement.[22] Taylor then proposed to make all supplemental deposits under the Bond Agreement without any insurance offsets, in return for its keeping all insurance proceeds and all disbursements under the Trust Agreement (*e.g.*, no "claw back" of potentially duplicative disbursements).[23] Characterizing the Agreements as creating a "zero-sum game," Taylor claimed its proposal would simplify implementation of the Trust Agreement and avoid a "meticulous and time-consuming effort" to determine whether and, if so, how much of its insurance proceeds duplicated past or future disbursements for the same work.[24]

### BOEM's 2009 Decision

In its 2009 Decision, BOEM "declined to accept" Taylor's proposal or to apply its insurance proceeds as an offset to its final supplemental deposits under the Bond Agreement.[25] BOEM stated Taylor was not entitled to any offset because it "has not yet completed any phase of the 'work,' as defined by the Trust Agreement."[26] In addition, BOEM stated it could "claw back" disbursements that are "later duplicated by insurance proceeds," but it did not then attempt to "claw back" any such disbursements from Taylor.[27]

Taylor made its supplemental deposits under the Bond Agreement "in full, under protest," based on BOEM's denial of its entitlement to any offsets.[28] Taylor timely appealed from the 2009 Decision; the Board initially suspended its consideration of this appeal by Order dated November 5, 2009.

---

[22] *See* Taylor Letter dated Aug. 13, 2009 (Taylor Proposal), AR 359-63, at 4.
[23] *Id.*
[24] *Id.* at 4, 5.
[25] *See* 2009 Decision at 1.
[26] *Id.* at 2.
[27] *Id.; see id.* at 1 ("[T]he reimbursement of insurance proceeds is *not due* until [BOEM] confirms duplication of Trust [Account] funds disbursement and insurance proceeds" (Emphasis added)), 3 ("If [BOEM] determines that there has been a duplication of insurance proceeds and Trust Account disbursements, [it] will order repayment to the Trust Account"); *see also* Answer at 14, 16; SOR at 4, 9.
[28] Taylor Letters to BOEM dated Sept. 10 and 21, 2009, AR 348 and 354.

IBLA 2010-12 & 2012-70

*Developments after the 2009 Decision*

Following issuance of the August 2009 decision, Taylor continued with its decommissioning work, completing the plugging and abandonment of nine wells, removing the platform deck and flare boom, and completing the removal of seafloor obstructions and debris. Taylor certified the completion of this decommissioning work, and BOEM, upon request, disbursed funds from the Trust Account to reimburse Taylor for its associated costs.[29]

As its decommissioning work proceeded, Taylor agreed with BOEM and BSEE, on occasion, to temporarily suspend its work pending assessment of associated risks. During the periods of suspension, Taylor incurred downtime costs associated with its decommissioning rig, used in drilling the IWs necessary for plugging and abandoning the nine existing wells.[30] The decommissioning rig remained under contract with Taylor's drilling contractor, and Taylor was required to pay its contractor for downtime costs. Daily rates were incurred during periods of "down time" when the rig sat idle, including when Taylor was prohibited from operating the rig during hurricane season. There is no question that the Agreements provide for disbursement of funds from the Trust Account for downtime costs.

By letter dated August 15, 2011, Taylor submitted a request for disbursement of Trust Account funds, in the total amount of $13,057,394.12, for the rig downtime costs, pursuant to Article IV of the Trust Agreement and section 1.D. of the Disbursement Agreement.[31] Taylor "certifie[d] that in relation to the 5 completed wells in the well phase of the Plan (contained in Schedule A, item 1) that are included in this [request] . . . the work was conducted and costs incurred[.]"[32] BOEM preliminarily denied the request in an August 19, 2011, letter, because the total amount already disbursed from the Trust Account for plugging and abandoning the nine wells ($218,083,723), together with the insurance proceeds already paid to Taylor ($91,430,819.90) totaled $309,514,542.90, which exceeded its actual decommissioning costs for these wells ($300,350,976.48), resulting in a Trust Account "overpayment" to Taylor of $9,163,566.42.[33] It specifically noted "Taylor

---

[29] *See* SOR at 11.
[30] *Id.*
[31] *See* Taylor Letter to BOEM dated Aug. 15, 2011, AR 289.
[32] *Id.*
[33] BOEM Letter to Taylor, dated Aug. 19, 2011, AR 274 ("Due to the overpayment of compensation[,] . . . Taylor will not receive further BOEM[] disbursements pursuant to the Trust Agreement for these nine completed intervention wells, including the disbursement for [rig downtime costs].").

may be required by the Regional Director to fund the [Trust Account] in the sum of $9,163,566.42" and that rig downtime costs were "appropriately accounted for in [BOEM's] Schedule A" as "well costs."[34]

Taylor sought to establish by letter dated September 6, 2011, that its actual decommissioning costs were greater than previously documented by at least $27,555,783.37, but it did not seek disbursement of Trust Account funds for any of that work.[35] Rather, it sought to establish that BOEM wrongly concluded in its August 19, 2011, letter, that Taylor's actual costs were less than the total of Trust Account funds disbursed and insurance proceeds received. Taylor therefore renewed its request for rig downtime costs, $13,057,394.12, less a rig credit of $2,623,489, for a net Trust Fund disbursement of $10,433,905.12.

BOEM responded to Taylor's renewed disbursement request by asking it to resubmit supporting documentation "in a well-specific manner" so that "each cost is clearly associated with a well."[36] Taylor replied by resubmitting its August 2011 disbursement request, accompanied with a detailed explanation of "why Taylor is entitled to the amount requested in the August 15, 2011 disbursement request."[37] Taylor asserted BOEM properly included insurance proceeds of $7,599,729.05 for Authorization for Expenditure (AFE) 28040 on its Schedule A but erroneously omitted the $40,934,233.31 in Costs Incurred for that AFE, "which provided the basis for Taylor's claims for [those] insurance proceeds."[38] It explained its costs were not "specifically allocated to each well as it is not practical to do so nor is it necessary since all costs relate, in the aggregate, to the relief well effort."[39] However, Taylor "substantiated" only $27,555,783.37 of these added costs,[40] by providing proof of full payment for all such costs, including checks or electronic payments to vendors.[41]

---

[34] Id.
[35] See Taylor letter to BOEM dated Sept. 6, 2011, AR 71.
[36] BOEM email to Taylor dated Sept. 9, 2011, AR 68.
[37] Taylor Letter to BOEM dated Nov. 2, 2011, AR 28.
[38] Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 4, AR 36; see id. at 3-4, AR 35-36.
[39] Id. at 3, AR 35; see id. ("It makes no difference if the costs are allocated to the nine wells individually or reflected in total since the total costs for the relief activity will equal $341,285,209.72 under either method.").
[40] See id. at 4-5, AR 36-37; see also id. at 4 n.1 (BOEM omitted other, "relatively small," costs incurred by Taylor), 5 ("Taylor could support the full approximately $40 million in costs that BOEM improperly excluded from [Costs Incurred].").
[41] See Trust Agreement, § 4.2 ("Prior to release of funds for completion of . . . Work, proof of full payment to all contracts may be required."); Disbursement Agreement

Taylor explained it was "entitled to the full amount of its requested disbursement for the relief well effort [related to the nine wells] because it is still entitled to the disbursements up to the Trust [Account] Allocation limit [in Schedule A] and further because the total of its actual costs far exceeds the Trust [Account] Allocation limit plus insurance proceeds."[42] According to Taylor:

> BOEM and Taylor are in agreement that Taylor is entitled to receive the full amount of disbursements to which it is entitled under the Trust Agreement for an activity if it can demonstrate that the total cost of the work completed [$327,906,759.85] exceeds the total allowable Trust Account Disbursement for that activity [$229,500,000] by an amount that is greater than the insurance proceeds received for that same work [$91,430,819.90].[43]

In effect, Taylor argued that it incurred costs to drill these nine wells that were sufficient to entitle it to the insurance proceeds *and* the entire Schedule A amount for the nine wells.

### *BOEM's 2011 Decision*

BOEM denied Taylor's resubmitted request for an additional disbursement due to adjusted rig downtime costs on November 7, 2011. BOEM concluded that additional Trust Account disbursements of $14,039,766.00 could be made for rig downtime costs for five of the nine wells (IW-4, IW-10, IW-11, IW-13, and IW-17) because their disbursements had not yet reached the $25.5 million per well cap.[44] However, BOEM determined Taylor was required to return $17,920,228.74 of the $25.5 million in disbursements from the Trust Account for one of these nine wells (IW-21) because it had been overcompensated by that amount due to its receipt of insurance proceeds that were allocated to the plugging and abandoning of that well.

---

Part V. A.1 ("[Taylor] will provide documentation, including copies of checks or proof of electronic payment to vendors, to support each request for disbursement of Trust Funds when the work pursuant to any AFE is completed.").

[42] Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 4, AR 48.
[43] *Id.* at 1.
[44] 2011 Decision at 2.

IBLA 2010-12 & 2012-70

Since the amount Taylor needed to return was more than it was entitled to receive for rig downtime costs, BOEM denied Taylor's request.[45]

In reaching its conclusion regarding excess disbursements, BOEM started with the schedule attached to its denial of Taylor initial request for rig downtime costs, which showed Costs Incurred for all nine wells totaling $300,350,976.48.[46] BOEM "accepted" $27,555,783.37 in additional costs that were substantiated by Taylor in requests dated September 6 and November 2, 2011, which then totaled $327,906,759.87.[47] BOEM allocated these added costs equally to all nine wells, as well as insurance proceeds already received for that additional work, because "Taylor has repeatedly stated that the $27+ million in costs . . . applies equally to all wells."[48]

BOEM determined total disbursements made to date with respect to each of the nine wells. BOEM calculated that disbursements for three wells (IW-1, IW-16, and IW-19) reached the $25.5 million per well cap; disbursements for five wells (IW-4, IW-10, IW-11, IW-13, and IW-17) were less than the cap: and that disbursements for one well (IW-21) exceeded the cap. BOEM concluded, "but for the situation arising out of IW 21, BOEM could disburse to Taylor the amounts representing the differences between the maximum permitted and the amount already disbursed," $14,039,766.99, which was more than the amount requested by Taylor.[49]

BOEM noted the IW-21 well received disbursements from the Trust Account that totaled its $25.5 million cap,[50] yet it was entitled to only $7,579,771.26 under the Agreements because of Taylor's insurance proceeds,[51] which meant Taylor had been overcompensated by $17,920,228.74:

---

[45] Id. at 3; See SOR at 11 ("The issues in the 2009 Decision did not become completely relevant until BOEM denied Taylor's disbursement requests in the 2011 Decision.").
[46] Id. at 2 (citing BOEM Letter to Taylor dated Aug. 19, 2011, Schedule A, AR 276).
[47] Id.
[48] Id.; see Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 3, AR 35).
[49] 2011 Decision at 2; see Answer at 19-20.
[50] See Answer at 19 ("Th[e] over-disbursement [of $25.5 million] may have occurred because IW 21 was the first IW completed, therefore the full $25.5 million may have been disbursed before Taylor had received all its insurance proceeds.").
[51] See Trust Agreement, § 4.1 (Disbursements for Obligations performed) ("No disbursements will be given for amounts reimbursed to [Taylor] by insurance proceeds.").

IBLA 2010-12 & 2012-70

Since the amount Taylor needed to return was more than it was entitled to receive for rig downtime costs, BOEM denied Taylor's request.[45]

In reaching its conclusion regarding excess disbursements, BOEM started with the schedule attached to its denial of Taylor initial request for rig downtime costs, which showed Costs Incurred for all nine wells totaling $300,350,976.48.[46] BOEM "accepted" $27,555,783.37 in additional costs that were substantiated by Taylor in requests dated September 6 and November 2, 2011, which then totaled $327,906,759.87.[47] BOEM allocated these added costs equally to all nine wells, as well as insurance proceeds already received for that additional work, because "Taylor has repeatedly stated that the $27+ million in costs . . . applies equally to all wells."[48]

BOEM determined total disbursements made to date with respect to each of the nine wells. BOEM calculated that disbursements for three wells (IW-1, IW-16, and IW-19) reached the $25.5 million per well cap; disbursements for five wells (IW-4, IW-10, IW-11, IW-13, and IW-17) were less than the cap: and that disbursements for one well (IW-21) exceeded the cap. BOEM concluded, "but for the situation arising out of IW 21, BOEM could disburse to Taylor the amounts representing the differences between the maximum permitted and the amount already disbursed," $14,039,766.99, which was more than the amount requested by Taylor.[49]

BOEM noted the IW-21 well received disbursements from the Trust Account that totaled its $25.5 million cap,[50] yet it was entitled to only $7,579,771.26 under the Agreements because of Taylor's insurance proceeds,[51] which meant Taylor had been overcompensated by $17,920,228.74:

---

[45] Id. at 3; See SOR at 11 ("The issues in the 2009 Decision did not become completely relevant until BOEM denied Taylor's disbursement requests in the 2011 Decision.").
[46] Id. at 2 (citing BOEM Letter to Taylor dated Aug. 19, 2011, Schedule A, AR 276).
[47] Id.
[48] Id.; see Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 3, AR 35).
[49] 2011 Decision at 2; see Answer at 19-20.
[50] See Answer at 19 ("Th[e] over-disbursement [of $25.5 million] may have occurred because IW 21 was the first IW completed, therefore the full $25.5 million may have been disbursed before Taylor had received all its insurance proceeds.").
[51] See Trust Agreement, § 4.1 (Disbursements for Obligations performed) ("No disbursements will be given for amounts reimbursed to [Taylor] by insurance proceeds.").

> Costs Incurred for IW 21 were $58,851,826.46, but Taylor received insurance proceeds of $51,272,055.20 for IW 21, leaving it eligible for the difference of $7,579,771.26 to be disbursed from the Trust [Account]. But, Taylor has already received the full $25,500,000 for IW 21. Therefore, when Taylor should have received only $7+ million from the Trust [Account] for IW 21, it received $25,500,000, and *the difference between these two numbers – $17,920,228.74 – represents an overpayment to Taylor, which is owed to the Trust [Account]*. When combined with a Rig Credit of $2,623,489.00, owed to the Trust [Account] [by reason of prior disbursements from the Trust Account], a total of $20,543,717.74 is owed back to the Trust [Account].[52]

In sum, Taylor was entitled to rig downtime costs of $14,039,766.99 from the Trust Account for 5 wells, but it owed the Trust Account, $20,543,717.74, for this well. BOEM therefore denied Taylor's request for disbursement of rig downtime costs but stated it was not then demanding Taylor to "pay into the Trust [Account] the overage amount of $6,503,951.74."[53]

Taylor timely appealed from the 2011 Decision. The Board initially suspended its consideration of this appeal by Order dated April 2, 2012. Taylor reported that its Trust Account had a balance of "over $432 million" on May 27, 2016, which was significantly more than the BOEM estimate to complete all remaining Obligations under the Trust Agreement (*i.e.*, plug and abandon 16 wells for $408 million ($25.5 million per well) and remove contaminated soil for $13 million).[54]

*DISCUSSION*

These consolidated appeals raise two basic questions: (1) whether Taylor was entitled to an offset of its supplemental deposits under the Bond Agreement; and (2) whether Taylor was entitled to additional Trust Fund disbursements for rig downtime costs under the Disbursement and Trust Agreements. We first identify the legal standards applicable to our interpreting these Agreements and then address the issues raised on appeal.

---

[52] 2011 Decision at 3 (emphasis added) (footnotes omitted).
[53] *Id.*
[54] SOR at 23; *see* Reply at 5; Trust Agreement Schedule A.1, A.5.

*I. Legal Standards for Interpreting Contracts*

[1] The Agreements were entered into by and between Taylor and the United States of America.[55] As such, they are treated the same as any contract wholly between private parties that are subject to common-law principles of contract law, which are equally binding on the United States.[56] As we held with respect to a Federal oil and gas lease: "The Board's task when faced with the construction of a lease is to determine and give effect to the intent of the parties as disclosed by the language used, construing the document as a whole and ascribing to the contract language its ordinary and commonly accepted meaning."[57] The intent found within the four corners of their contract will control unless its provisions are ambiguous (*i.e.*, "'reasonably susceptible to at least two different meanings'").[58] In adjudicating contract disputes between a bureau of the Department and a private party, it is for this Board to interpret contract language, terms, and conditions, as we owe no deference to a bureau's "technical determinations" or "legal interpretations" because it is our interpretation of the law, facts, and contract that is entitled to deference by the Federal Courts.[59] In other words, the Board exercises *de novo* review in reading,

---

[55] *See* Trust Agreement at 1 ("[the United States] acting by and through [BOEM]"); Disbursement Agreement at 1 ("[the United States] acting by and through [BOEM]"); Bond Agreement at 1 ("the United States] through its authorized officer, The Regional Director, Gulf of Mexico OCS Region, [BOEM].").

[56] *See* Answer at 12; *El Paso Natural Gas Col.,* 156 IBLA 330, 336 (2002); *Eason v. BLM,* 166 IBLA 292, 295 (2005); *PetroCorp,* 152 IBLA 77, 84 (2000); *ASARCO, Inc.,* 116 IBLA 120, 126 (1990); *Walch Logging, Co., Inc. v. Ass't Area Director,* 90 I.D. 88, 95, 11 IBLA 85 (1983); *see also Mesa Air Group, Inc. v. Department of Transportation,* 87 F.3d 498, 503-04 (D.C. Cir. 1996); *Rosebud Coal Sales Co., Inc. v. Hodel,* 667 F.2d 949, 951 (10th Cir. 1982).

[57] *Linmar Petroleum Co.,* 153 IBLA 99, 106 (2000) (citations omitted); *accord Priority Energy, LLC,* 186 IBLA 363, 386 (2015); *see Eason v. BLM,* 166 IBLA at 295; *Koniag, Inc.,* 135 IBLA 41, 47 (1996); *Goldman, Sachs & Co. v. City of Reno,* 747 F.3d 733, 743 (9th Cir. 2014), *cert. denied,* 135 S. Ct. 477 (2014).

[58] *Eason v. BLM,* 166 IBLA at 295 (quoting *Corbin on Contracts,* § 24.7 (1998)); *see id.* ("[A]mbiguity does not exist merely because the two parties disagree as to the meaning of a term."); *William J. Thoman,* 155 IBLA 266, 267 (2001).

[59] *Statoil Gulf of Mexico LLC,* 42 OHA 261, 289 (2011) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984)); *see* Answer at 11 (citing *Shamrock Metals, LLC,* 184 IBLA 1, 3-4 (2013) and *IMC Kalium Carlsbad, Inc. v. Interior Board of Land Appeals,* 206 F.3d 1003, 1009-10 (10th Cir. 2000)).

interpreting, applying, and issuing a final decision for the Department on the proper interpretation of that contract

## II. Taylor was Not Entitled to an Offset of its Supplemental Trust Fund Deposits under the Bond Agreement.

BOEM stated it did not believe Taylor was entitled to any offset of its supplemental deposits under the Bond Agreement because "Taylor has not yet completed any phase of the 'Work,' as defined by the Trust Agreement."[60] It then rejected Taylor's proposal to keep all insurance proceeds and disbursements (in lieu of taking any deposit offset) because "[Taylor] may only retain insurance proceeds if they do not duplicate a disbursement that has been made from the Trust Account."[61] BOEM reasoned that by requiring Taylor "to forego disbursements for amounts reimbursed by its insurance company," BOEM is compensated "for the risk it has taken that [Taylor] will be unable to complete the work required by the agreements, and [BOEM] will need to complete it, likely at a higher expense than anticipated by the agreements."[62]

Taylor claims it was entitled to an offset under the Bond Agreement because it "fully completed one commitment and an agreed-upon interim completion of a second obligation prior to the deadlines to make supplemental deposits[.]"[63] BOEM agrees with Taylor that it completed pipeline decommissioning under the Trust Agreement, for which it received Trust Fund disbursements of $3 million and $1.25 million in insurance proceeds, but since it received the full disbursement under Trust Agreement Schedule A.4 ($3,000,000), no "offset" and reduction in funding was required or permitted under the Bond Agreement.[64] As to Taylor's claim to an

---

[60] 2009 Decision at 2.
[61] Id. (citing Bond Agreement § 2.4 and Trust Agreement § 4.1); see id. ("[If a Trust Fund disbursement] is later duplicated by insurance proceeds, [Taylor] must return that disbursement.").
[62] Id. at 2-3; but see Trust Agreement § 4.3 (Individual costs incurred in the performance of Obligations in excess of the amounts shown on Schedule A shall be the full responsibility of [Taylor], and no Trust Funds shall be disbursed to cover any such costs."); Bond Agreement § 2.8 ("[BOEM retains the] right to require additional bonding to guarantee performance of Taylor's obligations to plug and abandon the wells . . . ").
[63] SOR at 3; see id. at 9 ("BOEM concurred with Taylor's certification of the completed work (save the one step for IW-21 to be completed at a later date), and authorized disbursement to Taylor corresponding funds from the Trust Account.").
[64] See Answer at 13-14; see Trust Agreement Schedule A.4 ($3,000,000).

"offset" for interim completion of the IW-21 Well, BOEM stated no offset was warranted until the decommissioning of that well is "completed."[65]

   A. *Taylor was Not Entitled to an Offset Based on Pipeline Decommissioning.*

We read the Trust and Bond Agreements as reflecting the parties' intent to ensure that Trust Funds would be available to pay the estimated cost to complete all work under the Trust Agreement. Simply stated, total deposits under the Bond Agreement for completing all Obligations under the Trust Agreement ($666,280,000) equaled the amount estimated by BOEM in its 2008 Areawide Bond ($466,280,000) and 2007 Supplemental Bond ($200,000,000) Orders.[66] As work is completed under the Trust Agreement, disbursements are made to Taylor up to the estimated cost of the Work, which would reduce the corpus of the Trust Fund by no more than that cost estimate, leaving sufficient funds to make disbursements when all other Work is completed. As Taylor correctly states in reply, the intent of the parties in the Agreements is for the Trust Account always to "have a declining balance."[67]

   Section 2,3 if the Bond Agreement states:

> Taylor will seek reimbursement from available insurance policies of all funds it spends performing the work required under [Trust Agreement Schedule A]. Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies, but the amount of the deposits required section 2.3 shall reflect an offset equivalent to the amount designated for work in Schedule A when that work is completed with funds from any source.

We read Bond Agreement § 2.4 as addressing what happens if an Obligation under the Trust Agreement is completed with insurance proceeds before a supplemental deposit need be made to the Trust Fund. Thus, a supplemental deposit could be offset by those insurance proceeds because no Trust Funds would be disbursed for that same work. Since the Trust Fund disbursed the full amount available under Trust Agreement Schedule A.4 ($3 million), there were no Obligations to offset with insurance proceeds under the Bond Agreement.[68] Although pipeline

---

[65] Answer at 16; *see id.* at 18 (quoting SOR at 9); *supra* note 50.
[66] *See* Bond Agreement, §§ 1.1, 1.5, 2.1, 2.2, 2.3; Trust Agreement.
[67] Reply at 4.
[68] Trust Agreement § 4.1 ("[Trust Fund disbursements are made] based upon a corresponding reduction of the Obligations in accordance with Schedule A."); *see id.* § 1.2(d) ("'Obligations' shall mean the duties and costs of [Taylor,] as set forth in

decommissioning costs were more than $4.25 million, the Trust Agreement clearly states Taylor is "fully responsible" for all pipeline decommissioning costs that exceed $3 million.[69] Thus, under our reading of the Agreements, Taylor could retain and use insurance proceeds to defray costs that exceed available disbursements under the Trust Agreement, but not to offset supplemental deposits under the Bond Agreement. Allowing an offset here for the $1.25 million Taylor received in insurance proceeds? would underfund the Trust Fund, leaving $1.25 million less in the Trust Fund to cover the estimated cost to complete all remaining work and satisfy all Obligations under the Trust Agreement. Although this appears to be the crux of Appellant's claim on appeal, we find no support for that result from our reading of the Agreements and, therefore, conclude that Taylor was not entitled to a deposit offset based on its receipt of insurance proceeds to decommission its pipelines.

  B. *Taylor was Not Entitled to an Offset Based on Partially Completed Work on the IW-21 Well.*

  Taylor claims it was entitled to an offset for the "agreed-to interim completion of IW-21," an intervention/relief well for plugging and abandoning the A-21 well.[70] The Bond Agreement states Taylor is entitled to offset its supplemental deposits "equivalent to the amount designated for work in Schedule A when that work is completed with funds from any source" (*e.g.*, Trust Fund disbursements, insurance proceeds, or retained earnings).[71] Until work is completed and an Obligation is satisfied under the Trust Agreement, there can be no offset under the Bond Agreement. In this case, there is no indication that the IW-21 Well was permanently plugged and abandoned, a condition precedent to Taylor claiming an offset for that work. We therefore conclude that Taylor was not entitled to a deposit offset under the Bond Agreement based on its interim completion of the IW-21 Well.

  Although its work at the IW-21 Well was not yet complete, Taylor claims it was nonetheless entitled to a deposit offset for completing "a phase of the Work" under the Trust Agreement.[72] According to Taylor, a phase of work includes entering

---

Schedule A attached hereto arising pursuant to the terms of the Leases and applicable federal regulations related to such Leases.").
[69] Trust Agreement § 4.3, Payment of Obligation Costs in Excess of the "Schedule A" Cost Estimates; *see* Trust Agreement Schedule A.4 (Remove decommissioned pipelines - $3,000,000).
[70] SOR at 16; *see supra* note 6.
[71] Bond Agreement § 2.4.
[72] SOR at 18 (citing Trust Agreement § 4.2); *see* Trust Agreement § 4.2, Partial Payments for Work Phase completion ("Upon [Taylor]'s presentation to [BOEM] of

into a drilling rig contract for a particular well, which meant it was entitled to an offset of up to $12,750,000 for that phase of the work on the IW-21 Well.[73] Regardless of its entitlement to a partial payment under the Trust and Disbursement Agreements, we do not find Taylor was entitled to an offset under the Bond Agreement. We do not read their partial payment provisions as being the same as or equivalent to "completed" work under the Bond Agreement or that such was the intent of the parties when they entered into the Agreements.[74] We therefore reject Taylor's claimed entitlement to an offset based on its completing only part of the work and only partially satisfying its Obligations under the Trust Agreement.

    *III. Taylor was not Entitled to Trust Fund Disbursements for Rig Downtime.*

BOEM agrees Taylor is entitled to disbursements from the Trust Account for rig downtime costs because they are legitimate decommissioning expenses under the Agreements. But it denied Taylor's request to disburse Trust Account funds as reimbursement for these costs because it found "Taylor was actually overcompensated by the Trust [Account] in the amount of $6,503,951.74 for plugging and abandonment work so far completed" under the Agreements.[75]

Based on its allocation of costs between the nine wells that were decommissioned by the time of its 2011 Decision, including the roughly $27.5 million in additional costs substantiated by Taylor on September 6 and November 2, 2011, BOEM found Taylor incurred costs of $58,851,826.46 for plugging and abandoning the IW-21 well. BOEM also found, by engaging in a similar allocation of insurance proceeds for the additional work substantiated by Taylor, that it received a total of $51,272,055.20 in insurance proceeds for the plugging and abandonment of the IW-

---

an executed contract for a phase of the Work as identified in the Plan, [Taylor] shall be entitled, with the written concurrence of [BOEM], to receive one-half (1/2) of the sums allocated for such Work in Schedule A, which shall be released from the Trust Funds to [Taylor].").

[73] SOR at 18 (quoting Disbursement Agreement); *see* Disbursement Agreement § 1.A ("At the time that [Taylor] executes a contract for drilling rig, thereby becoming legally bound to make all payments required under that contract, it may submit a request for disbursement of one-half of the cost for the drilling rig for the full term of the contract.").

[74] *See* Answer at 18 ("As Taylor admits in its SOR [at 9], at the time of the 2009 Decision, Taylor had 'completed *all but one step* to plug and abandon the first well[.] Therefore, as Taylor had not yet completed a phase of work, it could not take an offset against its supplemental deposit.").

[75] Decision at 3.

21 well. Thus, insurance proceeds covered the total costs for decommissioning the IW-21 well except for $7,579,771.26. But since the Trust Account had disbursed $25,500,000 to Taylor for that work, BOEM determined the Trust overcompensated Taylor for decommissioning the IW-21 well under the Trust Agreement by the difference, $17,920,228.74.

Taylor argues that it is entitled, under the Disbursement Agreement, to the requested disbursement for rig downtime costs, "[s]ince [it] received less than the allotted $25.5 million from Trust [Account] disbursements on *these five wells* [IW-4, IW-10, IW-11, IW-13, and IW-17] that Taylor plugged and abandoned."[76] Taylor requested "additional disbursements for *these wells* for rig down[]time in an amount of $10,433,905.12."[77] But Taylor ignores the fact that it was required to reimburse the Trust Account $17,920,228.74 for overcompensation on the IW-21 well. Under the Agreements before the Board, we conclude that BOEM correctly determined Taylor was not entitled to additional disbursements from the Trust Account for these nine wells.

Taylor was entitled by the Agreements to reimbursement of its substantiated costs to plug and abandon the IW-21 well to the extent they exceed insurance proceeds for that work, which was only $7,579,771.26. But since Taylor had already been reimbursed the maximum allowed by the Trust Agreement for that well, $25,500,000,[78] BOEM properly determined under the Agreements that Taylor was required to return the difference to the Trust Account, $17,920,228.74, as overcompensation or an overpayment. When the rig credit of $2,623,489 that Taylor admittedly owed the Trust Account is added to that amount, Taylor then owed

---

[76] SOR at 19 (emphasis added).
[77] *Id.*; *see id.* at 23 ("Under the plain language of the Trust Agreement, Taylor is entitled to reimbursement of the[] [rig downtime] costs because the total 'compensation' to Taylor is less than $25.5 million for the IW-4, 10, 11, 13, and 17 wells.").
[78] *See* Answer at 19 ("Because of th[e] prohibition [of duplicative disbursements and insurance proceeds], for work done on IW 21, BOEM had authority to disburse only the difference between actual costs and the amount reimbursed by insurance proceeds."), 22 ("[I]f Taylor received insurance proceeds for Schedule A work on a particular well, but then received the full $25.5 million disbursement for the same well, any amount of the disbursement that was duplicated by the insurance payment would need to be returned to the Trust. For example, if Taylor expended $55.5 million on a well and received $50 million in insurance proceeds for that well, it would be entitled to only the difference, *i.e.*, $5.5 million, from the Trust. . . . [I]t would have to repay the Trust $20 million.").

the Trust Account $20,543,717.74. Offsetting that amount by the $14,039,766 in rig downtime costs to decommission five wells (IW-4, IW-10, IW-11, IW-13, and IW-17), leaves Taylor owing $6,503,951.74 to the Trust Account.

BOEM's 2009 and 2011 Decisions reflect a proper construction of the Agreements. BOEM interpreted the Agreements as requiring the Trust Account to remain fully funded. As BOEM states:

> The funds in the Trust Account are encumbered funds, to be used to fulfill Taylor's decommissioning obligations – obligations Taylor knowingly assumed when it became a lessee on its . . . [OCS] leases. . . . BOEM has no access to the Trust [Account] funds for its own use. The money can only be expended to decommission the [offshore] . . . site. Withholding money in the Trust [Account] actually benefits Taylor by putting at Taylor's disposal funds to continue decommissioning the [offshore] . . . site, because Taylor continues to be obligated to do so.[79]

The ultimate aim of the Trust Account is to ensure that, regardless of the future financial solvency of Taylor or the availability of insurance proceeds from Taylor's private insurer, all of the work necessary to remove, plug and abandon, and otherwise fully decommission all of the wells, platform, pipeline, and other offshore facilities is completed. Once that work ends, the remaining funds in the Trust Account, including any and all funds that are not currently allocated to any future decommissioning work, will be returned to Taylor.[80] We thus conclude that the 2009 and 2011 Decisions fully comport with the plain language and intent of the Agreements.

## CONCLUSION

We conclude that the Regional Director properly denied Taylor's requests to retain insurance proceeds, together with disbursements, in lieu of offsetting them against the final supplemental deposits to the Trust Account. We further conclude that the Regional Director properly denied the disbursement of Trust Account funds for rig downtime costs related to the decommissioning of the Mississippi Canyon Blocks 20/21 and South Pass Block 73 platform, wells, pipeline, and other offshore facilities, situated on its OCS oil and gas leases.

---

[79] Answer at 3-17.
[80] See Reply at 2 ("[T]here are over $10 million of funds in the Trust Account allocated to the performance of none of the remaining obligations in Schedule A"), 5.

IBLA 2010-12 & 2012-70

     Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, we affirm both the 2009 Decision and the 2011 Decision.

/s/ James K. Jackson
James K. Jackson
Administrative Judge

I concur:

/s/ James F. Roberts
James F. Roberts
Acting Chief Administrative Judge