# EXHIBIT A

Receipt number 9998-5112487

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **TAYLOR ENERGY COMPANY LLC,** | * | **CASE NO.:**    18-1949 C |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **V.** | * | |
| | * | |
| **UNITED STATES DEPARTMENT OF THE** | * | |
| **INTERIOR, RYAN ZINKE, IN HIS OFFICIAL** | * | |
| **CAPACITY AS SECRETARY OF THE** | * | |
| **UNITED STATES DEPARTMENT OF THE** | * | |
| **INTERIOR, AND THE BUREAU OF** | * | |
| **OCEAN ENERGY MANAGEMENT,** | * | |
| | * | |
| **Defendants** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>COMPLAINT FOR BREACH OF CONTRACT</u>

Taylor Energy Company LLC ("Taylor Energy") files the following Complaint, through its undersigned counsel, against the United States Department of the Interior ("Interior") through the Interior Board of Land Appeals ("IBLA"), and through the Bureau of Ocean Energy Management ("BOEM," formerly known as the U.S. Minerals Management Service ("MMS")), in connection with the decommissioning of oil and gas facilities at Mississippi Canyon Block 20 ("MC20") in the Gulf of Mexico, and avers as follows:

### I.      PARTIES

1.      Plaintiff Taylor Energy is a Louisiana limited liability company with its principal place of business in New Orleans, Louisiana. Its sole member is Phyllis M. Taylor, a Louisiana resident domiciled in Orleans Parish, Louisiana.

EXHIBIT A

2.      Defendant United States Department of the Interior is the federal agency with authority, through the Secretary, to supervise and manage BOEM,[1] a successor agency to the MMS, the party that executed the Agreements defined below.

3.      Defendant Ryan Zinke is sued in his official capacity as Interior Secretary.  He is the chief officer of Interior charged with overseeing the proper administration and implementation of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333 ("OCSLA").  The IBLA makes decisions final for Interior on delegated authority from the Secretary.  43 C.F.R. § 4.1.

4.      Defendant BOEM manages the federal government's outer continental shelf oil and gas leasing program, and is the bureau with authority, pursuant to OCSLA, to ensure the financial state of lessees and to administer the Agreements, including requiring financial assurance from lessees and operators for, among other things, the decommissioning of their lease facilities.

## II.      JURISDICTION

5.      This Court has subject matter jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1).  The Tucker Act waives the Government's sovereign immunity and specifically authorizes suits against the Government for monetary damages resulting from its breach of contract.[2]

---

[1] The predecessor to BOEM is the Minerals Management Service ("MMS") of the DOI.  From mid-June 2010 to October of 2011, DOI renamed MMS the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").  On October 1, 2011, DOI replaced MMS with BOEM and another Bureau.

[2] Taylor Energy advises this Court that it has also filed a substantially similar lawsuit suit against the United States in the United States District Court for the Eastern District of Louisiana under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").  That suit was filed in an abundance of caution in the event jurisdiction in this Court under the Tucker Act is determined to be improper.  Taylor Energy intends to seek a stay of that APA proceeding pending this Court's determination of subject matter jurisdiction.

### III.     NATURE OF THE ACTION

6.     This is a breach of contract case involving the Government's incorrect interpretation of Agreements (as defined below) and its wrongful refusal to pay Taylor Energy $10,433,905.12, plus interest.

7.     This case involves two decisions by BOEM and affirmed by the IBLA denying Taylor Energy's requests for disbursement of Taylor Energy's funds under the Trust Agreement related to work performed and insurance proceeds received by Taylor Energy.   Specifically, BOEM issued (1) an August 28, 2009 decision ("2009 Decision") in which BOEM took the position that Taylor was required to: (a) deposit supplemental funds into the Trust Account; and (b) "reimburse" the Trust Account for "duplicative" insurance proceeds received, and (2) a November 7, 2011 decision ("2011 Decision") in which BOEM denied Taylor Energy's request for disbursement of Trust Account funds related to rig down time, a necessary cost related to securing a continuous contract for a drilling rig.   As required by 30 C.F.R. § 590.8, Taylor Energy timely appealed these two decisions before the IBLA, and both decisions were affirmed by the IBLA on October 29, 2018.

8.     The Government's decisions are contrary to the plain and clear terms of the Agreements and unlawfully withheld Taylor Energy's funds to "secure" obligations that Taylor Energy had already completed.   As a result of the IBLA Decision affirming the 2009 and 2011 Decisions of BOEM which were wrongfully decided, the United States has breached the Agreements and Taylor Energy is suffering and will continue to suffer monetary harm.

### IV.     RELEVANT FACTS

9.     Taylor Energy was the lessee and operator of: (a) the Outer Continental Shelf ("OCS") lease covering Mississippi Canyon Block 20, Lease OCS-G 04935 ("MC20 Lease");

and (b) part of two former OCS leases covering Mississippi Canyon Block 21 and South Pass Block 73, Lease OCS-G 15459 and Lease OCS-G 15371, respectively, on which a platform, 28 wells and associated facilities were located.

10.     Taylor Energy acquired its interest in the MC20 Lease dated effective December 1, 1981, by assignment from BP Exploration & Oil Inc. ("BP"), effective April 1, 1994.

11.     On September 16, 2004, Hurricane Ivan, a storm that alternated between a Category 4 and a Category 5 storm, struck the MC20 Site resulting in a massive seafloor shift that toppled the MC20 platform, scattered debris on and under the seafloor and severely damaged all of Taylor Energy's oil and gas wells at MC20.  As a result of the unprecedented seafloor collapse, the platform now lies about 550 feet down slope and southeast from its original location.  The associated well bores now rest in a tangled web buried under mud and sediment.  All production at MC20 permanently ceased several days before Hurricane Ivan hit in preparation for the storm.

12.     Taylor Energy, in collaboration with the responsible federal agencies, including BOEM, and the United States Coast Guard, promptly began efforts to identify a technologically feasible, safe, and unprecedented plan to decommission the MC20 facilities.  This plan involved drilling intervention wells which provided the only means of plugging and abandoning the wells.

13.     In furtherance of this goal, Taylor Energy and the United States, acting by and through the MMS, entered into three Agreements: (1) a March 19, 2008 Trust Agreement ("Trust Agreement"); (2) an Agreement to Provide Additional Bond ("Bond Agreement"); and (3) an Agreement between Taylor Energy and the MMS to Implement Article IV – Disbursements of the Trust Agreement ("Disbursement Agreement") (collectively referred to as "the Agreements") in 2008 to comply with OCSLA and federal regulations, and to secure a source of funds for

Taylor Energy's performance of its "Obligations" under the Trust Agreement to decommission the oil and gas facilities at MC20.

14.     Under the terms of the Agreements, Taylor Energy deposited $666,280,000 of its own funds into a Trust Account to cover the specific enumerated decommissioning "Obligations" at MC20 listed on Exhibit A to the Trust Agreement.  The Agreements specifically allocated the $666,280,000 to 29 separate commitments to: plug and abandon 25 of 28 wells; decommission a pipeline; remove the platform deck and flare boom; remove seafloor debris; and remove contaminated soil.

15.     Since the deposit by Taylor Energy was to be made over time, the Bond Agreement expressly provided that Taylor Energy was entitled to an offset, or reduction, from its remaining supplemental deposits for any work that Taylor Energy completed prior to the due date for any supplemental deposit.

16.     Upon the completion of each of the specified 29 commitments, Taylor Energy would seek a disbursement of its deposited funds for actual costs up to a designated amount: $25.5 million per well to plug and abandon (for a total of $637.5 million for all 25 wells), $6.245 million to remove the platform deck and flare boom, $6.535 million to remove seafloor debris, $3 million to decommission a pipeline, and $13 million to remove contaminated soil.

17.     The Agreements provided that Taylor Energy would make the $666,280,000 deposit in several installments.  To account for the fact that Taylor Energy might complete some of the specified decommissioning work before the later installments were due, and consistent with the clear wording under the Trust Agreement that Taylor Energy deposit a maximum of $666,280,000 into the Trust Account, the Bond Agreement provided for an "offset" or reduction of later installment deposits for any work completed prior to the date those deposits were due.

The offset provision recognized that there would be no need to "secure" funds to guarantee performance of specified decommissioning work that Taylor Energy had already completed.

18.     The Agreements also required Taylor Energy to seek reimbursement from Taylor Energy's insurance policies for work performed at MC20.   The Agreements specifically provided that while Taylor Energy would not be entitled to disbursements from the Trust Account for costs reimbursed by insurance, for any work performed prior to the due date of the final installment deposits, using money from any source (including insurance), Taylor Energy would be entitled to a reduction or offset in the amount it was required to deposit into the Trust Account equal to the designated amount stated in the Trust Agreement for the already completed work.

19.     In compliance with the Agreements, Taylor Energy secured contracts to begin the required work, and submitted invoices to its insurance underwriter as well as disbursement requests to BOEM for its completion of these commitments. In most instances, BOEM concurred with Taylor Energy's certification of the completed work and released Taylor Energy's corresponding funds from the Trust Account.   However, as to certain disbursement requests, BOEM erroneously denied Taylor Energy's requests.

### A. The 2009 Decision

20.     In August of 2009, BOEM maintained, contrary to the clear and plain terms of the Agreements, that because Taylor Energy received proceeds from insurance which BOEM believed may have been for the same work as the disbursement, Taylor Energy was not entitled to an offset from its remaining supplemental deposits for that work.  This was so notwithstanding that the work had been performed and was "completed" prior to the date of the supplemental deposit.

21.     Thereafter, on August 13, 2009, Taylor Energy documented its process to follow the Agreements so that it would fully fund the Trust Account, but retain its lawfully-procured insurance proceeds.  Taylor Energy acknowledged that the Trust Account should be fully funded and, therefore, deposited all the supplemental deposits to the Trust Account, but notified BOEM that the final deposits were made "under protest" pending resolution of BOEM's erroneous and unlawful interpretation of the Agreements.

22.     On August 28, 2009, BOEM issued a decision denying Taylor Energy's protest and declared that Taylor Energy was required to: (a) deposit supplemental funds into the Trust Account; and (b) "reimburse" the Trust Account for "duplicative" insurance proceeds received. *See* 2009 Decision attached hereto as Exhibit "1."

23.     Essentially, BOEM's 2009 Decision required Taylor Energy to provide an additional deposit to the Trust Account to refund money for work Taylor Energy had already paid for and completed.  BOEM's 2009 Decision required Taylor Energy to deposit the full amount ($666,280,000) into the Trust Account plus "reimburse" the Trust Account for insurance proceeds received.  This determination by BOEM required Taylor Energy to "over fund" and double-pay for a commitment already completed, and denied Taylor Energy's request for even one disbursement for the same commitment. BOEM's interpretation and 2009 Decision is contrary to the clear and plain language of the Agreements.

24.     Additionally, BOEM ignored and rendered meaningless the deposit "offset provision" set forth in the Bond Agreement through its interpretation of the Agreements.

### *B. The 2011 Decision*

25.     On August 15, 2011, September 6, 2011, and November 2, 2011, Taylor Energy requested disbursements of its own funds from the Trust Account for rig-down time costs.

26.     On November 7, 2011, BOEM denied Taylor Energy's request for disbursement of Trust Account funds related to rig-down time arising out of the inability to continue operations during hurricane season, a necessary cost related to securing a continuous contract for a drilling rig required to plug and abandon certain of the 25 wells.  *See* 2011 Decision attached hereto as Exhibit "2."

27.     BOEM's 2011 Decision applies the same flawed logic as the 2009 Decision.  As a result, it contravenes the clear and plain terms of the Agreements, as it requires Taylor Energy to "ensure" the availability of funds to pay for the commitment to plug and abandon one well multiple times—first by paying to drill the intervention well, second by paying into the Trust Account via a supplemental deposit after work on that well was already complete, and a third time because BOEM denied Taylor Energy's disbursement for work completed.

28.     Contrary to the 2011 Decision, Taylor Energy has not been "overcompensated" or received "excess disbursements" or "overpayments" for this obligation under the Trust Agreement.   In fact, contrary to the Agreements, Taylor Energy has actually received disbursements of <u>less than</u> the allocated $25.5 million for each of the wells that it decommissioned.

29.     In essence, the 2011 Decision, like the 2009 Decision, improperly retains Taylor Energy's funds in the Trust Account to "secure" the completion of "Obligations" that Taylor Energy already fulfilled.   BOEM's interpretation and the 2011 Decision runs contrary to the clear and plain terms of the Agreements.   The net effect of BOEM's 2009 and 2011 Decisions

was to improperly deny Taylor Energy $10,433,905.12 in disbursements in breach of the express terms of the Agreements.[3]

### *C. The IBLA Decision*

30.    Taylor Energy timely appealed BOEM's 2009 and 2011 Decisions to the IBLA thereby exhausting the administrative remedies as required by 30 C.F.R. § 590.8.  On October 29, 2018, the IBLA affirmed BOEM's 2009 and 2011 Decisions, which constitutes final agency action under 5 U.S.C. § 704.  *See* 193 IBLA 167, attached hereto as Exhibit "3."

31.    Like BOEM, the IBLA rendered meaningless the deposit "offset provision" contained in the Bond Agreement through its interpretation in connection with the 2009 Decision.  Further, in connection with the 2011 Decision its conclusions that Taylor Energy had been "overcompensated" on one well (IW-21) and that the Trust Account needs to "remain fully funded" is erroneous.  This conclusion improperly requires that funds remain in the Trust Account despite "not currently allocated to any future decommissioning work."

## V.    CAUSE OF ACTION

**The Government Has Breached the Agreements by Refusing to Direct the Disbursement of Funds ($10,433,905.12 Plus Applicable Interests) Owed to Taylor Energy**

32.    Taylor Energy incorporates by reference each of the allegations set forth above.

33.    The Government has wrongfully refused to pay Taylor Energy $10,433,905.12, plus interest.

34.    The IBLA Decision affirming the 2009 Decision and 2011 Decision of BOEM are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.

---

[3] The disputed amount was described to the Court in Taylor Energy's existing suit against Interior.  *See* Case No. 1:16-cv-00012 Rec. Doc. 1 at n.7; *see also* Rec. Doc. 72 at 10 (describing the IBLA insurance appeal).

35.     The 2009 and 2011 Decisions are contrary to the plain and clear terms of the Agreements and unlawfully withheld Taylor Energy's funds to "secure" obligations that Taylor Energy has already completed.

36.     As a result of the IBLA Decision affirming the 2009 and 2011 Decisions of BOEM which were wrongfully decided, the United States has breached the Agreements and Taylor Energy is suffering and will continue to suffer monetary harm.

WHEREFORE, this Court should reverse, set aside, and vacate the IBLA Decision affirming BOEM's 2009 and 2011 Decisions, which constituted separate breaches of the applicable contract between Taylor and the United States and award Taylor Energy monetary damages in the amount of $10,433,905.12 plus applicable interest.  This Court should also award Taylor Energy reasonable costs and attorneys' fees as authorized by law and such further relief as the Court deems just, proper, and equitable.

Respectfully submitted this 20th day of December, 2018.

s/ Carl D. Rosenblum
CARL D. ROSENBLUM, T.A. (LA Bar No. 2083)
EDWARD D. WEGMANN (La. Bar No. 13315)
ALIDA C. HAINKEL (LA Bar No. 24114)
LAUREN C. MASTIO (LA Bar No. 33077)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone:  (504) 582-8296
Facsimile:  (504) 589-8296
crosenblum@joneswalker.com

And

JOHN F. COONEY
PAUL A. DEBOLT
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
Telephone:  (202) 344-4000

**Attorneys for Taylor Energy Company LLC, Plaintiff**

Clear Form

# In The United States Court of Federal Claims

## Cover Sheet

Plaintiff(s) or Petitioner(s)

Names: **Taylor Energy Company LLC**          **18-1949 C**

Location of Plaintiff(s)/Petitioner(s) (city/state): **New Orleans, Louisiana**

(If this is a multi-plaintiff case, pursuant to RCFC 20(a), please use a separate sheet to list additional plaintiffs.)

Name of the attorney of record (See RCFC 83.1(c)): **Carl D. Rosenblum**

Firm Name: **Jones Walker LLP**

Contact information for pro se plaintiff/petitioner or attorney of record:

Post Office Box:

Street Address: **201 St. Charles Avenue, 49th Floor**

City-State-ZIP: **New Orleans, Louisiana 70170**

Telephone & Facsimile Numbers: **Telephone: 504-582-8296 Fax: 504-589-8296**

E-mail Address: **crosenblum@joneswalker.com**

Is the attorney of record admitted to the Court of Federal Claims Bar?  ⦿ Yes  ◯ No

Nature of Suit Code: **134**
Select only one (three digit) nature-of-suit code from the attached sheet.

Amount Claimed: $ **10,433,905.12++**
Use estimate if specific amount is not pleaded.

Agency Identification Code: **DOI**

Number of Claims Involved: **2**

Bid Protest Case (required for NOS 138 and 140):
Indicate approximate dollar amount of procurement at issue: $ **N/A**

Is plaintiff a small business?  ◯ Yes  ◯ No

Was this action preceded by the filing of a protest before the GAO?  ◯ Yes  ◯ No

If yes, was a decision on the merits rendered?  ◯ Yes  ◯ No

Income Tax (Partnership) Case:
Identify partnership or partnership group: **N/A**

Takings Case:
Specify Location of Property (city/state): **N/A**

Vaccine Case:
Date of Vaccination: **N/A**

Related Case:
Is this case directly related to any pending or previously filed case(s) in the United States Court of Federal Claims? If yes, you are required to file a separate notice of directly related case(s). See RCFC 40.2.   ⦿ Yes  ◯ No   **16-12C**
**Judge Nancy B. Firestone**

178



# United States Department of the Interior

**MINERALS MANAGEMENT SERVICE**
Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123-2394



In Reply Refer To: MS 5000

AUG 2 8 2009

Mr. William W. Pecue, II
President
Taylor Energy Company LLC
1615 Poydras Street, Suite 500
New Orleans, Louisiana 70112



Re: *Taylor Energy Company LLC – March 19, 2009, Trust Agreement; Insurance Provision*

Dear Mr. Pecue:

Thank you for your letter dated August 13, 2009, proposing a process to simplify implementation of the March 19, 2008, Trust Agreement and Agreement to Provide Additional Bond in relation to insurance proceeds. Relying on Section 2.4 of the Agreement to Provide Additional Bond, you propose that Taylor Energy Company (TEC) make the full final deposit into the Trust Account, required under Section 2.3, by September 21, 2009, without any offsets, and that TEC be permitted to retain all insurance proceeds it has received and will receive in the future as reimbursement for work performed at Mississippi Canyon (MC) Block 20. After consultation with our attorneys, we are writing to inform you that we decline to accept your proposal.

As we will explain in this letter, we believe you have misinterpreted the agreements and that TEC is required to deposit the full amount due next month and reimburse the Trust Account for any disbursements that have been made that duplicate reimbursement from your insurance company. Although the final deposit of $78 million remains due on September 21 ($3 million of which is actually due September 8), the reimbursement of insurance proceeds is not due until MMS confirms duplication of Trust funds disbursement and insurance proceeds.

Section 2.4 of the Agreement to Provide Additional Bond reads as follows:

> 2.4 Taylor will seek reimbursement from available insurance policies of all funds it spends performing the work required under the Plan identified in Section 5.3 of the Trust Agreement. Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies, but the amount of the deposit required in Section 2.3 shall reflect an offset equivalent to the amount designated for work in Schedule A when that work is completed with funds from any source.



EXHIBIT
1

Under this provision, TEC would be allowed to reduce the final deposit due next month by an amount equal to the amount allocated in Schedule A for "work ... completed with funds from any source." This phase requires the existence of completed work, as defined by Section 4.2 of the Trust Agreement ("completion of a phase of Work"), which does not yet exist. Taylor has not yet completed any phase of the "Work," as defined by the Trust Agreement, so no offset may be taken.

Furthermore, your proposal to deposit the full amount of the scheduled September 2009 payment but retain all insurance proceeds in lieu of an offset does not satisfy Section 2.4 of the Agreement for Additional Bond or Section 4.1 of the Trust Agreement. As we explained in our letter dated May 22, 2009 (enclosed and incorporated by reference here), MMS interprets these sections as prohibiting the duplication of Trust Fund disbursements and insurance proceeds, no matter which comes first. See Section 2.4 of the Agreement to Provide Additional Bond ("Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies"), and Section 4.1 of the Trust Agreement ("No disbursements will be given for amounts reimbursed to the Settlor by insurance proceeds"). You may only retain insurance proceeds if they do not duplicate a disbursement that has been made from the Trust Account. If you retain a duplicated payment, you would reduce the Trust Account in violation of the terms of the Agreement for Additional Bond and the Trust Agreement.

In your August 13, 2009, letter, you explain your interpretation of Section 2.4 as follows:

> The operative effect of Section 2.4 of the Bond Agreement is to acknowledge that TEC is not obligated to provide security to MMS, through the Trust Account or otherwise, for more than the $666 million total required under the Bond Agreement and Trust Agreement to undertake the phases of work for MC Block 20.

This interpretation is incorrect in part: while TEC is not obligated to deposit more than $666 million into the Trust Account, the terms of the two agreements prohibit disbursements from the Trust Account for any amounts duplicated by insurance proceeds. This prohibition has the effect of retaining in the Trust Account, instead of making a disbursement for, the amount allocated to a particular item of completed work that was also reimbursed by insurance. Accordingly, if TEC has received a disbursement from the Trust Fund that is later duplicated by insurance proceeds, TEC must return that disbursement.

The implementation of Section 2.4 of the Agreement to Provide Additional Bond and Section 4.1 of the Trust Agreement does not require TEC to deposit more than the $666 million required by the Agreement to Provide Additional Bond, but it does require TEC to forego disbursements for amounts reimbursed by its insurance company. The MMS believes that this result, which TEC consented to in these agreements, compensates MMS for the risk it has taken that TEC will be

3

unable to complete the work required by the agreements, and MMS will need to complete it, likely at a higher expense than anticipated by the agreements. If, however, as expected, TEC is able to complete the required work, these funds in the Trust Account will be released to TEC as provided for by the terms of the Trust Agreement.

In conclusion, under the terms of the Agreement to Provide Additional Bond and the Trust Agreement, TEC is obligated to deposit the full amount required by Section 2.3(c) of the Agreement to Provide Additional Bond. Furthermore, as we requested in our May 22, 2009, letter, TEC must provide a description of the "pre-planning work, engineering studies, and other preparatory efforts" for which TEC received additional insurance proceeds so we can confirm that TEC did not receive duplicative reimbursement for this work from the Trust Account. This information must be provided by October 15, 2009. We understand that TEC is having problems receiving this information from your insurance company, and reasonable extensions of this deadline may be granted. If MMS determines that there has been a duplication of insurance proceeds and Trust Account disbursements, MMS will order repayment to the Trust Account.

Finally, for future disbursements from the Trust Account, MMS will require TEC to certify whether or not it has requested and received reimbursement from its insurance company that duplicates its request for disbursement from the Trust Account. This certification is required to implement Section 2.4 of the Agreement to Provide Additional Bond and Section 4.1 of the Trust Agreement.

If TEC wishes to appeal this decision, pursuant to 30 C.F.R. Part 290, a notice of appeal must be filed in the office of the Regional Director, Gulf of Mexico Region, within 60 days of receipt of this letter. If you have any questions regarding this matter, please contact Ms. Cathy Moser at (504) 736-2690 or Ms. Silvia Murphy, Office of the Solicitor, at (202) 219-3031.

Sincerely,

Lars Herbst
Regional Director

Enclosure



# United States Department of the Interior

BUREAU OF OCEAN ENERGY MANAGEMENT
Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, LA 70123-2394

In Reply Refer To:  MS 5422

NOV 0 7 2011

Mr. William W. Pecue II
Taylor Energy Company LLC
One Lee Circle
New Orleans, Louisiana  70130

Dear Mr. Pecue:

In accordance with the March 19, 2008 Trust Agreement, by and among the United States of America, acting by and through the Bureau of Ocean Energy Management, Regulation and Enforcement of the United States Department of the Interior, (formerly the Minerals Management Service, and now, hereinafter referred to as, the Bureau of Ocean Energy Management or BOEM), Taylor Energy Company, LLC (Taylor), and JP Morgan Chase Bank, N.A., we hereby acknowledge your request for costs incurred for "Rig Downtime," as detailed in Taylor's November 2, 2011 letter and accompanying narrative.

As you are aware, Taylor first requested a disbursement for $13,057,394 for Rig Downtime costs by letter dated August 15, 2011. The BOEM replied to this request by letter dated August 19, 2011, which denied the request and attempted to briefly, perhaps insufficiently, explain the reasons for the denial. Attached to BOEM's August 19th letter was a spreadsheet, denominated "Schedule A", which attempted to detail the monies involved for each of the nine intervention wells already plugged and abandoned by Taylor.[1]

Schedule A broke out, on a well-by-well basis, all the insurance proceeds received by Taylor, all the Trust Fund disbursements received by Taylor – both of which were added together in a column entitled "Total Compensation," all the costs incurred by Taylor, and the maximum amount of per-well disbursement permitted by the Trust Agreement ($25,500,000). There was one exception to the well-by-well break-out, and that was the amounts shown as insurance proceeds received for four types of well work -- allocation of MC20 Well Costs, Engineering Survey Work, MC20 Marine Environmental Inv, and Planning for O.A. Drilling Rig. These insurance proceeds were not distributed on a well-by-well basis because, although BOEM had asked Taylor to detail to which wells these proceeds would apply, Taylor repeatedly replied that it could not make this determination because these types of well work, and therefore, the insurance proceeds received for these types of work, applied to all wells.

---

[1]IW 11, IW 19, IW 17, IW 1, IW 21, IW 4, IW 10, IW 13, and IW 16.

**EXHIBIT
2**

Schedule A also showed no entry in the "Costs Incurred" column for these four types of well work. After being questioned by Taylor about the lack of entries in the "Costs Incurred" column for these four types of work, BOEM explained that there were no entries made for incurred costs for these four types of work because the costs could not be substantiated and further, BOEM could not attribute them on a well-by-well basis.

Finally, when all the well-by-well costs incurred were added together, the total of Costs Incurred by Taylor was $300,350,976.48. But, the Total Compensation column summed to $309,514,452.90. (*See* "Schedule A.") Therefore, in its August 19th denial letter, BOEM stated that Taylor had been overcompensated by the amount of the discrepancy: $9,163,566.42.

In an attempt to resolve this matter, BOEM and Taylor representatives and their attorneys met and tried to come to some agreement on the interpretation of the proper apportionment of the monies involved. This resulted in Taylor's resubmission, by letter dated September 6, 2011, of its Rig Downtime disbursement request. Attached to this letter is a "Schedule 2," which lists a series of invoices paid by Taylor, representing costs incurred of $27,556,783,37 over and above the total costs incurred of $300,350,876.48 which appeared on BOEM's "Schedule A." Taylor claims that these invoices are not duplicative of any invoices previously submitted, and also claims that they substantiate the new increment of $27,556,783.37 of costs incurred. The BOEM hereby accepts both these claims, and has attached hereto a new spreadsheet, "Schedule A-1," which shows the addition of this $27+ million to the total of the "Costs Incurred" column.

That said, however, BOEM must again deny Taylor's disbursement request for $10,433,905.12, which was resubmitted again on November 2, 2011. "Schedule A-1" shows the new total of "Costs Incurred" as $327,906,759.87, which is now more than the "Total Compensation," of $309,514,542.90. Therefore, the discrepancy highlighted in BOEM's August 19th denial letter no longer exists. However, BOEM and Taylor are bound by the terms of the Trust Agreement, which clearly puts a per-well cap of $25,500,000 on disbursements. (*See* Paragraph 4.3 of Trust Agreement.) Therefore, the most that BOEM can possibly disburse, per well, no matter how high Taylor's Costs Incurred, is $25,500,000.

Because Taylor has repeatedly stated that the $27+ million in costs for the four well work types mentioned above applies to all wells, it has been divided evenly among the nine wells so far completed, and the "Costs Incurred " column on Spreadsheet A-1 shows, per well, the costs incurred, including 1/9 of this 27+ million applied to each well. Similarly, the insurance proceeds which Taylor has received for these four types of well work were added together and divided by 9 and 1/9 allocated to each well. Therefore, BOEM has accounted for the "new" $27+ million in costs substantiated by Taylor in its Schedule 2, and has spread across each well, both those "new" costs and the insurance proceeds directed to those costs.

Now, however, the disbursement request bumps up against the $25,500,000 per-well cap imposed by the Trust Agreement. In three cases, IW 19, IW 1, and IW 16, the full $25,500,000 has already been disbursed, and BOEM is powerless to disburse more. In five cases, IW 11, IW 17, IW 4, IW 10, and IW 13, the amount of the trust funds already disbursed by BOEM is less than the maximum $25,500,000, and, but for the situation arising out of IW 21, BOEM could disburse to Taylor the amounts representing the differences between the maximum permitted and the amount already disbursed. These differences are: for IW 11, $3,195,906.99, for IW 17, $1,550,274.00, for IW 4, $2,275,688.00, for IW 10, $3,250,716.00, and for IW 13, $3,767,182.00. The total of these differences is: $14,039,766.00.

3

On IW 21, Taylor was actually overcompensated by the Trust by $17,920,228.74. As shown in Schedule A-1, the Costs Incurred for IW 21 were $58,851,826.46, but Taylor received insurance proceeds of $51,272,055.20 for IW 21, leaving it eligible for the difference of $7,579,771.26 to be disbursed from the Trust.[2] But, Taylor has already received the full $25,500,000 for IW 21. Therefore, when Taylor should have received only $7+ million from the Trust for IW 21, it received $25,500,000, and the difference between these two numbers -- $17,920,228.74 – represents an overpayment to Taylor, which is owed to the Trust. When combined with a Rig Credit[3] of $2,623,489.00, owed to the Trust, a total of $20,543,717.74 is owed back to the Trust.

When the total putatively owed to Taylor ($14,039,766.00) is subtracted from the total owed back to the Trust ($20,543,717.74), the difference, which is owed back to the Trust, is $6,503,951.74, as shown at the bottom of the "Remaining Funds" column on Schedule A-1.
Because of the overpayment on IW 21 (and the rig credit) Taylor has then actually been overcompensated by the Trust in the amount of $6,503,951.74 for the plugging and abandonment work so far completed. Accordingly, BOEM must deny Taylor's most recent resubmission of its disbursement request, which is dated November 2, 2011 and requests a disbursement of $10,433,905.12 based on the "new" 27+ million in Costs Incurred. BOEM is not, at this time, however, requesting or demanding that Taylor pay into the Trust the overage amount of $6,503,951.74.

Should you have questions or concerns, you may contact Mr. Joshua T. Joyce, at (504)736-2779 or joshua.joyce@boemre.gov.

Sincerely,

John Rodi
Regional Director
Gulf of Mexico OCS Region

cc:     Mrs. Phyllis M. Taylor
        Taylor Energy Company LLC
        One Lee Circle
        New Orleans, Louisiana 70112

---

[2] See paragraph 4.1 of the Trust Agreement. ("No disbursements will be given for amounts reimbursed to the Settlor by Insurance proceeds.")
[3] Acknowledged by Taylor, see, e.g., Taylor's version of "Schedule A" attached to its Narrative, provided to BOEM on November 2, 2011.

**Schedule A-1**

| Activity | Insurance Proceeds Received* # | BOEMRE Disbursements Received | Total Compensation | Costs Incurred ** | Trust Allocation | Remaining Funds |
|---|---|---|---|---|---|---|
| IW 11 | 910,666.48 | 22,304,094.00 | 23,214,760.48 | 27,032,219.66 | 25,500,000.00 | 3,195,906.00 |
| IW 19 | 33,104,127.01 | 25,500,000.00 | 58,604,127.01 | 68,744,777.05 | 25,500,000.00 | |
| IW 17 | 913,140.69 | 23,949,726.00 | 24,862,866.69 | 28,091,431.05 | 25,500,000.00 | 1,550,274.00 |
| IW 1 | 1,713,844.00 | 25,500,000.00 | 27,213,844.00 | 33,977,969.15 | 25,500,000.00 | |
| IW 21 | 51,272,055.20 | 25,500,000.00 | 76,772,055.20 | 58,851,826.46 | 25,500,000.00 | -17,920,228.74 |
| IW 4 | 879,246.63 | 23,224,312.00 | 24,103,558.63 | 26,778,936.71 | 25,500,000.00 | 2,275,688.00 |
| IW 10 | 879,246.63 | 22,249,284.00 | 23,128,530.63 | 26,611,183.08 | 25,500,000.00 | 3,250,716.00 |
| IW 13 | 879,246.63 | 21,732,818.00 | 22,612,064.63 | 28,154,820.99 | 25,500,000.00 | 3,767,182.00 |
| IW 16 | 879,246.63 | 25,500,000.00 | 26,379,246.63 | 29,663,595.72 | 25,500,000.00 | |
| | | | | | | |
| Rig Credit | | 2,623,489.00 | 2,623,489.00 | | | -2,623,489.00 |
| Total | 91,430,819.90 | 218,083,723.00 | 309,514,542.90 | 327,906,759.87 | 229,500,000.00 | -6,503,951.74 |

\* Does not include $12,843,236.34 'Non Trust Related Costs'

# Includes insurance proceeds for the following distributed per well:  Allocation of MC20 Well Costs; Engineering Survey Work;
   MC20 Marine Environmental Inv; Planning for O.A. Drilling Rig

\*\* Includes the additional $27,555,783.37 costs incurred distributed per well



# United States Department of the Interior
## Office of Hearings and Appeals
### Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203

703-235-3750                703-235-8349 (fax)

## TAYLOR ENERGY COMPANY LLC

IBLA 2010-12 & 2012-70                Decided October 29, 2018

Consolidated appeals from decisions of the Regional Director, Gulf of Mexico OCS Region, Bureau of Ocean Energy Management, denying request to retain insurance proceeds, together with disbursements, in lieu of offset against supplemental deposits to trust account, and denying request to disburse trust account funds, for decommissioning work in the Outer Continental Shelf of the Gulf of Mexico. MS 5000 & MS 5422.

Decisions affirmed.

1.    Outer Continental Shelf Lands Act: Decommissioning;
      Outer Continental Shelf Lands Act: Oil and Gas Leases

      Contracts entered into by the United States are construed by the same standards as any contract between private parties. The Board's task in adjudicating contract disputes is to give effect to the intent of the parties expressed in the language of the contract they agreed to, based on our understanding of its ordinary and commonly accepted meaning. The parties' intent must be gleaned from the four corners of their contract, which is controlling unless the language of the contract is reasonably susceptible to at least two different constructions or is otherwise ambiguous. In adjudicating contract disputes, the Board exercises *de novo* review to read, interpret, apply, and issue a final decision for the Department on the proper interpretation of that contract.

APPEARANCES:   Peter J. Schaumberg, Esq., James M. Auslander, Esq., and Fred R. Wagner, Esq., Washington, D.C., and Bret A. Sumner, Esq., Michael K. Cross, Esq., Michael L. Beatty, Esq., William E. Sparks, Esq., and Malinda Morain, Esq., Denver, Colorado, for Taylor Energy Company LLC; Lori R.F. Monroe, Esq., Office of the

**EXHIBIT
3**

IBLA 2010-12 & 2012-70

Solicitor, U.S. Department of the Interior, Washington, D.C., for the Bureau of Ocean
Energy Management.

OPINION BY ADMINISTRATIVE JUDGE JACKSON

Taylor Energy Company LLC (Taylor) appeals from and petitions for a stay of
the August 28, 2009, decision (2009 Decision) of the Regional Director, Gulf of
Mexico OCS Region, Bureau of Ocean Energy Management (BOEM), denying Taylor's
request to retain insurance proceeds and disbursements from its Trust Account, in
lieu of offsetting them against supplemental deposits to the Trust Account.  Taylor
also appeals from a November 7, 2011, BOEM decision (2011 Decision) denying its
request for additional disbursements from the Trust Account for rig downtime costs
associated with its plugging and abandoning multiple wells.[1]   The Board docketed
Taylor's two appeals as IBLA 2010-12 and IBLA 2010-12, respectively.  By Order
dated January 30, 2012, we granted Taylor's request to consolidate its appeals, which
are now ripe for decision.[2]

BOEM's decisions interpreted and applied the terms and conditions of a Trust
Agreement by and between Taylor, BOEM, and JPMorgan Chase Bank (Trust
Agreement), an Agreement to Implement Article IV of the Trust Agreement between
Taylor and BOEM (Disbursement Agreement), and their Agreement to Provide
Additional Bond (Bond Agreement), hereinafter collectively referred to as the
Agreements.[3]   The Agreements provide for funding and managing disbursements
from the Trust Account for decommissioning activities on OCS leases where Taylor
was the lessee and operator.[4]

*SUMMARY*

When BOEM enters into contracts with a third party, it is bound by the
contract's terms and conditions in the same manner and to the same extent as is the
third party.  In deciding appeals involving contract language, terms, or conditions,

---

[1]  References herein to BOEM include its predecessors, the Minerals Management
Service (MMS) and the Bureau of Ocean Energy Management, Regulation and
Enforcement, as appropriate.
[2]  *See* Order dated April 26, 2018; Statement of Reasons filed May 27, 2016 (SOR);
Answer filed July 26, 2016; Reply filed Aug. 8, 2016.
[3]  *See* Trust Agreement dated Mar. 19, 2008, Administrative Record (AR) 569-592;
Disbursement Agreement dated Nov. 20, 2009, AR 593-600; Bond Agreement dated
Mar. 19, 2008, AR 601-610.
[4]  *See* Trust Agreement at 1 (Lease OCS-G 04931 (Mississippi Canyon Block 20),
Lease OCS-G 15459 and 5 wells (Mississippi Canyon Block 21), Lease OCS-G 15371
and 1 well (South Pass Block 73)).

the Board will give them their natural and most commonly understood meaning, so long as our doing so does not lead to absurd results and is not contrary to the contracting parties' clearly expressed intent. When such contracts establish a trust fund as a guaranteed source of funding to complete multiple tasks and allow required deposits to be reduced if a task is completed without trust funds, the contracting party is not entitled to reduce a future deposit unless the record shows it completed a task without trust funds. And where a contracting party does not substantiate its costs in the manner required by contract and show they were not paid by insurance proceeds, it may be required to repay disbursements it was not entitled to receive under its contract.

*BACKGROUND*

When Hurricane Ivan slammed into the Gulf of Mexico during September of 2004, it caused catastrophic damage to wells, facilities, and operations on Taylor's OCS Leases for Mississippi Canyon Blocks 20 and 21 and South Pass Block 73. Ivan shifted the sea floor, toppled a platform, buried wells beneath 150 feet of mud, and caused oil leaks in the area. In collaboration with BOEM, the Department's Bureau of Safety and Environmental Enforcement (BSEE), and the U.S. Coast Guard, Taylor developed a "technologically feasible, safe, and unprecedented plan to decommission the [offshore] . . . facilities,"[5] which relied heavily on the drilling of "intervention wells" (IWs) because they were the "only means" for plugging and abandoning 25 producing wells on its OCS leases.[6] Ultimately, Taylor decided to relinquish its OCS leases, decommission their facilities, and sell all assets used in its oil and gas business.[7]

---

[5] SOR at 5.

[6] *Id.; see* Plan of Operations for MC20A Decommissioning dated May 19, 2008 (Plan), AR 377. Intervention (or relief) wells were identified by reference to the well they were paired with for plugging and abandoning purposes (*e.g.*, IW-21 was paired with A-21, a producing well drilled from Platform A).

[7] *See* Answer at 2 ("BOEM realized that once Taylor sold its income producing assets and distributed the proceeds to its shareholder, it might not have sufficient funds to perform . . . decommissioning, therefore in late 2007 and early 2008, BOEM issued two Supplemental Bonding Orders to Taylor, requiring Taylor to post security in the amount of $666,280,000 to ensure sufficient funds to pay for the cost of decommissioning the MC20 site.").

*The Trust, Disbursement, and Bond Agreements*

Taylor and BOEM entered into the Agreements to establish a lease-specific abandonment account under rules implementing the Outer Continental Shelf Lands Act (OCSLA).[8] In lieu of lease and areawide bonds under 30 C.F.R. § 556.900(a), this abandonment account provides a secure source of funds to pay for decommissioning undertaken by Taylor or by BOEM the event of default by Taylor.[9] The rule at 30 C.F.R. § 250.1703 (What are the general requirements for decommissioning?) requires OCS lessees and operators to: "Permanently plug all wells"; "Remove all platforms and other facilities"; "Decommission all pipelines"; and "Clear the seafloor of all obstructions created by your lease[.]" Each of these regulatory obligations is a defined Obligation under the Trust Agreement and identified in its Schedule A:

1. permanently plug and abandon 25 wells in accordance with C.F.R. §§ 250.1710-1717 "@ $25,500,000 per well";
2. remove deck and flare broom in accordance with 30 C.F.R. §§ 250.1725-1730 for $6,245,000;
3. clear the seafloor in accordance with 30 CF.R. §§ 250.1740-1743 for $6,535,000;
3. remove pipelines in accordance with 30 CF.R. §§ 250.1750-1754 for $3,000,000; and
4. remove contaminated soil in accordance with 30 CF.R. § 250.300.[10]

Schedule A concludes by stating "Total Cost Estimate: $666,280,000."[11]

The Trust Agreement provides a mechanism for making disbursements from the Trust Account "for the actual costs of the Work performed and costs incurred to satisfy the Obligations, [but these disbursements] cannot exceed the cost estimates

---

[8] *See* 30 C.F.R. § 556.904 (Lease-specific abandonment accounts); Answer at 2; *see generally* 30 C.F.R. Part 556, Subpart I (Bonding).

[9] *See* 30 C.F.R. § 556.904(a)(2) ("You must fully fund the lease-specific abandonment account to cover all cases of leases abandonment and site clearance as estimated by BOEM.").

[10] Trust Agreement Schedule A.1 through A.5; *see* Trust Agreement § 1.2(d) (Obligations defined).

[11] Trust Agreement Schedule A at AR 590; *see* 30 C.F.R. § 556.904(a)(2) ("You must fully fund the lease-specific abandonment account to cover all decommissioning costs as estimated by BOEM within the timeframe the Regional Director prescribes.").

Case 2:18-cv-14065-GGC-MBN Document 20-2 Filed 06/26/18 Page 24 of 39
Case 1:13-cv-01549-NBF Document 1-40 Filed 12/26/18 Page 9 of 20

IBLA 2010-12 & 2012-70

shown in Schedule A."[12]  It also allows for partial disbursements of up to half the estimated cost of the Work when an executed contract is presented to BOEM for that Work, with the remaining half to be disbursed when that Work is completed.[13]

The Disbursement Agreement establishes special procedures for approving and making Trust Account disbursements for well decommissioning, pipeline decommissioning, platform decommissioning, and other Obligations under the Trust Agreement.[14]  Of particular importance here, it addresses downtime for drilling rigs engaged in well decommissioning by adjusting their daily rig fee "on an equal proportionate basis to each day the rig operated on a [Taylor] well," which entitles Taylor to an "additional disbursement for the rig fee for each day the rig operated on that well, *provided*, that the total disbursement for any well shall not exceed $25,500,000."[15]

The Bond Agreement specifies that making all deposits required of Taylor "will be considered compliance with the [Supplemental Bond Order for $200,000,000, dated November 30, 2007, and the Areawide Bond Order for $466,280,000, dated March 10, 2009]."[16]  It requires Taylor to make an initial deposit of $400,000,000, followed by supplemental deposits on June 3, 2008 ($38,250,000), March 23, 2009 ($150,000,000), September 8, 2009 ($3,000,000), and September 21, 2009 ($75,030,000).[17]  As to insurance, it states:

> Taylor will seek reimbursement from available insurance policies of all funds it spends performing the performing the work required under the [approved plan to complete the Obligations set forth in Schedule A]. Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies, but the amount of the deposit required in section 2.3 shall reflect an offset equivalent to the

---

[12]  Trust Agreement, § 4.1 (Disbursements for Obligations performed); *see id.* § 4.3 (Payment of Obligation Costs in Excess of the "Schedule A" Cost Estimates).

[13]  *Id.* §§ 4.1 (Disbursements for Obligations performed), 4.2 (Partial Payments for Work Phase completion).

[14]  Disbursement Agreement Parts I (Well Decommissioning), II (Pipeline Decommissioning), III (Platform Decommissioning), and IV (Other Obligations).

[15]  *Id.* Part I.D.1; *see* Trust Agreement Schedule A.1 ("$25,500,000 per well").

[16]  Bond Agreement § 2.5.

[17]  *Id.* §§ 2.1 to 2.3; Trust Agreement § 2.2 (Funding of Trust Agreement); SOR at 7; Answer at 3, 5 n.2; Reply at 3.

amount designated for work in Schedule A when that work is completed with funds from any source.[18]

Thus, if Work was completed before a supplemental deposit was due, Taylor was entitled to reduce its mandatory deposit by "the amount designated for work in Schedule A."[19]

### Taylor's Proposal and Request for Offsets under the Agreements

Taylor secured contracts, began decommissioning work, submitted insurance claims required by the Bond Agreement, and requested disbursements from its Trust Account under the Trust Agreement. Prior to the due date for making its final supplemental deposits under the Bond Agreement, Taylor completed pipeline decommissioning, requested and received disbursements of $3 million from its Trust Account for that work, and later received $1.25 million in insurance proceeds to reimburse it for its decommissioning costs.[20] BOEM initially sought to "claw back" $1.25 million of the $3 million in Trust Account disbursements, but it did not pursue the matter once it realized the actual cost to decommission the pipeline exceeded both disbursements and insurance proceeds for that work.[21]

---

[18] Bond Agreement § 2.4; *see* Trust Agreement § 4.1 ("No disbursements will be given for amounts reimbursed to [Taylor] by insurance proceeds.").

[19] *Id.*; *see* SOR at 2 ("To account for the fact that Taylor might complete some of the specified decommissioning work before the later installments were due, the Bond Agreement provided for an 'offset' of later installment deposits for any work completed prior to the date those deposits were due. The offset provision recognized that there would be no need to 'secure' funds for the performance of specified decommissioning work that Taylor had already paid for and performed."), 15 ("*BOEM would not need* to ensure 'compliance' of an obligation already performed").

[20] *See* SOR at 3; Answer at 18 n.6.

[21] *See* Answer at 13-14; Letter from BOEM dated May 22, 2009, at AR 368 ("[If Taylor's] actual costs exceed the maximum amount of Trust disbursements permitted by the Trust Agreement for a particular activity, then [Taylor] may retain insurance proceeds equal to the costs greater than the disbursement. In that situation, there is no duplication of payments[.]"); Taylor Letter dated Nov. 2, 2011, AR 45 ("BOEM and Taylor are in agreement that Taylor is *entitled to receive the full amount of disbursements* to which it is entitled under the Trust Agreement for an activity if it can demonstrate that the total cost of the work completed exceeds the total allowable Trust Account disbursement for that activity by an amount that is greater than the insurance proceeds Taylor received for that same work.").

By letter dated August 13, 2009, Taylor informed BOEM it received an additional $62.6 million in insurance proceeds that might arguably be associated with some of its work under the Trust Agreement, adding that the situation was complicated by its insurer not identifying whether and to what extent these insurance payments were made for decommissioning work required by the Trust Agreement.[22] Taylor then proposed to make all supplemental deposits under the Bond Agreement without any insurance offsets, in return for its keeping all insurance proceeds and all disbursements under the Trust Agreement (*e.g.*, no "claw back" of potentially duplicative disbursements).[23] Characterizing the Agreements as creating a "zero-sum game," Taylor claimed its proposal would simplify implementation of the Trust Agreement and avoid a "meticulous and time-consuming effort" to determine whether and, if so, how much of its insurance proceeds duplicated past or future disbursements for the same work.[24]

*BOEM's 2009 Decision*

In its 2009 Decision, BOEM "declined to accept" Taylor's proposal or to apply its insurance proceeds as an offset to its final supplemental deposits under the Bond Agreement.[25] BOEM stated Taylor was not entitled to any offset because it "has not yet completed any phase of the 'work,' as defined by the Trust Agreement."[26] In addition, BOEM stated it could "claw back" disbursements that are "later duplicated by insurance proceeds," but it did not then attempt to "claw back" any such disbursements from Taylor.[27]

Taylor made its supplemental deposits under the Bond Agreement "in full, under protest," based on BOEM's denial of its entitlement to any offsets.[28] Taylor timely appealed from the 2009 Decision; the Board initially suspended its consideration of this appeal by Order dated November 5, 2009.

---

[22] *See* Taylor Letter dated Aug. 13, 2009 (Taylor Proposal), AR 359-63, at 4.
[23] *Id.*
[24] *Id.* at 4, 5.
[25] *See* 2009 Decision at 1.
[26] *Id.* at 2.
[27] *Id.; see id.* at 1 ("[T]he reimbursement of insurance proceeds is *not due* until [BOEM] confirms duplication of Trust [Account] funds disbursement and insurance proceeds" (Emphasis added)), 3 ("If [BOEM] determines that there has been a duplication of insurance proceeds and Trust Account disbursements, [it] will order repayment to the Trust Account"); *see also* Answer at 14, 16; SOR at 4, 9.
[28] Taylor Letters to BOEM dated Sept. 10 and 21, 2009, AR 348 and 354.

*Developments after the 2009 Decision*

Following issuance of the August 2009 decision, Taylor continued with its decommissioning work, completing the plugging and abandonment of nine wells, removing the platform deck and flare boom, and completing the removal of seafloor obstructions and debris. Taylor certified the completion of this decommissioning work, and BOEM, upon request, disbursed funds from the Trust Account to reimburse Taylor for its associated costs.[29]

As its decommissioning work proceeded, Taylor agreed with BOEM and BSEE, on occasion, to temporarily suspend its work pending assessment of associated risks. During the periods of suspension, Taylor incurred downtime costs associated with its decommissioning rig, used in drilling the IWs necessary for plugging and abandoning the nine existing wells.[30] The decommissioning rig remained under contract with Taylor's drilling contractor, and Taylor was required to pay its contractor for downtime costs. Daily rates were incurred during periods of "down time" when the rig sat idle, including when Taylor was prohibited from operating the rig during hurricane season. There is no question that the Agreements provide for disbursement of funds from the Trust Account for downtime costs.

By letter dated August 15, 2011, Taylor submitted a request for disbursement of Trust Account funds, in the total amount of $13,057,394.12, for the rig downtime costs, pursuant to Article IV of the Trust Agreement and section 1.D. of the Disbursement Agreement.[31] Taylor "certifie[d] that in relation to the 5 completed wells in the well phase of the Plan (contained in Schedule A, item 1) that are included in this [request] . . . the work was conducted and costs incurred[.]"[32] BOEM preliminarily denied the request in an August 19, 2011, letter, because the total amount already disbursed from the Trust Account for plugging and abandoning the nine wells ($218,083,723), together with the insurance proceeds already paid to Taylor ($91,430,819.90) totaled $309,514,542.90, which exceeded its actual decommissioning costs for these wells ($300,350,976.48), resulting in a Trust Account "overpayment" to Taylor of $9,163,566.42.[33] It specifically noted "Taylor

---

[29] *See* SOR at 11.

[30] *Id.*

[31] *See* Taylor Letter to BOEM dated Aug. 15, 2011, AR 289.

[32] *Id.*

[33] BOEM Letter to Taylor, dated Aug. 19, 2011, AR 274 ("Due to the overpayment of compensation[,] . . . Taylor will not receive further BOEM[] disbursements pursuant to the Trust Agreement for these nine completed intervention wells, including the disbursement for [rig downtime costs].").

may be required by the Regional Director to fund the [Trust Account] in the sum of $9,163,566.42" and that rig downtime costs were "appropriately accounted for in [BOEM's] Schedule A" as "well costs."[34]

Taylor sought to establish by letter dated September 6, 2011, that its actual decommissioning costs were greater than previously documented by at least $27,555,783.37, but it did not seek disbursement of Trust Account funds for any of that work.[35] Rather, it sought to establish that BOEM wrongly concluded in its August 19, 2011, letter, that Taylor's actual costs were less than the total of Trust Account funds disbursed and insurance proceeds received. Taylor therefore renewed its request for rig downtime costs, $13,057,394.12, less a rig credit of $2,623,489, for a net Trust Fund disbursement of $10,433,905.12.

BOEM responded to Taylor's renewed disbursement request by asking it to resubmit supporting documentation "in a well-specific manner" so that "each cost is clearly associated with a well."[36] Taylor replied by resubmitting its August 2011 disbursement request, accompanied with a detailed explanation of "why Taylor is entitled to the amount requested in the August 15, 2011 disbursement request."[37] Taylor asserted BOEM properly included insurance proceeds of $7,599,729.05 for Authorization for Expenditure (AFE) 28040 on its Schedule A but erroneously omitted the $40,934,233.31 in Costs Incurred for that AFE, "which provided the basis for Taylor's claims for [those] insurance proceeds."[38] It explained its costs were not "specifically allocated to each well as it is not practical to do so nor is it necessary since all costs relate, in the aggregate, to the relief well effort."[39] However, Taylor "substantiated" only $27,555,783.37 of these added costs,[40] by providing proof of full payment for all such costs, including checks or electronic payments to vendors.[41]

---

[34]  *Id.*

[35]  *See* Taylor letter to BOEM dated Sept. 6, 2011, AR 71.

[36]  BOEM email to Taylor dated Sept. 9, 2011, AR 68.

[37]  Taylor Letter to BOEM dated Nov. 2, 2011, AR 28.

[38]  Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 4, AR 36; *see id*. at 3-4, AR 35-36.

[39]  *Id*. at 3, AR 35; *see id*. ("It makes no difference if the costs are allocated to the nine wells individually or reflected in total since the total costs for the relief activity will equal $341,285,209.72 under either method.").

[40]  *See id*. at 4-5, AR 36-37; *see also* id. at 4 n.1 (BOEM omitted other, "relatively small," costs incurred by Taylor), 5 ("Taylor could support the full approximately $40 million in costs that BOEM improperly excluded from [Costs Incurred].").

[41]  *See* Trust Agreement, § 4.2 ("Prior to release of funds for completion of . . . Work, proof of full payment to all contracts may be required."); Disbursement Agreement

Taylor explained it was "entitled to the full amount of its requested disbursement for the relief well effort [related to the nine wells] because it is still entitled to the disbursements up to the Trust [Account] Allocation limit [in Schedule A] and further because the total of its actual costs far exceeds the Trust [Account] Allocation limit plus insurance proceeds."[42]  According to Taylor:

> BOEM and Taylor are in agreement that Taylor is entitled to receive the full amount of disbursements to which it is entitled under the Trust Agreement for an activity if it can demonstrate that the total cost of the work completed [$327,906,759.85] exceeds the total allowable Trust Account Disbursement for that activity [$229,500,000] by an amount that is greater than the insurance proceeds received for that same work [$91,430,819.90].[43]

In effect, Taylor argued that it incurred costs to drill these nine wells that were sufficient to entitle it to the insurance proceeds *and* the entire Schedule A amount for the nine wells.

### BOEM's 2011 Decision

BOEM denied Taylor's resubmitted request for an additional disbursement due to adjusted rig downtime costs on November 7, 2011.  BOEM concluded that additional Trust Account disbursements of $14,039,766.00 could be made for rig downtime costs for five of the nine wells (IW-4, IW-10, IW-11, IW-13, and IW-17) because their disbursements had not yet reached the $25.5 million per well cap.[44]  However, BOEM determined Taylor was required to return $17,920,228.74 of the $25.5 million in disbursements from the Trust Account for one of these nine wells (IW-21) because it had been overcompensated by that amount due to its receipt of insurance proceeds that were allocated to the plugging and abandoning of that well.

---

Part V. A.1 ("[Taylor] will provide documentation, including copies of checks or proof of electronic payment to vendors, to support each request for disbursement of Trust Funds when the work pursuant to any AFE is completed.").
[42]  Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 4, AR 48.
[43]  *Id.* at 1.
[44]  2011 Decision at 2.

Since the amount Taylor needed to return was more than it was entitled to receive for rig downtime costs, BOEM denied Taylor's request.[45]

In reaching its conclusion regarding excess disbursements, BOEM started with the schedule attached to its denial of Taylor initial request for rig downtime costs, which showed Costs Incurred for all nine wells totaling $300,350,976.48.[46] BOEM "accepted" $27,555,783.37 in additional costs that were substantiated by Taylor in requests dated September 6 and November 2, 2011, which then totaled $327,906,759.87.[47] BOEM allocated these added costs equally to all nine wells, as well as insurance proceeds already received for that additional work, because "Taylor has repeatedly stated that the $27+ million in costs . . . applies equally to all wells."[48]

BOEM determined total disbursements made to date with respect to each of the nine wells. BOEM calculated that disbursements for three wells (IW-1, IW-16, and IW-19) reached the $25.5 million per well cap; disbursements for five wells (IW-4, IW-10, IW-11, IW-13, and IW-17) were less than the cap: and that disbursements for one well (IW-21) exceeded the cap. BOEM concluded, "but for the situation arising out of IW 21, BOEM could disburse to Taylor the amounts representing the differences between the maximum permitted and the amount already disbursed," $14,039,766.99, which was more than the amount requested by Taylor.[49]

BOEM noted the IW-21 well received disbursements from the Trust Account that totaled its $25.5 million cap,[50] yet it was entitled to only $7,579,771.26 under the Agreements because of Taylor's insurance proceeds,[51] which meant Taylor had been overcompensated by $17,920,228.74:

---

[45] Id. at 3; See SOR at 11 ("The issues in the 2009 Decision did not become completely relevant until BOEM denied Taylor's disbursement requests in the 2011 Decision.").

[46] Id. at 2 (citing BOEM Letter to Taylor dated Aug. 19, 2011, Schedule A, AR 276).

[47] Id.

[48] Id.; see Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 3, AR 35).

[49] 2011 Decision at 2; see Answer at 19-20.

[50] See Answer at 19 ("Th[e] over-disbursement [of $25.5 million] may have occurred because IW 21 was the first IW completed, therefore the full $25.5 million may have been disbursed before Taylor had received all its insurance proceeds.").

[51] See Trust Agreement, § 4.1 (Disbursements for Obligations performed) ("No disbursements will be given for amounts reimbursed to [Taylor] by insurance proceeds.").

> Costs Incurred for IW 21 were $58,851,826.46, but Taylor received
> insurance proceeds of $51,272,055.20 for IW 21, leaving it eligible for
> the difference of $7,579,771.26 to be disbursed from the Trust
> [Account]. But, Taylor has already received the full $25,500,000 for
> IW 21. Therefore, when Taylor should have received only $7+ million
> from the Trust [Account] for IW 21, it received $25,500,000, and *the
> difference between these two numbers – $17,920,228.74 – represents an
> overpayment to Taylor, which is owed to the Trust [Account]*. When
> combined with a Rig Credit of $2,623,489.00, owed to the Trust
> [Account] [by reason of prior disbursements from the Trust Account], a
> total of $20,543,717.74 is owed back to the Trust [Account].[52]

In sum, Taylor was entitled to rig downtime costs of $14,039,766.99 from the Trust
Account for 5 wells, but it owed the Trust Account, $20,543,717.74, for this well.
BOEM therefore denied Taylor's request for disbursement of rig downtime costs but
stated it was not then demanding Taylor to "pay into the Trust [Account] the overage
amount of $6,503,951.74."[53]

Taylor timely appealed from the 2011 Decision. The Board initially suspended
its consideration of this appeal by Order dated April 2, 2012. Taylor reported
that its Trust Account had a balance of "over $432 million" on May 27, 2016, which
was significantly more than the BOEM estimate to complete all remaining Obligations
under the Trust Agreement (*i.e.*, plug and abandon 16 wells for $408 million ($25.5
million per well) and remove contaminated soil for $13 million).[54]

*DISCUSSION*

These consolidated appeals raise two basic questions: (1) whether Taylor was
entitled to an offset of its supplemental deposits under the Bond Agreement; and
(2) whether Taylor was entitled to additional Trust Fund disbursements for rig
downtime costs under the Disbursement and Trust Agreements. We first identify the
legal standards applicable to our interpreting these Agreements and then address the
issues raised on appeal.

---

[52] 2011 Decision at 3 (emphasis added) (footnotes omitted).
[53] *Id.*
[54] SOR at 23; *see* Reply at 5; Trust Agreement Schedule A.1, A.5.

*I. Legal Standards for Interpreting Contracts*

    [1] The Agreements were entered into by and between Taylor and the United States of America.[55] As such, they are treated the same as any contract wholly between private parties that are subject to common-law principles of contract law, which are equally binding on the United States.[56] As we held with respect to a Federal oil and gas lease: "The Board's task when faced with the construction of a lease is to determine and give effect to the intent of the parties as disclosed by the language used, construing the document as a whole and ascribing to the contract language its ordinary and commonly accepted meaning."[57] The intent found within the four corners of their contract will control unless its provisions are ambiguous (*i.e.*, "'reasonably susceptible to at least two different meanings'").[58] In adjudicating contract disputes between a bureau of the Department and a private party, it is for this Board to interpret contract language, terms, and conditions, as we owe no deference to a bureau's "technical determinations" or "legal interpretations" because it is our interpretation of the law, facts, and contract that is entitled to deference by the Federal Courts.[59] In other words, the Board exercises *de novo* review in reading,

---

[55] *See* Trust Agreement at 1 ("[the United States] acting by and through [BOEM]"); Disbursement Agreement at 1 ("[the United States] acting by and through [BOEM]"); Bond Agreement at 1 ("the United States] through its authorized officer, The Regional Director, Gulf of Mexico OCS Region, [BOEM].").

[56] *See* Answer at 12; *El Paso Natural Gas Col.*, 156 IBLA 330, 336 (2002); *Eason v. BLM*, 166 IBLA 292, 295 (2005); *PetroCorp*, 152 IBLA 77, 84 (2000); *ASARCO, Inc.*, 116 IBLA 120, 126 (1990); *Walch Logging, Co., Inc. v. Ass't Area Director*, 90 I.D. 88, 95, 11 IBLA 85 (1983); *see also Mesa Air Group, Inc. v. Department of Transportation*, 87 F.3d 498, 503-04 (D.C. Cir. 1996); *Rosebud Coal Sales Co., Inc. v. Hodel*, 667 F.2d 949, 951 (10th Cir. 1982).

[57] *Linmar Petroleum Co.*, 153 IBLA 99, 106 (2000) (citations omitted); *accord Priority Energy, LLC*, 186 IBLA 363, 386 (2015); *see Eason v. BLM*, 166 IBLA at 295; *Koniag, Inc.*, 135 IBLA 41, 47 (1996); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 477 (2014).

[58] *Eason v. BLM*, 166 IBLA at 295 (quoting *Corbin on Contracts*, § 24.7 (1998)); *see id.* ("[A]mbiguity does not exist merely because the two parties disagree as to the meaning of a term."); *William J. Thoman*, 155 IBLA 266, 267 (2001).

[59] *Statoil Gulf of Mexico LLC*, 42 OHA 261, 289 (2011) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)); *see* Answer at 11 (citing *Shamrock Metals, LLC,* 184 IBLA 1, 3-4 (2013) and *IMC Kalium Carlsbad, Inc. v. Interior Board of Land Appeals*, 206 F.3d 1003, 1009-10 (10th Cir. 2000)).

interpreting, applying, and issuing a final decision for the Department on the proper interpretation of that contract

## II. Taylor was Not Entitled to an Offset of its Supplemental Trust Fund Deposits under the Bond Agreement.

BOEM stated it did not believe Taylor was entitled to any offset of its supplemental deposits under the Bond Agreement because "Taylor has not yet completed any phase of the 'Work,' as defined by the Trust Agreement."[60] It then rejected Taylor's proposal to keep all insurance proceeds and disbursements (in lieu of taking any deposit offset) because "[Taylor] may only retain insurance proceeds if they do not duplicate a disbursement that has been made from the Trust Account."[61] BOEM reasoned that by requiring Taylor "to forego disbursements for amounts reimbursed by its insurance company," BOEM is compensated "for the risk it has taken that [Taylor] will be unable to complete the work required by the agreements, and [BOEM] will need to complete it, likely at a higher expense than anticipated by the agreements."[62]

Taylor claims it was entitled to an offset under the Bond Agreement because it "fully completed one commitment and an agreed-upon interim completion of a second obligation prior to the deadlines to make supplemental deposits[.]"[63] BOEM agrees with Taylor that it completed pipeline decommissioning under the Trust Agreement, for which it received Trust Fund disbursements of $3 million and $1.25 million in insurance proceeds, but since it received the full disbursement under Trust Agreement Schedule A.4 ($3,000,000), no "offset" and reduction in funding was required or permitted under the Bond Agreement.[64] As to Taylor's claim to an

---

[60] 2009 Decision at 2.

[61] *Id.* (citing Bond Agreement § 2.4 and Trust Agreement § 4.1); *see id.* ("[If a Trust Fund disbursement] is later duplicated by insurance proceeds, [Taylor] must return that disbursement.").

[62] *Id.* at 2-3; *but see* Trust Agreement § 4.3 (Individual costs incurred in the performance of Obligations in excess of the amounts shown on Schedule A shall be the full responsibility of [Taylor], and no Trust Funds shall be disbursed to cover any such costs."); Bond Agreement § 2.8 ("[BOEM retains the] right to require additional bonding to guarantee performance of Taylor's obligations to plug and abandon the wells . . . ").

[63] SOR at 3; *see id.* at 9 ("BOEM concurred with Taylor's certification of the completed work (save the one step for IW-21 to be completed at a later date), and authorized disbursement to Taylor corresponding funds from the Trust Account.").

[64] *See* Answer at 13-14; *see* Trust Agreement Schedule A.4 ($3,000,000).

"offset" for interim completion of the IW-21 Well, BOEM stated no offset was warranted until the decommissioning of that well is "completed."[65]

A. *Taylor was Not Entitled to an Offset Based on Pipeline Decommissioning.*

We read the Trust and Bond Agreements as reflecting the parties' intent to ensure that Trust Funds would be available to pay the estimated cost to complete all work under the Trust Agreement. Simply stated, total deposits under the Bond Agreement for completing all Obligations under the Trust Agreement ($666,280,000) equaled the amount estimated by BOEM in its 2008 Areawide Bond ($466,280,000) and 2007 Supplemental Bond ($200,000,000) Orders.[66] As work is completed under the Trust Agreement, disbursements are made to Taylor up to the estimated cost of the Work, which would reduce the corpus of the Trust Fund by no more than that cost estimate, leaving sufficient funds to make disbursements when all other Work is completed. As Taylor correctly states in reply, the intent of the parties in the Agreements is for the Trust Account always to "have a declining balance."[67]

Section 2,3 if the Bond Agreement states:

Taylor will seek reimbursement from available insurance policies of all funds it spends performing the work required under [Trust Agreement Schedule A]. Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies, but the amount of the deposits required section 2.3 shall reflect an offset equivalent to the amount designated for work in Schedule A when that work is completed with funds from any source.

We read Bond Agreement § 2.4 as addressing what happens if an Obligation under the Trust Agreement is completed with insurance proceeds before a supplemental deposit need be made to the Trust Fund. Thus, a supplemental deposit could be offset by those insurance proceeds because no Trust Funds would be disbursed for that same work. Since the Trust Fund disbursed the full amount available under Trust Agreement Schedule A.4 ($3 million), there were no Obligations to offset with insurance proceeds under the Bond Agreement.[68] Although pipeline

---

[65] Answer at 16; *see id.* at 18 (quoting SOR at 9); *supra* note 50.

[66] *See* Bond Agreement, §§ 1.1, 1.5, 2.1, 2.2, 2.3; Trust Agreement.

[67] Reply at 4.

[68] Trust Agreement § 4.1 ("[Trust Fund disbursements are made] based upon a corresponding reduction of the Obligations in accordance with Schedule A."); *see id.* § 1.2(d) ("'Obligations' shall mean the duties and costs of [Taylor,] as set forth in

decommissioning costs were more than $4.25 million, the Trust Agreement clearly states Taylor is "fully responsible" for all pipeline decommissioning costs that exceed $3 million.[69] Thus, under our reading of the Agreements, Taylor could retain and use insurance proceeds to defray costs that exceed available disbursements under the Trust Agreement, but not to offset supplemental deposits under the Bond Agreement. Allowing an offset here for the $1.25 million Taylor received in insurance proceeds? would underfund the Trust Fund, leaving $1.25 million less in the Trust Fund to cover the estimated cost to complete all remaining work and satisfy all Obligations under the Trust Agreement. Although this appears to be the crux of Appellant's claim on appeal, we find no support for that result from our reading of the Agreements and, therefore, conclude that Taylor was not entitled to a deposit offset based on its receipt of insurance proceeds to decommission its pipelines.

B. *Taylor was Not Entitled to an Offset Based on Partially Completed Work on the IW-21 Well.*

Taylor claims it was entitled to an offset for the "agreed-to interim completion of IW-21," an intervention/relief well for plugging and abandoning the A-21 well.[70] The Bond Agreement states Taylor is entitled to offset its supplemental deposits "equivalent to the amount designated for work in Schedule A when that work is completed with funds from any source" (*e.g.*, Trust Fund disbursements, insurance proceeds, or retained earnings).[71] Until work is completed and an Obligation is satisfied under the Trust Agreement, there can be no offset under the Bond Agreement. In this case, there is no indication that the IW-21 Well was permanently plugged and abandoned, a condition precedent to Taylor claiming an offset for that work. We therefore conclude that Taylor was not entitled to a deposit offset under the Bond Agreement based on its interim completion of the IW-21 Well.

Although its work at the IW-21 Well was not yet complete, Taylor claims it was nonetheless entitled to a deposit offset for completing "a phase of the Work" under the Trust Agreement.[72] According to Taylor, a phase of work includes entering

---

Schedule A attached hereto arising pursuant to the terms of the Leases and applicable federal regulations related to such Leases.").

[69] Trust Agreement § 4.3, Payment of Obligation Costs in Excess of the "Schedule A" Cost Estimates; *see* Trust Agreement Schedule A.4 (Remove decommissioned pipelines - $3,000,000).

[70] SOR at 16; *see* supra note 6.

[71] Bond Agreement § 2.4.

[72] SOR at 18 (citing Trust Agreement § 4.2); *see* Trust Agreement § 4.2, Partial Payments for Work Phase completion ("Upon [Taylor]'s presentation to [BOEM] of

into a drilling rig contract for a particular well, which meant it was entitled to an offset of up to $12,750,000 for that phase of the work on the IW-21 Well.[73] Regardless of its entitlement to a partial payment under the Trust and Disbursement Agreements, we do not find Taylor was entitled to an offset under the Bond Agreement. We do not read their partial payment provisions as being the same as or equivalent to "completed" work under the Bond Agreement or that such was the intent of the parties when they entered into the Agreements.[74] We therefore reject Taylor's claimed entitlement to an offset based on its completing only part of the work and only partially satisfying its Obligations under the Trust Agreement.

### III. Taylor was not Entitled to Trust Fund Disbursements for Rig Downtime.

BOEM agrees Taylor is entitled to disbursements from the Trust Account for rig downtime costs because they are legitimate decommissioning expenses under the Agreements. But it denied Taylor's request to disburse Trust Account funds as reimbursement for these costs because it found "Taylor was actually overcompensated by the Trust [Account] in the amount of $6,503,951.74 for plugging and abandonment work so far completed" under the Agreements.[75]

Based on its allocation of costs between the nine wells that were decommissioned by the time of its 2011 Decision, including the roughly $27.5 million in additional costs substantiated by Taylor on September 6 and November 2, 2011, BOEM found Taylor incurred costs of $58,851,826.46 for plugging and abandoning the IW-21 well. BOEM also found, by engaging in a similar allocation of insurance proceeds for the additional work substantiated by Taylor, that it received a total of $51,272,055.20 in insurance proceeds for the plugging and abandonment of the IW-

---

an executed contract for a phase of the Work as identified in the Plan, [Taylor] shall be entitled, with the written concurrence of [BOEM], to receive one-half (1/2) of the sums allocated for such Work in Schedule A, which shall be released from the Trust Funds to [Taylor].").

[73] SOR at 18 (quoting Disbursement Agreement); see Disbursement Agreement § 1.A ("At the time that [Taylor] executes a contract for drilling rig, thereby becoming legally bound to make all payments required under that contract, it may submit a request for disbursement of one-half of the cost for the drilling rig for the full term of the contract.").

[74] See Answer at 18 ("As Taylor admits in its SOR [at 9], at the time of the 2009 Decision, Taylor had 'completed all but one step to plug and abandon the first well[.] Therefore, as Taylor had not yet completed a phase of work, it could not take an offset against its supplemental deposit.").

[75] Decision at 3.

Case 2:18-cv-14065-JCC-MBN Document 40-3 Filed 12/20/18 Page 37 of 39
Case 1:18-cv-01949-NBF Document 14-3 Filed 12/26/18 Page 37 of 39

IBLA 2010-12 & 2012-70

21 well. Thus, insurance proceeds covered the total costs for decommissioning the IW-21 well except for $7,579,771.26. But since the Trust Account had disbursed $25,500,000 to Taylor for that work, BOEM determined the Trust overcompensated Taylor for decommissioning the IW-21 well under the Trust Agreement by the difference, $17,920,228.74.

Taylor argues that it is entitled, under the Disbursement Agreement, to the requested disbursement for rig downtime costs, "[s]ince [it] received less than the allotted $25.5 million from Trust [Account] disbursements on *these five wells* [IW-4, IW-10, IW-11, IW-13, and IW-17] that Taylor plugged and abandoned."[76] Taylor requested "additional disbursements for *these wells* for rig down[]time in an amount of $10,433,905.12."[77] But Taylor ignores the fact that it was required to reimburse the Trust Account $17,920,228.74 for overcompensation on the IW-21 well. Under the Agreements before the Board, we conclude that BOEM correctly determined Taylor was not entitled to additional disbursements from the Trust Account for these nine wells.

Taylor was entitled by the Agreements to reimbursement of its substantiated costs to plug and abandon the IW-21 well to the extent they exceed insurance proceeds for that work, which was only $7,579,771.26. But since Taylor had already been reimbursed the maximum allowed by the Trust Agreement for that well, $25,500,000,[78] BOEM properly determined under the Agreements that Taylor was required to return the difference to the Trust Account, $17,920,228.74, as overcompensation or an overpayment. When the rig credit of $2,623,489 that Taylor admittedly owed the Trust Account is added to that amount, Taylor then owed

---

[76] SOR at 19 (emphasis added).

[77] *Id.*; *see id.* at 23 ("Under the plain language of the Trust Agreement, Taylor is entitled to reimbursement of the[] [rig downtime] costs because the total 'compensation' to Taylor is less than $25.5 million for the IW-4, 10, 11, 13, and 17 wells.").

[78] *See* Answer at 19 ("Because of th[e] prohibition [of duplicative disbursements and insurance proceeds], for work done on IW 21, BOEM had authority to disburse only the difference between actual costs and the amount reimbursed by insurance proceeds."), 22 ("[I]f Taylor received insurance proceeds for Schedule A work on a particular well, but then received the full $25.5 million disbursement for the same well, any amount of the disbursement that was duplicated by the insurance payment would need to be returned to the Trust. For example, if Taylor expended $55.5 million on a well and received $50 million in insurance proceeds for that well, it would be entitled to only the difference, *i.e.*, $5.5 million, from the Trust. . . . [I]t would have to repay the Trust $20 million.").

the Trust Account $20,543,717.74. Offsetting that amount by the $14,039,766 in rig
downtime costs to decommission five wells (IW-4, IW-10, IW-11, IW-13, and IW-17),
leaves Taylor owing $6,503,951.74 to the Trust Account.

BOEM's 2009 and 2011 Decisions reflect a proper construction of the
Agreements. BOEM interpreted the Agreements as requiring the Trust Account to
remain fully funded. As BOEM states:

> The funds in the Trust Account are encumbered funds, to be used to
> fulfill Taylor's decommissioning obligations – obligations Taylor
> knowingly assumed when it became a lessee on its . . . [OCS]
> leases. . . . BOEM has no access to the Trust [Account] funds for its
> own use. The money can only be expended to decommission the
> [offshore] . . . site. Withholding money in the Trust [Account] actually
> benefits Taylor by putting at Taylor's disposal funds to continue
> decommissioning the [offshore] . . . site, because Taylor continues to be
> obligated to do so.[79]

The ultimate aim of the Trust Account is to ensure that, regardless of the future
financial solvency of Taylor or the availability of insurance proceeds from Taylor's
private insurer, all of the work necessary to remove, plug and abandon, and
otherwise fully decommission all of the wells, platform, pipeline, and other offshore
facilities is completed. Once that work ends, the remaining funds in the Trust
Account, including any and all funds that are not currently allocated to any future
decommissioning work, will be returned to Taylor.[80] We thus conclude that the
2009 and 2011 Decisions fully comport with the plain language and intent of the
Agreements.

*CONCLUSION*

We conclude that the Regional Director properly denied Taylor's requests to
retain insurance proceeds, together with disbursements, in lieu of offsetting them
against the final supplemental deposits to the Trust Account. We further conclude
that the Regional Director properly denied the disbursement of Trust Account funds
for rig downtime costs related to the decommissioning of the Mississippi Canyon
Blocks 20/21 and South Pass Block 73 platform, wells, pipeline, and other offshore
facilities, situated on its OCS oil and gas leases.

---

[79] Answer at 3-17.

[80] *See* Reply at 2 ("[T]here are over $10 million of funds in the Trust Account
allocated to the performance of none of the remaining obligations in Schedule A"), 5.

IBLA 2010-12 & 2012-70

    Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, we affirm both the 2009 Decision and the 2011 Decision.

James K. Jackson
Administrative Judge

I concur:

James F. Roberts
Acting Chief Administrative Judge