# EXHIBIT B

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| TAYLOR ENERGY COMPANY LLC, | ) |
| Plaintiff, | )  No. 18-1949C |
| | )  Judge Nancy B. Firestone |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

### DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(3) of the Rules of the Court of Federal Claims (RCFC), and 28 U.S.C. § 1500, defendant, the United States, respectfully moves to dismiss the complaint filed by plaintiff, Taylor Energy Company, LLC (Taylor), because this Court lacks subject matter jurisdiction to entertain Taylor's complaint.

### SUMMARY

This Court lacks jurisdiction to entertain Taylor's complaint because, before filing its complaint in this Court, Taylor filed a "substantially similar" lawsuit in the United States District Court for the Eastern District of Louisiana involving the same operative facts and seeking, ultimately, the same relief, a return of $10 million from the Trust account established to pay for Taylor's decommissioning efforts at the site of Taylor's collapsed drilling platform in the Gulf of Mexico.  Because Taylor's filing in the Eastern District of Louisiana preceded its filing in this Court, pursuant to 28 U.S.C. § 1500, longstanding precedential decisions and RCFC 12(h)(3), this Court does not possess jurisdiction to entertain Taylor's complaint, and it must dismiss Taylor's complaint.

EXHIBIT B

## QUESTION PRESENTED

1. Whether the lawsuit Taylor filed in a United States District Court asserts the same operative facts as those asserted in its later-filed suit in the United States Court of Federal Claims, such that the Court of Federal Claims does not possess jurisdiction to entertain Taylor's complaint?

## STATEMENT OF FACTS

### I. Taylor Filed A "Substantially Similar" Complaint In The Eastern District Of Louisiana Before It Filed Its Complaint In This Court

On December 20, 2018, at approximately 11:38 am, central standard time, Taylor filed a complaint in the Eastern District of Louisiana. *See* Ex. A, Email from Carl Rosenblum to John Roberson (Dec. 20, 12:56 pm); Ex. B, Complaint, *Taylor Energy Company LLC v. United States Department of the Interior et al.,* No. 2:18 cv 14065, E.D. La., Dec. 20, 2018). Upon filing its complaint, Taylor received a Notice of Electronic Filing from the Eastern District of Louisiana, which stated that "[t]he following transaction was entered by Rosenblum, Carl on 12/20/2018 at 11:38 AM CST and filed on 12/20/2018." *Id.* Below this statement, the Docket Text indicates that the "transaction" was the filing of the complaint in that case. *Id.*

Later on December 20, 2018, Taylor filed a complaint in this Court, which it expressly acknowledges is "substantially similar" to its complaint in the Eastern District of Louisiana. *See* Complaint at 2 n2. To be precise, Taylor filed its complaint in this Court at approximately 11:56 am central standard time. *See* Ex. C, Email from Carl Rosenblum to John Roberson (Dec. 20, 2018, 1:03 pm) (forwarding Notice of Electronic Filing from the United States Court of Federal Claims noting that the complaint was filed

2

at 12:56 pm eastern standard time (the equivalent of 11:56 am central standard time)).

Thus, at the time that Taylor filed its complaint in this case, its complaint in the Eastern

District of Louisiana, filed earlier at 11:38 am, was already pending.

## II.    Taylor's Complaint In The Eastern District Of Louisiana Is "Substantially Similar" To Taylor's Complaint In This Court

Taylor has expressly acknowledged in its complaint in this Court that its lawsuit here

is "substantially similar" to its lawsuit in the Eastern District of Louisiana, which Taylor

admits it had already "*filed*" in the Eastern District of Louisiana.  Complaint at 2 n.2.

This similarity is unsurprising because, in both lawsuits, Taylor seeks to appeal the same

IBLA decision.  *Compare* Complaint at ¶ 8 ("As a result of the IBLA Decision affirming

the 2009 and 2011 Decisions of BOEM . . . the United States has breached the

Agreements.") *and* Ex. B, Complaint No. 2:18 cv 14065, E.D. La., Dec. 20, 2018) at ¶ 1

("Taylor Energy seeks judicial review of the IBLA's October 29, 2018 final decision.").

Specifically, Taylor stated:

> Taylor Energy advises this Court that it has also *filed* a *substantially similar* lawsuit against the United States in the United States District Court for the Eastern District of Louisiana under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").  That suit *was filed* in an abundance of caution in the event jurisdiction in this Court under the Tucker Act is determined to be improper.  Taylor Energy intends to seek a stay of that APA proceeding pending this Court's determination of subject matter jurisdiction.

Complaint at 2 n. 2 (emphasis added).

Thus, Taylor acknowledges that its complaint in the Eastern District of Louisiana

"was filed" before its filing of the complaint in this matter, and that the claims are so

"substantially similar" that it "intends to seek a stay" of the Eastern District of Louisiana litigation pending this Court's determination of subject matter jurisdiction.

A review of Taylor's two complaints demonstrates that the two complaints are, in fact, "substantially similar." Most importantly, both lawsuits set forth the same set of operative facts. Indeed, every single paragraph of the Relevant Facts section of the two complaints are identical with the exception of a single paragraph. *Compare* Complaint (CFC) at ¶¶ 9 – 31 *with* Complaint (E.D. La.) at ¶¶ 16 – 38. And the only difference between the two complaints with respect to the one non-identical paragraph is that, in the complaint filed in this Court, at paragraph 13, Taylor specifically identifies its three agreements with the United States connected with the formation and funding of the Trust, whereas in the complaint filed in the Eastern District of Louisiana, at paragraph 20, Taylor does not expressly identify the three Agreements.

Furthermore, in both complaints, the relief Taylor seeks is the repudiation of a ruling by the Interior Board of Land Appeals, which affirmed decisions of the Bureau of Ocean Energy Management (BOEM) to not provide an offset to Taylor equal to the proceeds Taylor received from its insurance carrier – leading to the ultimate relief of a payment of $10,433,905.12 to Taylor. *Compare* Complaint (CFC) at ¶¶ 33, 36 *with* Complaint (E.D. La.) at p. 10 at "Relief Requested" at ¶¶ 1, 3.

Finally, in both complaints, the parties identified by Taylor are the same. *Compare* Complaint (CFC) at ¶¶ 1-4 *with* Complaint (E.D. La.) at ¶¶ 4-7.

## ARGUMENT

### I.     Standard Of Review

Plaintiffs have the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *See Kokonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)); *Resource Investments, Inc. v. United States*, 114 Fed. Cl. 639, 646 (2014).

In reviewing a motion to dismiss, the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000).  Nevertheless, subject matter jurisdiction is a threshold issue to be considered before proceeding to the merits of the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

If subject matter jurisdiction is lacking, the Court must dismiss the claim.  RCFC 12(h)(3).

### II.     This Court Does Not Possess Jurisdiction To Entertain Taylor's Claims Because Taylor Had Previously Filed An Action Asserting The Same Claims In the Eastern District of Louisiana

This Court must dismiss Taylor's complaint because, as Taylor admits, it filed a substantially similar lawsuit asserting the same operative facts in the Eastern District of Louisiana before filing suit in this Court.  Pursuant to 28 U.S.C. § 1500, a long line of cases interpreting the contours of that statute, and this Court's Rules, this Court does not possess jurisdiction to entertain Taylor's complaint.

The jurisdictional bar (now codified in 28 U.S.C. § 1500) against plaintiffs seeking essentially the same claim in both a district court and this Court reflects a

5

longstanding doctrine; indeed, it was first established more than 150 years ago, in 1868, to curb duplicate lawsuits brought by residents of the Confederacy. *See United States v. Tohono O'Odham Nation*, 563 U.S. 307, 311 (2011); *see also UNR Indus., Inc. v. United States*, 962 F.2d 1013, 1017-19 (Fed. Cir. 1992) (discussing the historic background of § 1500 and its predecessor).

The statute at 28 U.S.C. § 1500 states:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500.

The United States Court of Appeals for the Federal Circuit has stated that, "[t]o determine whether § 1500 applies, a court must make two inquiries: '(1) whether there is an earlier-filed 'suit or process' pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed case are 'for or in respect to' the same claim(s) asserted in the later-filed Court of Federal Claims action.'" *Petro Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1381 (Fed. Cir. 2017) (quoting *Resource Investments, Inc. v. United States*, 785 F.3d 660, 664 (Fed. Cir. 2015)).

Thus, as for the first prong of a § 1500 determination, the Federal Circuit has made it clear that § 1500 applies only when a suit is commenced in another court against the United States before the claim is filed in the Court of Federal Claims. *See Petro Hunt*, 862 F.3d at 1384 (citing *Tecon Eng'rs, Inc. v. United States*, 343 F.2d 943, 949

6

(Ct. Cl. 1965); *Brandt v. United States*, 710 F.3d 1369, 1379 n.7 (Fed. Cir. 2013); and

*Hardwick Bros. Co. II v. United States*, 72 F.3d 883, 886 (Fed. Cir. 1995)).  Here, there

can be no dispute that Taylor filed suit in the Eastern District of Louisiana before filing

its complaint in this Court.  See above at 2.

      As for the second prong of a § 1500 determination, two suits are deemed to be

"for or in respect to" the same claim "if they are based on substantially the same

operative facts, regardless of the relief sought in each suit."  *Tohono*, 563 U.S. at 317.

> An interpretation of § 1500 focused on the facts rather than
> the relief a party seeks preserves the provision as it was
> meant to function, and it keeps the provision from becoming
> a mere pleading rule, to be circumvented by carving up a
> single transaction into overlapping pieces seeking different
> relief.

*Tohono*, 563 U.S. at 315.  As the *Tohono* Court explained, "two suits are for or in respect

to the same claim when they are based on substantially the same operative facts."  *Id.* at

318 (citing *Keene Corp. v. United* States, 508 U.S. 200, 206 (1993)); *accord Central*

*Pines Land Co., L.L.C. v. United States*, 697 F.3d 1360, 164 (Fed Cir. 2012); *Trusted*

*Integration, Inc. v. United States*, 659 F.3d 1159, 1164-66 (Fed. Cir. 2011); *Hymas v.*

*United States*, No. 18-831C, 2018 WL 6600973 at *13 (Fed. Cl., Dec. 17, 2018); *Straw v.*

*United* States, No. 17-1082C, 2017 WL 6045984 at *12 (Fed. Cl. Dec. 6, 2017);

*Resource Investments*, 114 Fed. Cl. at 643-44; *Coeur d'Alene Tribe v. United States*, 102

Fed. Cl. 17, 22 (2011); *British American Tobacco Co., Ltd. v. United States*, 89 Ct. Cl.

438, 440 (1939).

Here, there can be no dispute that Taylor's suit in the Eastern District of Louisiana and in this Court set forth the same operative facts. As noted above, the two complaints' recitations of the Relevant Facts are nearly identical. See above at 4.

Accordingly, this Court is prohibited by 28 U.S.C. 1500 from entertaining Taylor's complaint and it must dismiss the complaint. *See* 28 U.S.C. § 1500; *Tohono*, 563 U.S. at 317-18; *Keene*, 508 U.S. at 215-17; *Petro-Hunt*, 862 F.3d at 1384; *Resource Investments*, 785 F.3d at 668; *Central Pines*, 697 F.3d at 1366-67; *Trusted Integration*, 659 F.3d at 1165-67; *Hymas,* 2018 WL 6600973 at * 15; *Straw*, 2017 WL 6045984 at *12; *Hood v. United States*, 130 Fed. Cl. 232, 241-42 (2017); *Coeur d'Alene*, 102 Fed. Cl. at 26-27; *Nat'l Cored Forgings Co. v. United States*, 132 Ct. Cl. 11, 20 (1955); *British American*, 89 Ct. Cl. at 440; RCFC 12(h)(3).

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court dismiss Taylor's complaint for lack of jurisdiction.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director


/s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director

8

/s/ John H. Roberson
JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 353-7972
Fax: (202) 514-8640
Dated:  February 15, 2019          Email:  John.Roberson@usdoj.gov

# EXHIBIT  A

| From: | Rosenblum, Carl |
|---|---|
| To: | Roberson, John (CIV) |
| Cc: | William (Will) Pecue II |
| Subject: | Fwd: [EXTERNAL] Activity in Case 2:18-cv-14065 Taylor Energy Company LLC v. United States Department of Interior et al Complaint |
| Date: | Thursday, December 20, 2018 12:56:23 PM |

John- Attached is a courtesy copy of a suit filed today.

Sent from my iPhone

Begin forwarded message:

From: <Efile_Notice@laed.uscourts.gov<mailto:Efile_Notice@laed.uscourts.gov>>
Date: December 20, 2018 at 11:38:22 AM CST
To: <Efile_Information@laed.uscourts.gov<mailto:Efile_Information@laed.uscourts.gov>>
Subject: [EXTERNAL] Activity in Case 2:18-cv-14065 Taylor Energy Company LLC v. United States Department of Interior et al Complaint

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

U.S. District Court

Eastern District of Louisiana

Notice of Electronic Filing

The following transaction was entered by Rosenblum, Carl on 12/20/2018 at 11:38 AM CST and filed on 12/20/2018
Case Name:    Taylor Energy Company LLC v. United States Department of Interior et al
Case Number:    2:18-cv-14065<https://ecf.laed.uscourts.gov/cgi-bin/DktRpt.pl?227499>
Filer:  Taylor Energy Company LLC
Document Number:    1<https://ecf.laed.uscourts.gov/doc1/085010632423?caseid=227499&de_seq_num=5&magic_num=92568380>

Docket Text:
COMPLAINT against All Defendants (Filing fee $ 400 receipt number 053L-7316956) filed by Taylor Energy Company LLC. (Attachments: # (1) Civil Cover Sheet, # (2) Exhibit 1, # (3) Exhibit 2, # (4) Exhibit 3)Attorney Carl David Rosenblum added to party Taylor Energy Company LLC(pty:pla).(Rosenblum, Carl)

2:18-cv-14065 Notice has been electronically mailed to:

Carl David Rosenblum    crosenblum@joneswalker.com<mailto:crosenblum@joneswalker.com>,
bmonaghan@joneswalker.com<mailto:bmonaghan@joneswalker.com>,
rbourg@joneswalker.com<mailto:rbourg@joneswalker.com>

2:18-cv-14065 Notice has been delivered by other means to:

The following document(s) are associated with this transaction:

Document description:Main Document
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1091133085 [Date=12/20/2018] [FileNumber=9598920-
0] [9961008779ab0bdf704a1f30a7d9d96f608522845c4cd9c6cd33921bc024068f40
51f8fd4f5781c92f8aed7e81a0bf0930f1719d376d363712c5206d0b5d766e]]
Document description:Civil Cover Sheet
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1091133085 [Date=12/20/2018] [FileNumber=9598920-
1] [094056f173245a19cd1ea0c18ce56c9ef17e7b82f183d284a214a9743895fcb9fc
de42c9c409c0ab443f393a6f2c61044436dee11c0b5954160f919b2ead9d3f]]
Document description:Exhibit 1
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1091133085 [Date=12/20/2018] [FileNumber=9598920-
2] [708aad016da394439973dcc9abc92cb90662b15040ffeb93fb030a07d3889123c5
08b47cc6a488d7597dbc8a136d6a6afc6608ded3780cfebc50549f97f7f00]]
Document description:Exhibit 2
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1091133085 [Date=12/20/2018] [FileNumber=9598920-
3] [84c4bd56820a59d710699df63acb3229c86babcc64f26d9644182997a8a2973478
8c8e83bc6238a7e568eb275e67ccb78b7a4de0bd84c35616b461ab0380e5a8]]
Document description:Exhibit 3
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1091133085 [Date=12/20/2018] [FileNumber=9598920-
4] [b378d739e8360e80f4528d7996da6110291e5528f17728b8436c46cb379a1065c0
4d9c113380dd01711631004cbc499747a813f79eae42d11d6cc1f094dd580f]]

# EXHIBIT  B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TAYLOR ENERGY COMPANY LLC,** | * | **CIVIL ACTION NO.:** |
| | * | |
| **Plaintiff,** | * | **SECTION:** |
| | * | |
| **V.** | * | **MAGISTRATE:** |
| | * | |
| **UNITED STATES DEPARTMENT OF THE** | * | |
| **INTERIOR, RYAN ZINKE, IN HIS OFFICIAL** | * | |
| **CAPACITY AS SECRETARY OF THE** | * | |
| **UNITED STATES DEPARTMENT OF THE** | * | |
| **INTERIOR, AND THE BUREAU OF** | * | |
| **OCEAN ENERGY MANAGEMENT,** | * | |
| | * | |
| **Defendants** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT

Plaintiff, Taylor Energy Company LLC ("Taylor Energy"), brings this civil action under

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, for judicial review related to

the arbitrary, capricious and not otherwise in accordance with law decisions of the United States

Department of the Interior ("Interior") through the Interior Board of Land Appeals ("IBLA"),

and through the Bureau of Ocean Energy Management ("BOEM," formerly known as the U.S.

Minerals Management Service ("MMS")), in connection with the decommissioning of oil and

gas facilities at Mississippi Canyon Block 20 ("MC20") in the Gulf of Mexico, and avers as

follows:

### I.     NATURE OF THE ACTION

1.     Taylor Energy seeks judicial review of the IBLA's October 29, 2018 final

decision ("IBLA Decision") upholding BOEM's failure to follow "common-law principles of

contract law" and the express mandates of the Outer Continental Shelf Lands Act ("OCSLA"),

the Oil Pollution Act, federal regulations implementing these statutes, and three related agreements: (1) a March 19, 2008 Trust Agreement ("Trust Agreement"); (2) an Agreement to Provide Additional Bond ("Bond Agreement"); and (3) an Agreement Between Taylor Energy and the MMS to Implement Article IV-Disbursements of the Trust Agreement ("Disbursement Agreement") (collectively referred to as "the Agreements").[1]  Taylor Energy entered into all three of the Agreements as part of a "settlement" with the MMS to fund certain defined "Obligations" under the Trust Agreement to decommission an oil and gas platform and wells destroyed at MC20 in 2004 in the wake of Hurricane Ivan.

2.        Specifically, Taylor Energy seeks review of the IBLA Decision that affirmed two BOEM decisions related to BOEM's interpretation of the Agreements: (1) BOEM's August 28, 2009 decision ("2009 Decision") in which BOEM took the position that Taylor Energy was required to: (a) deposit supplemental funds into the Trust Account; and (b) "reimburse" the Trust Account for "duplicative" insurance proceeds received; and (2) BOEM's November 7, 2011 decision ("2011 Decision") denying Taylor's Energy's request for disbursement of Trust Account funds related to rig down time, a necessary cost related to securing a continuous contract for a drilling rig required to decommission the wells.

3.        The net effect of BOEM's 2009 and 2011 Decisions was to improperly deny Taylor Energy a $10,433,905.12 disbursement of its own funds from the Trust Account.  The Trust Account presently and incorrectly contains Taylor Energy's funds deposited to "secure" "Obligations" that Taylor Energy has already performed. The IBLA Decision affirming BOEM's

---

[1] Because Taylor Energy's claims relate to Defendants' violation of the Agreements, Taylor Energy has also filed suit against Defendants in the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491 *et seq.*  This suit is filed in an abundance of caution in the event jurisdiction is determined to be improper in the Court of Federal Claims.  Taylor Energy intends to seek a stay of this proceeding pending that determination.

decisions denying Taylor Energy its rightful reimbursements is therefore arbitrary, capricious, and not in accordance with law.

## II.    PARTIES

4.      Plaintiff Taylor Energy is a Louisiana limited liability company with its principal place of business in New Orleans, Louisiana.  Its sole member is Phyllis M. Taylor, a Louisiana resident domiciled in Orleans Parish, Louisiana.

5.      Defendant United States Department of the Interior is the federal agency with authority, through the Secretary, to supervise and manage BOEM,[2] a successor agency to the MMS, the party that executed the Agreements.

6.      Defendant Ryan Zinke is sued in his official capacity as Interior Secretary.  He is the chief officer of Interior charged with overseeing the proper administration and implementation of OCSLA.  The IBLA makes decisions final for Interior on delegated authority from the Secretary. 43 C.F.R. § 4.1.

7.      Defendant BOEM is the bureau with authority, pursuant to OCSLA, to ensure the financial state of lessees and to administer the Agreements.

## III.    JURISDICTION

8.      This Court has subject matter jurisdiction over this action pursuant to the APA, 5 U.S.C. §§ 701-706 and 28 U.S.C. § 1331 (federal question).  The APA waives the Government's sovereign immunity and specifically authorizes suits against the Government for the relief set forth herein.

9.      Venue lies in this Court under 28 U.S.C. § 1391(e) because a substantial part of the events giving rise to this action and the underlying claims occurred in the Eastern District of

---

[2] The predecessor to BOEM is the Minerals Management Service ("MMS") of the DOI.  From mid-June 2010 to October of 2011, DOI renamed MMS the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").  On October 1, 2011, DOI replaced MMS with BOEM and another Bureau.

Louisiana. Defendant BOEM has an office in New Orleans, Louisiana, which is within the Eastern District of Louisiana and therefore resides in this District. Venue is also dictated in the Eastern District of Louisiana by Section 12(a)(1) of the Bond Agreement.

## IV. LEGAL BACKGROUND

10.     The APA allows persons and organizations to challenge final agency actions in federal court. 5 U.S.C. §§ 702, 704.

11.     The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

12.     "[A]gency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C.§ 551(13).

13.     The APA provides that a court shall hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

14.     The APA also allows an affected party to challenge final agency actions in federal court. 5 U.S.C. §§ 702, 704.

15.     BOEM manages the federal government's outer continental shelf oil and gas leasing program, including requiring financial assurance from lessees and operators for, among other things, the decommissioning of their oil and gas facilities.

## V. RELEVANT FACTS

16.     Taylor Energy was the lessee and operator of: (a) the Outer Continental Shelf (OCS) lease covering MC20, Lease OCS-G 04935 ("MC20 Lease"); and (b) part of two former

OCS leases covering Mississippi Canyon Block 21 and South Pass Block 73, Lease OCS-G

15459 and Lease OCS-G 15371, respectively, on which a platform, 28 wells and associated

facilities were located.

17.     Taylor Energy acquired its interest in the MC20 Lease dated, effective December

1, 1981, by assignment from BP Exploration & Oil Inc. ("BP"), effective April 1, 1994.

18.     On September 16, 2004, Hurricane Ivan, a storm that alternated between a

Category 4 and a Category 5 storm, struck the MC20 Site resulting in a massive seafloor shift

that toppled the MC20 platform, scattered debris on and under the seafloor and severely

damaged all of Taylor Energy's oil and gas wells at MC20.  As a result of the unprecedented

seafloor collapse, the platform now lies about 550 feet down slope and southeast from its original

location.  The associated well bores now rest in a tangled web buried under mud and sediment.

All production at MC20 permanently ceased several days before Hurricane Ivan hit in

preparation for the storm.

19.     Taylor Energy, in collaboration with the responsible federal agencies, including

BOEM, and the United States Coast Guard, promptly began efforts to identify a technologically

feasible, safe, and unprecedented plan to decommission the MC20 facilities.  This plan involved

drilling intervention wells which provided the only means of plugging and abandoning the wells.

20.     In furtherance of this goal, Taylor Energy and the United States, acting by and

through the MMS, entered into the Agreements in 2008 to comply with OCSLA and federal

regulations, and to secure a source of funds for Taylor Energy's performance of its "Obligations"

under the Trust Agreement to decommission the oil and gas facilities at MC20.

21.     Under the terms of the Agreements, Taylor Energy deposited $666,280,000 of its

own funds into a Trust Account to cover the specific enumerated decommissioning

"Obligations" at MC20 listed on Exhibit A to the Trust Agreement. The Agreements specifically allocated the $666,280,000 to 29 separate commitments to: plug and abandon 25 of 28 wells; decommission a pipeline; remove the platform deck and flare boom; remove seafloor debris; and remove contaminated soil.

22. Since the deposit by Taylor Energy was to be made over time, the Bond Agreement expressly provided that Taylor Energy was entitled to an offset, or reduction, from its remaining supplemental deposits for any work that Taylor Energy completed prior to the due date for any supplemental deposit.

23. Upon the completion of each of the specified 29 commitments, Taylor Energy would seek a disbursement of its deposited funds for actual costs up to a designated amount: $25.5 million per well to plug and abandon (for a total of $637.5 million for all 25 wells), $6.245 million to remove the platform deck and flare boom, $6.535 million to remove seafloor debris, $3 million to decommission a pipeline, and $13 million to remove contaminated soil.

24. The Agreements provided that Taylor Energy would make the $666,280,000 deposit in several installments. To account for the fact that Taylor Energy might complete some of the specified decommissioning work _before_ the later installments were due, and consistent with the clear wording under the Trust Agreement that Taylor Energy deposit a _maximum_ of $666,280,000 into the Trust Account, the Bond Agreement provided for an "offset" or reduction of later installment deposits for any work completed prior to the date those deposits were due. The offset provision recognized that there would be no need to "secure" funds to guarantee performance of specified decommissioning work that Taylor Energy had already completed.

25. The Agreements also required Taylor Energy to seek reimbursement from Taylor Energy's insurance policies for work performed at MC20. The Agreements specifically

provided that while Taylor Energy would not be entitled to disbursements from the Trust Account for costs reimbursed by insurance, for any work performed <u>prior</u> to the due date of the final installment deposits, using money from any source (including insurance), Taylor Energy would be entitled to a reduction or offset in the amount it was required to deposit into the Trust Account equal to the designated amount stated in the Trust Agreement for the already completed work.

26.     In compliance with the Agreements, Taylor Energy secured contracts to begin the required work, and submitted invoices to its insurance underwriter as well as disbursement requests to BOEM for its completion of these commitments.   In most instances, BOEM concurred with Taylor Energy's certification of the completed work and released Taylor Energy's corresponding funds from the Trust Account.   However, as to certain disbursement requests, BOEM erroneously denied Taylor Energy's requests.

### A. The 2009 Decision

27.     In August of 2009, BOEM maintained, contrary to the clear and plain terms of the Agreements, that because Taylor Energy received proceeds from insurance which BOEM believed may have been for the same work as the disbursement, Taylor Energy was not entitled to an offset from its remaining supplemental deposits for that work.   This was so notwithstanding that the work had been performed and was "completed" prior to the date of the supplemental deposit.

28.     Thereafter, on August 13, 2009, Taylor Energy documented its process to follow the Agreements so that it would fully fund the Trust Account, but retain its lawfully-procured insurance proceeds.   Taylor Energy acknowledged that the Trust Account should be fully funded and, therefore, deposited all the supplemental deposits to the Trust Account, but notified BOEM

that the final deposits were made "under protest" pending resolution of BOEM's erroneous and unlawful interpretation of the Agreements.

29.     On August 28, 2009, BOEM issued a decision denying Taylor Energy's protest and declared that Taylor Energy was required to: (a) deposit supplemental funds into the Trust Account; and (b) "reimburse" the Trust Account for "duplicative" insurance proceeds received. *See* 2009 Decision attached hereto as Exhibit "1."

30.     Essentially, BOEM's 2009 Decision required Taylor Energy to provide an additional deposit to the Trust Account to refund money for work Taylor Energy had already paid for and completed. BOEM's 2009 Decision required Taylor Energy to deposit the full amount ($666,280,000) into the Trust Account plus "reimburse" the Trust Account for insurance proceeds received. This determination by BOEM required Taylor Energy to "over fund" and double-pay for a commitment already completed, and denied Taylor Energy's request for even one disbursement for the same commitment. BOEM's interpretation and 2009 Decision is contrary to the clear and plain language of the Agreements.

31.     Additionally, BOEM ignored and rendered meaningless the deposit "offset provision" set forth in the Bond Agreement through its interpretation of the Agreements.

### B. The 2011 Decision

32.     On August 15, 2011, September 6, 2011, and November 2, 2011, Taylor Energy requested disbursements of its own funds from the Trust Account for rig-down time costs.

33.     On November 7, 2011, BOEM denied Taylor Energy's request for disbursement of Trust Account funds related to rig-down time arising out of the inability to continue operations during hurricane season, a necessary cost related to securing a continuous contract for a drilling rig required to plug and abandon certain of the 25 wells. *See* 2011 Decision attached hereto as Exhibit "2."

34.     BOEM's 2011 Decision applies the same flawed logic as the 2009 Decision.  It is also arbitrary and capricious and not otherwise in accordance with law in light of the clear and plain terms of the Agreements, as it requires Taylor Energy to "ensure" the availability of funds to pay for the commitment to plug and abandon one well multiple times—first by paying to drill the intervention well, second by paying into the Trust Account via a supplemental deposit after work on that well was already complete, and a third time because BOEM denied Taylor Energy's disbursement for work completed.

35.     Contrary to the 2011 Decision, Taylor Energy has not been "overcompensated" or received "excess disbursements" or "overpayments" for this obligation under the Trust Agreement.  In fact, contrary to the Agreements Taylor Energy has actually received disbursements of <u>less than</u> the allocated $25.5 million for each of the wells that it decommissioned.

36.     In essence, the 2011 Decision, like the 2009 Decision, retains Taylor Energy's funds in the Trust Account to "secure" the completion of "Obligations" that Taylor Energy already fulfilled.  BOEM's interpretation and the 2011 Decision runs contrary to the clear and plain terms of the Agreements.  The net effect of BOEM's 2009 and 2011 Decisions was to improperly withhold $10,433,905.12 of Taylor Energy's funds.

### *C. The IBLA Decision*

37.     Taylor Energy timely appealed BOEM's 2009 and 2011 Decisions to the IBLA thereby exhausting the administrative remedies as required by 30 C.F.R. § 590.8.  On October 29, 2018, the IBLA affirmed BOEM's 2009 and 2011 Decisions, which constitutes final agency action under 5 U.S.C. § 704.  *See* 193 IBLA 167, attached hereto as Exhibit "3."

38.     Like BOEM, the IBLA rendered meaningless the deposit "offset provision" contained in the Bond Agreement through its interpretation in connection with the 2009

Decision. Further, in connection with the 2011 Decision its <u>conclusions that</u> Taylor Energy had been "overcompensated" on one well (IW-21) and that the Trust Account needs to "remain fully funded" is erroneous. This conclusion improperly requires that funds remain in the Trust Account despite "not currently allocated to any future decommissioning work."

## VI.  CAUSE OF ACTION

### THE IBLA DECISION IS ARBITRARY, CAPRICIOUS AND OTHERWISE NOT IN ACCORDANCE WITH LAW

39.    Taylor Energy incorporates by reference each of the allegations set forth above.

40.    The IBLA Decision affirming the 2009 Decision and 2011 Decision of BOEM is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  The 2009 and 2011 Decisions are contrary to the plain and clear terms of the Agreements and unlawfully withheld Taylor Energy's funds to "secure" obligations that Taylor Energy has already completed.

41.    As a result of the IBLA Decision affirming the BOEM 2009 and 2011 Decisions, Taylor Energy is suffering and will continue to suffer harm.

## VII.  RELIEF REQUESTED

Taylor Energy respectfully requests that this Court order the following relief:

1.    Reverse, set aside, and vacate the IBLA Decision affirming BOEM's 2009 and 2011 Decisions;

2.    Declare that the 2009 Decision and 2011 Decision are arbitrary, capricious, contrary to law and an abuse of discretion;

3.    Remand to BOEM with instructions to direct the disbursement of the funds ($10,433,905.12 plus applicable interests) owed to Taylor Energy;

4.    All reasonable costs and attorneys' fees as authorized by law; and

5.      For such further relief as the Court deems just, proper, and equitable.

Dated:  December 20th, 2018

Respectfully submitted,

By: *s/ Carl D. Rosenblum*
        Carl D. Rosenblum, T.A. (La. Bar No. 2083)
        Edward D. Wegmann (La. Bar No. 13315)
        Alida C. Hainkel (La. Bar No. 24114)
        Lauren C. Mastio (La. Bar No. 33077)
        JONES WALKER LLP
        201 St. Charles Avenue, 49th Floor
        New Orleans, Louisiana 70170-5100
        Telephone:  (504) 582-8296
        Facsimile: (504) 589-8296
        crosenblum@joneswalker.com

*Attorneys for Taylor Energy Company LLC,*
*Plaintiff*

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Taylor Energy Company LLC

**(b)** County of Residence of First Listed Plaintiff   Orleans
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Carl D. Rosenblum (#02083) / Edward D. Wegmann (#13315) / Alida C. Hainkel (#24114) / Lauren C. Mastio (#33077) / Jones Walker LLP
201 St. Charles Avenue, 49th Fl., New Orleans, LA (504) 582-8296

## DEFENDANTS

United States Department of the Interior, Ryan Zinke, In His Official Capacity as Secretary of the United States Department of the Interior, and the Bureau of Ocean Energy Management

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☒ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 USC § 701-706 and 28 USC § 1331
Brief description of cause:
Judicial Review of Final Agency Action

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE   12/20/18

SIGNATURE OF ATTORNEY OF RECORD   *Carl D. Rosenblum*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

Case 2:18-cv-14065-JGG-MBN Document 30-3 Filed 04/26/19 Page 27 of 56
Case 2:18-cv-01949-NBF Document 1-0 Filed 02/19/19 Page 40 of 46
Case 2:18-cv-14065-JTM-MBN Document 1-2 Filed 12/20/18 Page 1 of 3



## United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123-2394

In Reply Refer To: MS 5000

AUG 2 8 2009



Mr. William W. Pecue, II
President
Taylor Energy Company LLC
1615 Poydras Street, Suite 500
New Orleans, Louisiana 70112

Re:    *Taylor Energy Company LLC – March 19, 2009, Trust Agreement; Insurance Provision*

Dear Mr. Pecue:

Thank you for your letter dated August 13, 2009, proposing a process to simplify implementation of the March 19, 2008, Trust Agreement and Agreement to Provide Additional Bond in relation to insurance proceeds. Relying on Section 2.4 of the Agreement to Provide Additional Bond, you propose that Taylor Energy Company (TEC) make the full final deposit into the Trust Account, required under Section 2.3, by September 21, 2009, without any offsets, and that TEC be permitted to retain all insurance proceeds it has received and will receive in the future as reimbursement for work performed at Mississippi Canyon (MC) Block 20. After consultation with our attorneys, we are writing to inform you that we decline to accept your proposal.

As we will explain in this letter, we believe you have misinterpreted the agreements and that TEC is required to deposit the full amount due next month and reimburse the Trust Account for any disbursements that have been made that duplicate reimbursement from your insurance company. Although the final deposit of $78 million remains due on September 21 ($3 million of which is actually due September 8), the reimbursement of insurance proceeds is not due until MMS confirms duplication of Trust funds disbursement and insurance proceeds.

Section 2.4 of the Agreement to Provide Additional Bond reads as follows:

> 2.4    Taylor will seek reimbursement from available insurance policies of all funds it spends performing the work required under the Plan identified in Section 5.3 of the Trust Agreement. Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies, but the amount of the deposit required in Section 2.3 shall reflect an offset equivalent to the amount designated for work in Schedule A when that work is completed with funds from any source.



EXHIBIT
1

2

Under this provision, TEC would be allowed to reduce the final deposit due next month by an amount equal to the amount allocated in Schedule A for "work … completed with funds from any source." This phase requires the existence of completed work, as defined by Section 4.2 of the Trust Agreement ("completion of a phase of Work"), which does not yet exist. Taylor has not yet completed any phase of the "Work," as defined by the Trust Agreement, so no offset may be taken.

Furthermore, your proposal to deposit the full amount of the scheduled September 2009 payment but retain all insurance proceeds in lieu of an offset does not satisfy Section 2.4 of the Agreement for Additional Bond or Section 4.1 of the Trust Agreement. As we explained in our letter dated May 22, 2009 (enclosed and incorporated by reference here), MMS interprets these sections as prohibiting the duplication of Trust Fund disbursements and insurance proceeds, no matter which comes first. See Section 2.4 of the Agreement to Provide Additional Bond ("Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies"), and Section 4.1 of the Trust Agreement ("No disbursements will be given for amounts reimbursed to the Settlor by insurance proceeds"). You may only retain insurance proceeds if they do not duplicate a disbursement that has been made from the Trust Account. If you retain a duplicated payment, you would reduce the Trust Account in violation of the terms of the Agreement for Additional Bond and the Trust Agreement.

In your August 13, 2009, letter, you explain your interpretation of Section 2.4 as follows:

> The operative effect of Section 2.4 of the Bond Agreement is to acknowledge that TEC is not obligated to provide security to MMS, through the Trust Account or otherwise, for more than the $666 million total required under the Bond Agreement and Trust Agreement to undertake the phases of work for MC Block 20.

This interpretation is incorrect in part: while TEC is not obligated to deposit more than $666 million into the Trust Account, the terms of the two agreements prohibit disbursements from the Trust Account for any amounts duplicated by insurance proceeds. This prohibition has the effect of retaining in the Trust Account, instead of making a disbursement for, the amount allocated to a particular item of completed work that was also reimbursed by insurance. Accordingly, if TEC has received a disbursement from the Trust Fund that is later duplicated by insurance proceeds, TEC must return that disbursement.

The implementation of Section 2.4 of the Agreement to Provide Additional Bond and Section 4.1 of the Trust Agreement does not require TEC to deposit more than the $666 million required by the Agreement to Provide Additional Bond, but it does require TEC to forego disbursements for amounts reimbursed by its insurance company. The MMS believes that this result, which TEC consented to in these agreements, compensates MMS for the risk it has taken that TEC will be

3

unable to complete the work required by the agreements, and MMS will need to complete it, likely at a higher expense than anticipated by the agreements. If, however, as expected, TEC is able to complete the required work, these funds in the Trust Account will be released to TEC as provided for by the terms of the Trust Agreement.

In conclusion, under the terms of the Agreement to Provide Additional Bond and the Trust Agreement, TEC is obligated to deposit the full amount required by Section 2.3(c) of the Agreement to Provide Additional Bond. Furthermore, as we requested in our May 22, 2009, letter, TEC must provide a description of the "pre-planning work, engineering studies, and other preparatory efforts" for which TEC received additional insurance proceeds so we can confirm that TEC did not receive duplicative reimbursement for this work from the Trust Account. This information must be provided by October 15, 2009. We understand that TEC is having problems receiving this information from your insurance company, and reasonable extensions of this deadline may be granted. If MMS determines that there has been a duplication of insurance proceeds and Trust Account disbursements, MMS will order repayment to the Trust Account.

Finally, for future disbursements from the Trust Account, MMS will require TEC to certify whether or not it has requested and received reimbursement from its insurance company that duplicates its request for disbursement from the Trust Account. This certification is required to implement Section 2.4 of the Agreement to Provide Additional Bond and Section 4.1 of the Trust Agreement.

If TEC wishes to appeal this decision, pursuant to 30 C.F.R. Part 290, a notice of appeal must be filed in the office of the Regional Director, Gulf of Mexico Region, within 60 days of receipt of this letter. If you have any questions regarding this matter, please contact Ms. Cathy Moser at (504) 736-2690 or Ms. Silvia Murphy, Office of the Solicitor, at (202) 219-3031.

Sincerely,

Lars Herbst
Regional Director

Enclosure



# United States Department of the Interior

BUREAU OF OCEAN ENERGY MANAGEMENT
Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, LA 70123-2394

In Reply Refer To:  MS 5422

**NOV 0 7 2011**

Mr. William W. Pecue II
Taylor Energy Company LLC
One Lee Circle
New Orleans, Louisiana  70130

Dear Mr. Pecue:

In accordance with the March 19, 2008 Trust Agreement, by and among the United States of America, acting by and through the Bureau of Ocean Energy Management, Regulation and Enforcement of the United States Department of the Interior, (formerly the Minerals Management Service, and now, and hereinafter referred to as, the Bureau of Ocean Energy Management or BOEM), Taylor Energy Company, LLC (Taylor), and JP Morgan Chase Bank, N.A., we hereby acknowledge your request for costs incurred for "Rig Downtime," as detailed in Taylor's November 2, 2011 letter and accompanying narrative.

As you are aware, Taylor first requested a disbursement for $13,057,394 for Rig Downtime costs by letter dated August 15, 2011. The BOEM replied to this request by letter dated August 19, 2011, which denied the request and attempted to briefly, perhaps insufficiently, explain the reasons for the denial. Attached to BOEM's August 19th letter was a spreadsheet, denominated "Schedule A", which attempted to detail the monies involved for each of the nine intervention wells already plugged and abandoned by Taylor.[1]

Schedule A broke out, on a well-by-well basis, all the insurance proceeds received by Taylor, all the Trust Fund disbursements received by Taylor -- both of which were added together in a column entitled "Total Compensation," all the costs incurred by Taylor, and the maximum amount of per-well disbursement permitted by the Trust Agreement ($25,500,000). There was one exception to the well-by-well break-out, and that was the amounts shown as insurance proceeds received for four types of well work -- allocation of MC20 Well Costs, Engineering Survey Work, MC20 Marine Environmental Inv, and Planning for O.A. Drilling Rig. These insurance proceeds were not distributed on a well-by-well basis because, although BOEM had asked Taylor to detail to which wells these proceeds would apply, Taylor repeatedly replied that it could not make this determination because these types of well work, and therefore, the insurance proceeds received for these types of work, applied to all wells.

---

[1] IW 11, IW 19, IW 17, IW 1, IW 21, IW 4, IW 10, IW 13, and IW 16.

**EXHIBIT 2**

2

Schedule A also showed no entry in the "Costs Incurred" column for these four types of well work. After being questioned by Taylor about the lack of entries in the "Costs Incurred" column for these four types of work, BOEM explained that there were no entries made for incurred costs for these four types of work because the costs could not be substantiated and further, BOEM could not attribute them on a well-by-well basis.

Finally, when all the well-by-well costs incurred were added together, the total of Costs Incurred by Taylor was $300,350,976.48. But, the Total Compensation column summed to $309,514,452.90. (*See* "Schedule A.") Therefore, in its August 19th denial letter, BOEM stated that Taylor had been overcompensated by the amount of the discrepancy: $9,163,566.42.

In an attempt to resolve this matter, BOEM and Taylor representatives and their attorneys met and tried to come to some agreement on the interpretation of the proper apportionment of the monies involved. This resulted in Taylor's resubmission, by letter dated September 6, 2011, of its Rig Downtime disbursement request. Attached to this letter is a "Schedule 2," which lists a series of invoices paid by Taylor, representing costs incurred of $27,556,783,37 over and above the total costs incurred of $300,350,876.48 which appeared on BOEM's "Schedule A." Taylor claims that these invoices are not duplicative of any invoices previously submitted, and also claims that they substantiate the new increment of $27,556,783.37 of costs incurred. The BOEM hereby accepts both these claims, and has attached hereto a new spreadsheet, "Schedule A-1," which shows the addition of this $27+ million to the total of the "Costs Incurred" column.

That said, however, BOEM must again deny Taylor's disbursement request for $10,433,905.12, which was resubmitted again on November 2, 2011. "Schedule A-1" shows the new total of "Costs Incurred" as $327,906,759.87, which is now more than the "Total Compensation," of $309,514,542.90. Therefore, the discrepancy highlighted in BOEM's August 19th denial letter no longer exists. However, BOEM and Taylor are bound by the terms of the Trust Agreement, which clearly puts a per-well cap of $25,500,000 on disbursements. (*See* Paragraph 4.3 of Trust Agreement.) Therefore, the most that BOEM can possibly disburse, per well, no matter how high Taylor's Costs Incurred, is $25,500,000.

Because Taylor has repeatedly stated that the $27+ million in costs for the four well work types mentioned above applies to all wells, it has been divided evenly among the nine wells so far completed, and the "Costs Incurred " column on Spreadsheet A-1 shows, per well, the costs incurred, including 1/9 of this 27+ million applied to each well. Similarly, the insurance proceeds which Taylor has received for these four types of well work were added together and divided by 9 and 1/9 allocated to each well. Therefore, BOEM has accounted for the "new" $27+ million in costs substantiated by Taylor in its Schedule 2, and has spread across each well, both those "new" costs and the insurance proceeds directed to those costs.

Now, however, the disbursement request bumps up against the $25,500,000 per-well cap imposed by the Trust Agreement. In three cases, IW 19, IW 1, and IW 16, the full $25,500,000 has already been disbursed, and BOEM is powerless to disburse more. In five cases, IW 11, IW 17, IW 4, IW 10, and IW 13, the amount of the trust funds already disbursed by BOEM is less than the maximum $25,500,000, and, but for the situation arising out of IW 21, BOEM could disburse to Taylor the amounts representing the differences between the maximum permitted and the amount already disbursed. These differences are: for IW 11, $3,195,906.99, for IW 17, $1,550,274.00, for IW 4, $2,275,688.00, for IW 10, $3,250,716.00, and for IW 13, $3,767,182.00. The total of these differences is: $14,039,766.00.

3

On IW 21, Taylor was actually overcompensated by the Trust by $17,920,228.74. As shown in Schedule A-1, the Costs Incurred for IW 21 were $58,851,826.46, but Taylor received insurance proceeds of $51,272,055.20 for IW 21, leaving it eligible for the difference of $7,579,771.26 to be disbursed from the Trust.[2] But, Taylor has already received the full $25,500,000 for IW 21. Therefore, when Taylor should have received only $7+ million from the Trust for IW 21, it received $25,500,000, and the difference between these two numbers -- $17,920,228.74 – represents an overpayment to Taylor, which is owed to the Trust. When combined with a Rig Credit[3] of $2,623,489.00, owed to the Trust, a total of $20,543,717.74 is owed back to the Trust.

When the total putatively owed to Taylor ($14,039,766.00) is subtracted from the total owed back to the Trust ($20,543,717.74), the difference, which is owed back to the Trust, is $6,503,951.74, as shown at the bottom of the "Remaining Funds" column on Schedule A-1.
Because of the overpayment on IW 21 (and the rig credit) Taylor has then actually been overcompensated by the Trust in the amount of $6,503,951.74 for the plugging and abandonment work so far completed. BOEM must deny Taylor's most recent resubmission of its disbursement request, which is dated November 2, 2011 and requests a disbursement of $10,433,905.12 based on the "new" 27+ million in Costs Incurred. BOEM is not, at this time, however, requesting or demanding that Taylor pay into the Trust the overage amount of $6,503,951.74.

Should you have questions or concerns, you may contact Mr. Joshua T. Joyce, at (504)736-2779 or joshua.joyce@boemre.gov.

Sincerely,

John Rodi
Regional Director
Gulf of Mexico OCS Region

cc:    Mrs. Phyllis M. Taylor
       Taylor Energy Company LLC
       One Lee Circle
       New Orleans, Louisiana 70112

---

[2] See paragraph 4.1 of the Trust Agreement. ("No disbursements will be given for amounts reimbursed to the Settlor by insurance proceeds.")
[3] Acknowledged by Taylor, see, e.g., Taylor's version of "Schedule A" attached to its Narrative, provided to BOEM on November 2, 2011.

Schedule A-1

| Activity | Insurance Proceeds Received*# | BOEMRE Disbursements Received | Total Compensation | Costs Incurred ** | Trust Allocation | Remaining Funds |
|---|---|---|---|---|---|---|
| IW 11 | 910,666.48 | 22,304,094.00 | 23,214,760.48 | 27,032,219.66 | 25,500,000.00 | |
| IW 19 | 33,104,127.01 | 25,500,000.00 | 58,604,127.01 | 68,744,777.05 | 25,500,000.00 | 3,195,906.00 |
| IW 17 | 913,140.69 | 23,949,726.00 | 24,862,866.69 | 28,091,431.05 | 25,500,000.00 | |
| IW 1 | 1,713,844.00 | 25,500,000.00 | 27,213,844.00 | 33,977,969.15 | 25,500,000.00 | 1,550,274.00 |
| IW 21 | 51,272,055.20 | 25,500,000.00 | 76,772,055.20 | 58,851,826.46 | 25,500,000.00 | -17,920,228.74 |
| IW 4 | 879,246.63 | 23,224,312.00 | 24,103,558.63 | 26,778,936.71 | 25,500,000.00 | 2,275,688.00 |
| IW 10 | 879,246.63 | 22,249,284.00 | 23,128,530.63 | 26,611,183.08 | 25,500,000.00 | 3,250,716.00 |
| IW 13 | 879,246.63 | 21,732,818.00 | 22,612,064.63 | 28,154,820.99 | 25,500,000.00 | 3,767,182.00 |
| IW 16 | 879,246.63 | 25,500,000.00 | 26,379,246.63 | 29,663,595.72 | 25,500,000.00 | |
| | | | | | | |
| Rig Credit | | 2,623,489.00 | 2,623,489.00 | | | -2,623,489.00 |
| Total | 91,430,819.90 | 218,083,723.00 | 309,514,542.90 | 327,906,759.87 | 229,500,000.00 | -6,503,951.74 |

* Does not include $12,843,236.34 'Non Trust Related Costs'

# Includes insurance proceeds for the following distributed per well: Allocation of MC20 Well Costs; Engineering Survey Work;

MC20 Marine Environmental Inv; Planning for O.A. Drilling Rig

** Includes the additional $27,555,783.37 costs incurred distributed per well



# United States Department of the Interior
## Office of Hearings and Appeals
Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203

703-235-3750          703-235-8349 (fax)

## TAYLOR ENERGY COMPANY LLC

IBLA 2010-12 & 2012-70          Decided October 29, 2018

Consolidated appeals from decisions of the Regional Director, Gulf of Mexico OCS Region, Bureau of Ocean Energy Management, denying request to retain insurance proceeds, together with disbursements, in lieu of offset against supplemental deposits to trust account, and denying request to disburse trust account funds, for decommissioning work in the Outer Continental Shelf of the Gulf of Mexico. MS 5000 & MS 5422.

Decisions affirmed.

1.     Outer Continental Shelf Lands Act: Decommissioning;
        Outer Continental Shelf Lands Act: Oil and Gas Leases

        Contracts entered into by the United States are construed by the same standards as any contract between private parties. The Board's task in adjudicating contract disputes is to give effect to the intent of the parties expressed in the language of the contract they agreed to, based on our understanding of its ordinary and commonly accepted meaning. The parties' intent must be gleaned from the four corners of their contract, which is controlling unless the language of the contract is reasonably susceptible to at least two different constructions or is otherwise ambiguous. In adjudicating contract disputes, the Board exercises *de novo* review to read, interpret, apply, and issue a final decision for the Department on the proper interpretation of that contract.

APPEARANCES: Peter J. Schaumberg, Esq., James M. Auslander, Esq., and Fred R. Wagner, Esq., Washington, D.C., and Bret A. Sumner, Esq., Michael K. Cross, Esq., Michael L. Beatty, Esq., William E. Sparks, Esq., and Malinda Morain, Esq., Denver, Colorado, for Taylor Energy Company LLC; Lori R.F. Monroe, Esq., Office of the

EXHIBIT
3

Solicitor, U.S. Department of the Interior, Washington, D.C., for the Bureau of Ocean Energy Management.

OPINION BY ADMINISTRATIVE JUDGE JACKSON

Taylor Energy Company LLC (Taylor) appeals from and petitions for a stay of the August 28, 2009, decision (2009 Decision) of the Regional Director, Gulf of Mexico OCS Region, Bureau of Ocean Energy Management (BOEM), denying Taylor's request to retain insurance proceeds and disbursements from its Trust Account, in lieu of offsetting them against supplemental deposits to the Trust Account. Taylor also appeals from a November 7, 2011, BOEM decision (2011 Decision) denying its request for additional disbursements from the Trust Account for rig downtime costs associated with its plugging and abandoning multiple wells.[1]  The Board docketed Taylor's two appeals as IBLA 2010-12 and IBLA 2010-12, respectively. By Order dated January 30, 2012, we granted Taylor's request to consolidate its appeals, which are now ripe for decision.[2]

BOEM's decisions interpreted and applied the terms and conditions of a Trust Agreement by and between Taylor, BOEM, and JPMorgan Chase Bank (Trust Agreement), an Agreement to Implement Article IV of the Trust Agreement between Taylor and BOEM (Disbursement Agreement), and their Agreement to Provide Additional Bond (Bond Agreement), hereinafter collectively referred to as the Agreements.[3]  The Agreements provide for funding and managing disbursements from the Trust Account for decommissioning activities on OCS leases where Taylor was the lessee and operator.[4]

*SUMMARY*

When BOEM enters into contracts with a third party, it is bound by the contract's terms and conditions in the same manner and to the same extent as is the third party. In deciding appeals involving contract language, terms, or conditions,

---

[1]  References herein to BOEM include its predecessors, the Minerals Management Service (MMS) and the Bureau of Ocean Energy Management, Regulation and Enforcement, as appropriate.

[2]  *See* Order dated April 26, 2018; Statement of Reasons filed May 27, 2016 (SOR); Answer filed July 26, 2016; Reply filed Aug. 8, 2016.

[3]  *See* Trust Agreement dated Mar. 19, 2008, Administrative Record (AR) 569-592; Disbursement Agreement dated Nov. 20, 2009, AR 593-600; Bond Agreement dated Mar. 19, 2008, AR 601-610.

[4]  *See* Trust Agreement at 1 (Lease OCS-G 04931 (Mississippi Canyon Block 20), Lease OCS-G 15459 and 5 wells (Mississippi Canyon Block 21), Lease OCS-G 15371 and 1 well (South Pass Block 73)).

the Board will give them their natural and most commonly understood meaning, so long as our doing so does not lead to absurd results and is not contrary to the contracting parties' clearly expressed intent. When such contracts establish a trust fund as a guaranteed source of funding to complete multiple tasks and allow required deposits to be reduced if a task is completed without trust funds, the contracting party is not entitled to reduce a future deposit unless the record shows it completed a task without trust funds. And where a contracting party does not substantiate its costs in the manner required by contract and show they were not paid by insurance proceeds, it may be required to repay disbursements it was not entitled to receive under its contract.

*BACKGROUND*

When Hurricane Ivan slammed into the Gulf of Mexico during September of 2004, it caused catastrophic damage to wells, facilities, and operations on Taylor's OCS Leases for Mississippi Canyon Blocks 20 and 21 and South Pass Block 73. Ivan shifted the sea floor, toppled a platform, buried wells beneath 150 feet of mud, and caused oil leaks in the area. In collaboration with BOEM, the Department's Bureau of Safety and Environmental Enforcement (BSEE), and the U.S. Coast Guard, Taylor developed a "technologically feasible, safe, and unprecedented plan to decommission the [offshore] . . . facilities,"[5] which relied heavily on the drilling of "intervention wells" (IWs) because they were the "only means" for plugging and abandoning 25 producing wells on its OCS leases.[6] Ultimately, Taylor decided to relinquish its OCS leases, decommission their facilities, and sell all assets used in its oil and gas business.[7]

---

[5] SOR at 5.

[6] *Id.; see* Plan of Operations for MC20A Decommissioning dated May 19, 2008 (Plan), AR 377. Intervention (or relief) wells were identified by reference to the well they were paired with for plugging and abandoning purposes (*e.g.*, IW-21 was paired with A-21, a producing well drilled from Platform A).

[7] *See* Answer at 2 ("BOEM realized that once Taylor sold its income producing assets and distributed the proceeds to its shareholder, it might not have sufficient funds to perform . . . decommissioning, therefore in late 2007 and early 2008, BOEM issued two Supplemental Bonding Orders to Taylor, requiring Taylor to post security in the amount of $666,280,000 to ensure sufficient funds to pay for the cost of decommissioning the MC20 site.").

IBLA 2010-12 & 2012-70

*The Trust, Disbursement, and Bond Agreements*

Taylor and BOEM entered into the Agreements to establish a lease-specific abandonment account under rules implementing the Outer Continental Shelf Lands Act (OCSLA).[8] In lieu of lease and areawide bonds under 30 C.F.R. § 556.900(a), this abandonment account provides a secure source of funds to pay for decommissioning undertaken by Taylor or by BOEM the event of default by Taylor.[9] The rule at 30 C.F.R. § 250.1703 (What are the general requirements for decommissioning?) requires OCS lessees and operators to: "Permanently plug all wells"; "Remove all platforms and other facilities"; "Decommission all pipelines"; and "Clear the seafloor of all obstructions created by your lease[.]" Each of these regulatory obligations is a defined Obligation under the Trust Agreement and identified in its Schedule A:

1. permanently plug and abandon 25 wells in accordance with C.F.R. §§ 250.1710-1717 "@ $25,500,000 per well";
2. remove deck and flare broom in accordance with 30 C.F.R. §§ 250.1725-1730 for $6,245,000;
3. clear the seafloor in accordance with 30 CF.R. §§ 250.1740-1743 for $6,535,000;
3. remove pipelines in accordance with 30 CF.R. §§ 250.1750-1754 for $3,000,000; and
4. remove contaminated soil in accordance with 30 CF.R. § 250.300.[10]

Schedule A concludes by stating "Total Cost Estimate: $666,280,000."[11]

The Trust Agreement provides a mechanism for making disbursements from the Trust Account "for the actual costs of the Work performed and costs incurred to satisfy the Obligations, [but these disbursements] cannot exceed the cost estimates

---

[8] *See* 30 C.F.R. § 556.904 (Lease-specific abandonment accounts); Answer at 2; *see generally* 30 C.F.R. Part 556, Subpart I (Bonding).
[9] *See* 30 C.F.R. § 556.904(a)(2) ("You must fully fund the lease-specific abandonment account to cover all cases of leases abandonment and site clearance as estimated by BOEM.").
[10] Trust Agreement Schedule A.1 through A.5; *see* Trust Agreement § 1.2(d) (Obligations defined).
[11] Trust Agreement Schedule A at AR 590; *see* 30 C.F.R. § 556.904(a)(2) ("You must fully fund the lease-specific abandonment account to cover all decommissioning costs as estimated by BOEM within the timeframe the Regional Director prescribes.").

shown in Schedule A."[12] It also allows for partial disbursements of up to half the estimated cost of the Work when an executed contract is presented to BOEM for that Work, with the remaining half to be disbursed when that Work is completed.[13]

The Disbursement Agreement establishes special procedures for approving and making Trust Account disbursements for well decommissioning, pipeline decommissioning, platform decommissioning, and other Obligations under the Trust Agreement.[14] Of particular importance here, it addresses downtime for drilling rigs engaged in well decommissioning by adjusting their daily rig fee "on an equal proportionate basis to each day the rig operated on a [Taylor] well," which entitles Taylor to an "additional disbursement for the rig fee for each day the rig operated on that well, *provided*, that the total disbursement for any well shall not exceed $25,500,000."[15]

The Bond Agreement specifies that making all deposits required of Taylor "will be considered compliance with the [Supplemental Bond Order for $200,000,000, dated November 30, 2007, and the Areawide Bond Order for $466,280,000, dated March 10, 2009]."[16] It requires Taylor to make an initial deposit of $400,000,000, followed by supplemental deposits on June 3, 2008 ($38,250,000), March 23, 2009 ($150,000,000), September 8, 2009 ($3,000,000), and September 21, 2009 ($75,030,000).[17] As to insurance, it states:

> Taylor will seek reimbursement from available insurance policies of all funds it spends performing the performing the work required under the [approved plan to complete the Obligations set forth in Schedule A]. Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies, but the amount of the deposit required in section 2.3 shall reflect an offset equivalent to the

---

[12] Trust Agreement, § 4.1 (Disbursements for Obligations performed); *see id*. § 4.3 (Payment of Obligation Costs in Excess of the "Schedule A" Cost Estimates).

[13] *Id*. §§ 4.1 (Disbursements for Obligations performed), 4.2 (Partial Payments for Work Phase completion).

[14] Disbursement Agreement Parts I (Well Decommissioning), II (Pipeline Decommissioning), III (Platform Decommissioning), and IV (Other Obligations).

[15] *Id*. Part I.D.1; *see* Trust Agreement Schedule A.1 ("$25,500,000 per well").

[16] Bond Agreement § 2.5.

[17] *Id*. §§ 2.1 to 2.3; Trust Agreement § 2.2 (Funding of Trust Agreement); SOR at 7; Answer at 3, 5 n.2; Reply at 3.

Case 2:18-cv-14065-JEM Document 30-3 Entered on FLSD Docket 04/26/19 Page 39 of 56
Case 2:18-cv-14065-JTM-MBN Document 14 Filed 12/20/18 Page 6 of 20

IBLA 2010-12 & 2012-70

amount designated for work in Schedule A when that work is
completed with funds from any source.[18]

Thus, if Work was completed before a supplemental deposit was due, Taylor was
entitled to reduce its mandatory deposit by "the amount designated for work in
Schedule A."[19]

*Taylor's Proposal and Request for Offsets under the Agreements*

Taylor secured contracts, began decommissioning work, submitted insurance
claims required by the Bond Agreement, and requested disbursements from its Trust
Account under the Trust Agreement. Prior to the due date for making its final
supplemental deposits under the Bond Agreement, Taylor completed pipeline
decommissioning, requested and received disbursements of $3 million from its Trust
Account for that work, and later received $1.25 million in insurance proceeds to
reimburse it for its decommissioning costs.[20] BOEM initially sought to "claw back"
$1.25 million of the $3 million in Trust Account disbursements, but it did not pursue
the matter once it realized the actual cost to decommission the pipeline exceeded
both disbursements and insurance proceeds for that work.[21]

---

[18] Bond Agreement § 2.4; *see* Trust Agreement § 4.1 ("No disbursements will be
given for amounts reimbursed to [Taylor] by insurance proceeds.").

[19] *Id.*; *see* SOR at 2 ("To account for the fact that Taylor might complete some of the
specified decommissioning work before the later installments were due, the Bond
Agreement provided for an 'offset' of later installment deposits for any work
completed prior to the date those deposits were due. The offset provision recognized
that there would be no need to 'secure' funds for the performance of specified
decommissioning work that Taylor had already paid for and performed."), 15
("*BOEM would not need* to ensure 'compliance' of an obligation already performed").

[20] *See* SOR at 3; Answer at 18 n.6.

[21] *See* Answer at 13-14; Letter from BOEM dated May 22, 2009, at AR 368 ("[If
Taylor's] actual costs exceed the maximum amount of Trust disbursements permitted
by the Trust Agreement for a particular activity, then [Taylor] may retain insurance
proceeds equal to the costs greater than the disbursement. In that situation, there is
no duplication of payments[.]"); Taylor Letter dated Nov. 2, 2011, AR 45 ("BOEM
and Taylor are in agreement that Taylor is *entitled to receive the full amount of
disbursements* to which it is entitled under the Trust Agreement for an activity if it can
demonstrate that the total cost of the work completed exceeds the total allowable
Trust Account disbursement for that activity by an amount that is greater than the
insurance proceeds Taylor received for that same work.").

By letter dated August 13, 2009, Taylor informed BOEM it received an additional $62.6 million in insurance proceeds that might arguably be associated with some of its work under the Trust Agreement, adding that the situation was complicated by its insurer not identifying whether and to what extent these insurance payments were made for decommissioning work required by the Trust Agreement.[22] Taylor then proposed to make all supplemental deposits under the Bond Agreement without any insurance offsets, in return for its keeping all insurance proceeds and all disbursements under the Trust Agreement (*e.g.*, no "claw back" of potentially duplicative disbursements).[23] Characterizing the Agreements as creating a "zero-sum game," Taylor claimed its proposal would simplify implementation of the Trust Agreement and avoid a "meticulous and time-consuming effort" to determine whether and, if so, how much of its insurance proceeds duplicated past or future disbursements for the same work.[24]

### BOEM's 2009 Decision

In its 2009 Decision, BOEM "declined to accept" Taylor's proposal or to apply its insurance proceeds as an offset to its final supplemental deposits under the Bond Agreement.[25] BOEM stated Taylor was not entitled to any offset because it "has not yet completed any phase of the 'work,' as defined by the Trust Agreement."[26] In addition, BOEM stated it could "claw back" disbursements that are "later duplicated by insurance proceeds," but it did not then attempt to "claw back" any such disbursements from Taylor.[27]

Taylor made its supplemental deposits under the Bond Agreement "in full, under protest," based on BOEM's denial of its entitlement to any offsets.[28] Taylor timely appealed from the 2009 Decision; the Board initially suspended its consideration of this appeal by Order dated November 5, 2009.

---

[22] *See* Taylor Letter dated Aug. 13, 2009 (Taylor Proposal), AR 359-63, at 4.
[23] *Id.*
[24] *Id.* at 4, 5.
[25] *See* 2009 Decision at 1.
[26] *Id.* at 2.
[27] *Id.; see id.* at 1 ("[T]he reimbursement of insurance proceeds is *not due* until [BOEM] confirms duplication of Trust [Account] funds disbursement and insurance proceeds" (Emphasis added)), 3 ("If [BOEM] determines that there has been a duplication of insurance proceeds and Trust Account disbursements, [it] will order repayment to the Trust Account"); *see also* Answer at 14, 16; SOR at 4, 9.
[28] Taylor Letters to BOEM dated Sept. 10 and 21, 2009, AR 348 and 354.

*Developments after the 2009 Decision*

Following issuance of the August 2009 decision, Taylor continued with its decommissioning work, completing the plugging and abandonment of nine wells, removing the platform deck and flare boom, and completing the removal of seafloor obstructions and debris. Taylor certified the completion of this decommissioning work, and BOEM, upon request, disbursed funds from the Trust Account to reimburse Taylor for its associated costs.[29]

As its decommissioning work proceeded, Taylor agreed with BOEM and BSEE, on occasion, to temporarily suspend its work pending assessment of associated risks. During the periods of suspension, Taylor incurred downtime costs associated with its decommissioning rig, used in drilling the IWs necessary for plugging and abandoning the nine existing wells.[30] The decommissioning rig remained under contract with Taylor's drilling contractor, and Taylor was required to pay its contractor for downtime costs. Daily rates were incurred during periods of "down time" when the rig sat idle, including when Taylor was prohibited from operating the rig during hurricane season. There is no question that the Agreements provide for disbursement of funds from the Trust Account for downtime costs.

By letter dated August 15, 2011, Taylor submitted a request for disbursement of Trust Account funds, in the total amount of $13,057,394.12, for the rig downtime costs, pursuant to Article IV of the Trust Agreement and section 1.D. of the Disbursement Agreement.[31] Taylor "certifie[d] that in relation to the 5 completed wells in the well phase of the Plan (contained in Schedule A, item 1) that are included in this [request] . . . the work was conducted and costs incurred[.]"[32] BOEM preliminarily denied the request in an August 19, 2011, letter, because the total amount already disbursed from the Trust Account for plugging and abandoning the nine wells ($218,083,723), together with the insurance proceeds already paid to Taylor ($91,430,819.90) totaled $309,514,542.90, which exceeded its actual decommissioning costs for these wells ($300,350,976.48), resulting in a Trust Account "overpayment" to Taylor of $9,163,566.42.[33] It specifically noted "Taylor

---

[29] *See* SOR at 11.

[30] *Id.*

[31] *See* Taylor Letter to BOEM dated Aug. 15, 2011, AR 289.

[32] *Id.*

[33] BOEM Letter to Taylor, dated Aug. 19, 2011, AR 274 ("Due to the overpayment of compensation[,] . . . Taylor will not receive further BOEM[] disbursements pursuant to the Trust Agreement for these nine completed intervention wells, including the disbursement for [rig downtime costs].").

may be required by the Regional Director to fund the [Trust Account] in the sum of $9,163,566.42" and that rig downtime costs were "appropriately accounted for in [BOEM's] Schedule A" as "well costs."[34]

Taylor sought to establish by letter dated September 6, 2011, that its actual decommissioning costs were greater than previously documented by at least $27,555,783.37, but it did not seek disbursement of Trust Account funds for any of that work.[35] Rather, it sought to establish that BOEM wrongly concluded in its August 19, 2011, letter, that Taylor's actual costs were less than the total of Trust Account funds disbursed and insurance proceeds received. Taylor therefore renewed its request for rig downtime costs, $13,057,394.12, less a rig credit of $2,623,489, for a net Trust Fund disbursement of $10,433,905.12.

BOEM responded to Taylor's renewed disbursement request by asking it to resubmit supporting documentation "in a well-specific manner" so that "each cost is clearly associated with a well."[36] Taylor replied by resubmitting its August 2011 disbursement request, accompanied with a detailed explanation of "why Taylor is entitled to the amount requested in the August 15, 2011 disbursement request."[37] Taylor asserted BOEM properly included insurance proceeds of $7,599,729.05 for Authorization for Expenditure (AFE) 28040 on its Schedule A but erroneously omitted the $40,934,233.31 in Costs Incurred for that AFE, "which provided the basis for Taylor's claims for [those] insurance proceeds."[38] It explained its costs were not "specifically allocated to each well as it is not practical to do so nor is it necessary since all costs relate, in the aggregate, to the relief well effort."[39] However, Taylor "substantiated" only $27,555,783.37 of these added costs,[40] by providing proof of full payment for all such costs, including checks or electronic payments to vendors.[41]

---

[34] Id.

[35] See Taylor letter to BOEM dated Sept. 6, 2011, AR 71.

[36] BOEM email to Taylor dated Sept. 9, 2011, AR 68.

[37] Taylor Letter to BOEM dated Nov. 2, 2011, AR 28.

[38] Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 4, AR 36; see id. at 3-4, AR 35-36.

[39] Id. at 3, AR 35; see id. ("It makes no difference if the costs are allocated to the nine wells individually or reflected in total since the total costs for the relief activity will equal $341,285,209.72 under either method.").

[40] See id. at 4-5, AR 36-37; see also id. at 4 n.1 (BOEM omitted other, "relatively small," costs incurred by Taylor), 5 ("Taylor could support the full approximately $40 million in costs that BOEM improperly excluded from [Costs Incurred].").

[41] See Trust Agreement, § 4.2 ("Prior to release of funds for completion of . . . Work, proof of full payment to all contracts may be required."); Disbursement Agreement

Taylor explained it was "entitled to the full amount of its requested disbursement for the relief well effort [related to the nine wells] because it is still entitled to the disbursements up to the Trust [Account] Allocation limit [in Schedule A] and further because the total of its actual costs far exceeds the Trust [Account] Allocation limit plus insurance proceeds."[42]  According to Taylor:

> BOEM and Taylor are in agreement that Taylor is entitled to receive the full amount of disbursements to which it is entitled under the Trust Agreement for an activity if it can demonstrate that the total cost of the work completed [$327,906,759.85] exceeds the total allowable Trust Account Disbursement for that activity [$229,500,000] by an amount that is greater than the insurance proceeds received for that same work [$91,430,819.90].[43]

In effect, Taylor argued that it incurred costs to drill these nine wells that were sufficient to entitle it to the insurance proceeds *and* the entire Schedule A amount for the nine wells.

*BOEM's 2011 Decision*

BOEM denied Taylor's resubmitted request for an additional disbursement due to adjusted rig downtime costs on November 7, 2011.  BOEM concluded that additional Trust Account disbursements of $14,039,766.00 could be made for rig downtime costs for five of the nine wells (IW-4, IW-10, IW-11, IW-13, and IW-17) because their disbursements had not yet reached the $25.5 million per well cap.[44]  However, BOEM determined Taylor was required to return $17,920,228.74 of the $25.5 million in disbursements from the Trust Account for one of these nine wells (IW-21) because it had been overcompensated by that amount due to its receipt of insurance proceeds that were allocated to the plugging and abandoning of that well.

---

Part V. A.1 ("[Taylor] will provide documentation, including copies of checks or proof of electronic payment to vendors, to support each request for disbursement of Trust Funds when the work pursuant to any AFE is completed.").
[42]  Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 4, AR 48.
[43]  *Id.* at 1.
[44]  2011 Decision at 2.

Since the amount Taylor needed to return was more than it was entitled to receive for rig downtime costs, BOEM denied Taylor's request.[45]

In reaching its conclusion regarding excess disbursements, BOEM started with the schedule attached to its denial of Taylor initial request for rig downtime costs, which showed Costs Incurred for all nine wells totaling $300,350,976.48.[46] BOEM "accepted" $27,555,783.37 in additional costs that were substantiated by Taylor in requests dated September 6 and November 2, 2011, which then totaled $327,906,759.87.[47] BOEM allocated these added costs equally to all nine wells, as well as insurance proceeds already received for that additional work, because "Taylor has repeatedly stated that the $27+ million in costs . . . applies equally to all wells."[48]

BOEM determined total disbursements made to date with respect to each of the nine wells. BOEM calculated that disbursements for three wells (IW-1, IW-16, and IW-19) reached the $25.5 million per well cap; disbursements for five wells (IW-4, IW-10, IW-11, IW-13, and IW-17) were less than the cap: and that disbursements for one well (IW-21) exceeded the cap. BOEM concluded, "but for the situation arising out of IW 21, BOEM could disburse to Taylor the amounts representing the differences between the maximum permitted and the amount already disbursed," $14,039,766.99, which was more than the amount requested by Taylor.[49]

BOEM noted the IW-21 well received disbursements from the Trust Account that totaled its $25.5 million cap,[50] yet it was entitled to only $7,579,771.26 under the Agreements because of Taylor's insurance proceeds,[51] which meant Taylor had been overcompensated by $17,920,228.74:

---

[45] *Id.* at 3; *See* SOR at 11 ("The issues in the 2009 Decision did not become completely relevant until BOEM denied Taylor's disbursement requests in the 2011 Decision.").

[46] *Id.* at 2 (citing BOEM Letter to Taylor dated Aug. 19, 2011, Schedule A, AR 276).

[47] *Id.*

[48] *Id.*; *see* Taylor Letter to BOEM dated Nov. 2, 2011, Ex. 1 at 3, AR 35).

[49] 2011 Decision at 2; *see* Answer at 19-20.

[50] *See* Answer at 19 ("Th[e] over-disbursement [of $25.5 million] may have occurred because IW 21 was the first IW completed, therefore the full $25.5 million may have been disbursed before Taylor had received all its insurance proceeds.").

[51] *See* Trust Agreement, § 4.1 (Disbursements for Obligations performed) ("No disbursements will be given for amounts reimbursed to [Taylor] by insurance proceeds.").

Costs Incurred for IW 21 were $58,851,826.46, but Taylor received insurance proceeds of $51,272,055.20 for IW 21, leaving it eligible for the difference of $7,579,771.26 to be disbursed from the Trust [Account]. But, Taylor has already received the full $25,500,000 for IW 21. Therefore, when Taylor should have received only $7+ million from the Trust [Account] for IW 21, it received $25,500,000, and *the difference between these two numbers – $17,920,228.74 – represents an overpayment to Taylor, which is owed to the Trust [Account]*. When combined with a Rig Credit of $2,623,489.00, owed to the Trust [Account] [by reason of prior disbursements from the Trust Account], a total of $20,543,717.74 is owed back to the Trust [Account].[52]

In sum, Taylor was entitled to rig downtime costs of $14,039,766.99 from the Trust Account for 5 wells, but it owed the Trust Account, $20,543,717.74, for this well. BOEM therefore denied Taylor's request for disbursement of rig downtime costs but stated it was not then demanding Taylor to "pay into the Trust [Account] the overage amount of $6,503,951.74."[53]

Taylor timely appealed from the 2011 Decision. The Board initially suspended its consideration of this appeal by Order dated April 2, 2012. Taylor reported that its Trust Account had a balance of "over $432 million" on May 27, 2016, which was significantly more than the BOEM estimate to complete all remaining Obligations under the Trust Agreement (*i.e.*, plug and abandon 16 wells for $408 million ($25.5 million per well) and remove contaminated soil for $13 million).[54]

*DISCUSSION*

These consolidated appeals raise two basic questions: (1) whether Taylor was entitled to an offset of its supplemental deposits under the Bond Agreement; and (2) whether Taylor was entitled to additional Trust Fund disbursements for rig downtime costs under the Disbursement and Trust Agreements. We first identify the legal standards applicable to our interpreting these Agreements and then address the issues raised on appeal.

---

[52] 2011 Decision at 3 (emphasis added) (footnotes omitted).
[53] *Id.*
[54] SOR at 23; *see* Reply at 5; Trust Agreement Schedule A.1, A.5.

Case 2:18-cv-14065-JEM Document 130-3 Entered 04/26/19 Page 46 of 56
Case 2:18-cv-14065-JEM-MBN Document 14 Filed 12/20/18 Page 13 of 20

IBLA 2010-12 & 2012-70

*I. Legal Standards for Interpreting Contracts*

[1]  The Agreements were entered into by and between Taylor and the United States of America.[55]  As such, they are treated the same as any contract wholly between private parties that are subject to common-law principles of contract law, which are equally binding on the United States.[56]  As we held with respect to a Federal oil and gas lease: "The Board's task when faced with the construction of a lease is to determine and give effect to the intent of the parties as disclosed by the language used, construing the document as a whole and ascribing to the contract language its ordinary and commonly accepted meaning."[57]  The intent found within the four corners of their contract will control unless its provisions are ambiguous (*i.e.*, "'reasonably susceptible to at least two different meanings'").[58]  In adjudicating contract disputes between a bureau of the Department and a private party, it is for this Board to interpret contract language, terms, and conditions, as we owe no deference to a bureau's "technical determinations" or "legal interpretations" because it is our interpretation of the law, facts, and contract that is entitled to deference by the Federal Courts.[59]  In other words, the Board exercises *de novo* review in reading,

---

[55]  *See* Trust Agreement at 1 ("[the United States] acting by and through [BOEM]"); Disbursement Agreement at 1 ("[the United States] acting by and through [BOEM]"); Bond Agreement at 1 ("the United States] through its authorized officer, The Regional Director, Gulf of Mexico OCS Region, [BOEM].").

[56]  *See* Answer at 12; *El Paso Natural Gas Col.*, 156 IBLA 330, 336 (2002); *Eason v. BLM*, 166 IBLA 292, 295 (2005); *PetroCorp*, 152 IBLA 77, 84 (2000); *ASARCO, Inc.*, 116 IBLA 120, 126 (1990); *Walch Logging, Co., Inc. v. Ass't Area Director*, 90 I.D. 88, 95, 11 IBLA 85 (1983); *see also Mesa Air Group, Inc. v. Department of Transportation*, 87 F.3d 498, 503-04 (D.C. Cir. 1996); *Rosebud Coal Sales Co., Inc. v. Hodel*, 667 F.2d 949, 951 (10th Cir. 1982).

[57]  *Linmar Petroleum Co.*, 153 IBLA 99, 106 (2000) (citations omitted); *accord Priority Energy, LLC*, 186 IBLA 363, 386 (2015); *see Eason v. BLM*, 166 IBLA at 295; *Koniag, Inc.*, 135 IBLA 41, 47 (1996); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 477 (2014).

[58]  *Eason v. BLM*, 166 IBLA at 295 (quoting *Corbin on Contracts*, § 24.7 (1998)); *see id.* ("[A]mbiguity does not exist merely because the two parties disagree as to the meaning of a term."); *William J. Thoman*, 155 IBLA 266, 267 (2001).

[59]  *Statoil Gulf of Mexico LLC*, 42 OHA 261, 289 (2011) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)); *see* Answer at 11 (citing *Shamrock Metals, LLC*, 184 IBLA 1, 3-4 (2013) and *IMC Kalium Carlsbad, Inc. v. Interior Board of Land Appeals*, 206 F.3d 1003, 1009-10 (10th Cir. 2000)).

Case 2:18-cv-14065-JEM Document 30-3 Entered 04/26/19 Page 47 of 56
Case 2:18-cv-14065-JFM-MBN Document 1-4 Filed 12/20/18 Page 14 of 20

IBLA 2010-12 & 2012-70

interpreting, applying, and issuing a final decision for the Department on the proper interpretation of that contract

### II. Taylor was Not Entitled to an Offset of its Supplemental Trust Fund Deposits under the Bond Agreement.

BOEM stated it did not believe Taylor was entitled to any offset of its supplemental deposits under the Bond Agreement because "Taylor has not yet completed any phase of the 'Work,' as defined by the Trust Agreement."[60] It then rejected Taylor's proposal to keep all insurance proceeds and disbursements (in lieu of taking any deposit offset) because "[Taylor] may only retain insurance proceeds if they do not duplicate a disbursement that has been made from the Trust Account."[61] BOEM reasoned that by requiring Taylor "to forego disbursements for amounts reimbursed by its insurance company," BOEM is compensated "for the risk it has taken that [Taylor] will be unable to complete the work required by the agreements, and [BOEM] will need to complete it, likely at a higher expense than anticipated by the agreements."[62]

Taylor claims it was entitled to an offset under the Bond Agreement because it "fully completed one commitment and an agreed-upon interim completion of a second obligation prior to the deadlines to make supplemental deposits[.]"[63] BOEM agrees with Taylor that it completed pipeline decommissioning under the Trust Agreement, for which it received Trust Fund disbursements of $3 million and $1.25 million in insurance proceeds, but since it received the full disbursement under Trust Agreement Schedule A.4 ($3,000,000), no "offset" and reduction in funding was required or permitted under the Bond Agreement.[64] As to Taylor's claim to an

---

[60] 2009 Decision at 2.

[61] Id. (citing Bond Agreement § 2.4 and Trust Agreement § 4.1); see id. ("[If a Trust Fund disbursement] is later duplicated by insurance proceeds, [Taylor] must return that disbursement.").

[62] Id. at 2-3; but see Trust Agreement § 4.3 (Individual costs incurred in the performance of Obligations in excess of the amounts shown on Schedule A shall be the full responsibility of [Taylor], and no Trust Funds shall be disbursed to cover any such costs."); Bond Agreement § 2.8 ("[BOEM retains the] right to require additional bonding to guarantee performance of Taylor's obligations to plug and abandon the wells . . . ").

[63] SOR at 3; see id. at 9 ("BOEM concurred with Taylor's certification of the completed work (save the one step for IW-21 to be completed at a later date), and authorized disbursement to Taylor corresponding funds from the Trust Account.").

[64] See Answer at 13-14; see Trust Agreement Schedule A.4 ($3,000,000).

"offset" for interim completion of the IW-21 Well, BOEM stated no offset was warranted until the decommissioning of that well is "completed."[65]

### A. *Taylor was Not Entitled to an Offset Based on Pipeline Decommissioning.*

We read the Trust and Bond Agreements as reflecting the parties' intent to ensure that Trust Funds would be available to pay the estimated cost to complete all work under the Trust Agreement. Simply stated, total deposits under the Bond Agreement for completing all Obligations under the Trust Agreement ($666,280,000) equaled the amount estimated by BOEM in its 2008 Areawide Bond ($466,280,000) and 2007 Supplemental Bond ($200,000,000) Orders.[66] As work is completed under the Trust Agreement, disbursements are made to Taylor up to the estimated cost of the Work, which would reduce the corpus of the Trust Fund by no more that that cost estimate, leaving sufficient funds to make disbursements when all other Work is completed. As Taylor correctly states in reply, the intent of the parties in the Agreements is for the Trust Account always to "have a declining balance."[67]

Section 2,3 if the Bond Agreement states:

> Taylor will seek reimbursement from available insurance policies of all funds it spends performing the work required under [Trust Agreement Schedule A]. Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies, but the amount of the deposits required section 2.3 shall reflect an offset equivalent to the amount designated for work in Schedule A when that work is completed with funds from any source.

We read Bond Agreement § 2.4 as addressing what happens if an Obligation under the Trust Agreement is completed with insurance proceeds before a supplemental deposit need be made to the Trust Fund. Thus, a supplemental deposit could be offset by those insurance proceeds because no Trust Funds would be disbursed for that same work. Since the Trust Fund disbursed the full amount available under Trust Agreement Schedule A.4 ($3 million), there were no Obligations to offset with insurance proceeds under the Bond Agreement.[68] Although pipeline

---

[65] Answer at 16; *see id.* at 18 (quoting SOR at 9); *supra* note 50.

[66] *See* Bond Agreement, §§ 1.1, 1.5, 2.1, 2.2, 2.3; Trust Agreement.

[67] Reply at 4.

[68] Trust Agreement § 4.1 ("[Trust Fund disbursements are made] based upon a corresponding reduction of the Obligations in accordance with Schedule A."); *see id.* § 1.2(d) ("'Obligations' shall mean the duties and costs of [Taylor,] as set forth in

decommissioning costs were more than $4.25 million, the Trust Agreement clearly states Taylor is "fully responsible" for all pipeline decommissioning costs that exceed $3 million.[69] Thus, under our reading of the Agreements, Taylor could retain and use insurance proceeds to defray costs that exceed available disbursements under the Trust Agreement, but not to offset supplemental deposits under the Bond Agreement. Allowing an offset here for the $1.25 million Taylor received in insurance proceeds? would underfund the Trust Fund, leaving $1.25 million less in the Trust Fund to cover the estimated cost to complete all remaining work and satisfy all Obligations under the Trust Agreement. Although this appears to be the crux of Appellant's claim on appeal, we find no support for that result from our reading of the Agreements and, therefore, conclude that Taylor was not entitled to a deposit offset based on its receipt of insurance proceeds to decommission its pipelines.

   B. *Taylor was Not Entitled to an Offset Based on Partially Completed Work on the IW-21 Well.*

   Taylor claims it was entitled to an offset for the "agreed-to interim completion of IW-21," an intervention/relief well for plugging and abandoning the A-21 well.[70] The Bond Agreement states Taylor is entitled to offset its supplemental deposits "equivalent to the amount designated for work in Schedule A when that work is completed with funds from any source" (*e.g.*, Trust Fund disbursements, insurance proceeds, or retained earnings).[71] Until work is completed and an Obligation is satisfied under the Trust Agreement, there can be no offset under the Bond Agreement. In this case, there is no indication that the IW-21 Well was permanently plugged and abandoned, a condition precedent to Taylor claiming an offset for that work. We therefore conclude that Taylor was not entitled to a deposit offset under the Bond Agreement based on its interim completion of the IW-21 Well.

   Although its work at the IW-21 Well was not yet complete, Taylor claims it was nonetheless entitled to a deposit offset for completing "a phase of the Work" under the Trust Agreement.[72] According to Taylor, a phase of work includes entering

---

Schedule A attached hereto arising pursuant to the terms of the Leases and applicable federal regulations related to such Leases.").
[69]   Trust Agreement § 4.3, Payment of Obligation Costs in Excess of the "Schedule A" Cost Estimates; *see* Trust Agreement Schedule A.4 (Remove decommissioned pipelines - $3,000,000).
[70]   SOR at 16; *see supra* note 6.
[71]   Bond Agreement § 2.4.
[72]   SOR at 18 (citing Trust Agreement § 4.2); *see* Trust Agreement § 4.2, Partial Payments for Work Phase completion ("Upon [Taylor]'s presentation to [BOEM] of

Case 2:18-cv-14065-GMN-MBN Document 130-3 Filed 04/26/19 Page 50 of 56
Case 2:18-cv-14065-JTM-MBN Document 1-4 Filed 12/20/18 Page 17 of 20

IBLA 2010-12 & 2012-70

into a drilling rig contract for a particular well, which meant it was entitled to an offset of up to $12,750,000 for that phase of the work on the IW-21 Well.[73] Regardless of its entitlement to a partial payment under the Trust and Disbursement Agreements, we do not find Taylor was entitled to an offset under the Bond Agreement. We do not read their partial payment provisions as being the same as or equivalent to "completed" work under the Bond Agreement or that such was the intent of the parties when they entered into the Agreements.[74] We therefore reject Taylor's claimed entitlement to an offset based on its completing only part of the work and only partially satisfying its Obligations under the Trust Agreement.

### III. Taylor was not Entitled to Trust Fund Disbursements for Rig Downtime.

BOEM agrees Taylor is entitled to disbursements from the Trust Account for rig downtime costs because they are legitimate decommissioning expenses under the Agreements. But it denied Taylor's request to disburse Trust Account funds as reimbursement for these costs because it found "Taylor was actually overcompensated by the Trust [Account] in the amount of $6,503,951.74 for plugging and abandonment work so far completed" under the Agreements.[75]

Based on its allocation of costs between the nine wells that were decommissioned by the time of its 2011 Decision, including the roughly $27.5 million in additional costs substantiated by Taylor on September 6 and November 2, 2011, BOEM found Taylor incurred costs of $58,851,826.46 for plugging and abandoning the IW-21 well. BOEM also found, by engaging in a similar allocation of insurance proceeds for the additional work substantiated by Taylor, that it received a total of $51,272,055.20 in insurance proceeds for the plugging and abandonment of the IW-

---

an executed contract for a phase of the Work as identified in the Plan, [Taylor] shall be entitled, with the written concurrence of [BOEM], to receive one-half (1/2) of the sums allocated for such Work in Schedule A, which shall be released from the Trust Funds to [Taylor].").

[73] SOR at 18 (quoting Disbursement Agreement); *see* Disbursement Agreement § 1.A ("At the time that [Taylor] executes a contract for drilling rig, thereby becoming legally bound to make all payments required under that contract, it may submit a request for disbursement of one-half of the cost for the drilling rig for the full term of the contract.").

[74] *See* Answer at 18 ("As Taylor admits in its SOR [at 9], at the time of the 2009 Decision, Taylor had 'completed *all but one step* to plug and abandon the first well[.] Therefore, as Taylor had not yet completed a phase of work, it could not take an offset against its supplemental deposit.").

[75] Decision at 3.

21 well.  Thus, insurance proceeds covered the total costs for decommissioning the IW-21 well except for $7,579,771.26.  But since the Trust Account had disbursed $25,500,000 to Taylor for that work, BOEM determined the Trust overcompensated Taylor for decommissioning the IW-21 well under the Trust Agreement by the difference, $17,920,228.74.

Taylor argues that it is entitled, under the Disbursement Agreement, to the requested disbursement for rig downtime costs, "[s]ince [it] received less than the allotted $25.5 million from Trust [Account] disbursements on *these five wells* [IW-4, IW-10, IW-11, IW-13, and IW-17] that Taylor plugged and abandoned."[76]  Taylor requested "additional disbursements for *these wells* for rig down[]time in an amount of $10,433,905.12."[77]  But Taylor ignores the fact that it was required to reimburse the Trust Account $17,920,228.74 for overcompensation on the IW-21 well.  Under the Agreements before the Board, we conclude that BOEM correctly determined Taylor was not entitled to additional disbursements from the Trust Account for these nine wells.

Taylor was entitled by the Agreements to reimbursement of its substantiated costs to plug and abandon the IW-21 well to the extent they exceed insurance proceeds for that work, which was only $7,579,771.26.  But since Taylor had already been reimbursed the maximum allowed by the Trust Agreement for that well, $25,500,000,[78]  BOEM properly determined under the Agreements that Taylor was required to return the difference to the Trust Account, $17,920,228.74, as overcompensation or an overpayment.  When the rig credit of $2,623,489 that Taylor admittedly owed the Trust Account is added to that amount, Taylor then owed

---

[76] SOR at 19 (emphasis added).

[77] *Id.*; *see id.* at 23 ("Under the plain language of the Trust Agreement, Taylor is entitled to reimbursement of the[] [rig downtime] costs because the total 'compensation' to Taylor is less than $25.5 million for the IW-4, 10, 11, 13, and 17 wells.").

[78] *See* Answer at 19 ("Because of th[e] prohibition [of duplicative disbursements and insurance proceeds], for work done on IW 21, BOEM had authority to disburse only the difference between actual costs and the amount reimbursed by insurance proceeds."), 22 ("[I]f Taylor received insurance proceeds for Schedule A work on a particular well, but then received the full $25.5 million disbursement for the same well, any amount of the disbursement that was duplicated by the insurance payment would need to be returned to the Trust.  For example, if Taylor expended $55.5 million on a well and received $50 million in insurance proceeds for that well, it would be entitled to only the difference, *i.e.*, $5.5 million, from the Trust.  . . . [I]t would have to repay the Trust $20 million.").

IBLA 2010-12 & 2012-70

the Trust Account $20,543,717.74. Offsetting that amount by the $14,039,766 in rig downtime costs to decommission five wells (IW-4, IW-10, IW-11, IW-13, and IW-17), leaves Taylor owing $6,503,951.74 to the Trust Account.

BOEM's 2009 and 2011 Decisions reflect a proper construction of the Agreements. BOEM interpreted the Agreements as requiring the Trust Account to remain fully funded. As BOEM states:

> The funds in the Trust Account are encumbered funds, to be used to fulfill Taylor's decommissioning obligations – obligations Taylor knowingly assumed when it became a lessee on its . . . [OCS] leases. . . . BOEM has no access to the Trust [Account] funds for its own use. The money can only be expended to decommission the [offshore] . . . site. Withholding money in the Trust [Account] actually benefits Taylor by putting at Taylor's disposal funds to continue decommissioning the [offshore] . . . site, because Taylor continues to be obligated to do so.[79]

The ultimate aim of the Trust Account is to ensure that, regardless of the future financial solvency of Taylor or the availability of insurance proceeds from Taylor's private insurer, all of the work necessary to remove, plug and abandon, and otherwise fully decommission all of the wells, platform, pipeline, and other offshore facilities is completed. Once that work ends, the remaining funds in the Trust Account, including any and all funds that are not currently allocated to any future decommissioning work, will be returned to Taylor.[80] We thus conclude that the 2009 and 2011 Decisions fully comport with the plain language and intent of the Agreements.

## CONCLUSION

We conclude that the Regional Director properly denied Taylor's requests to retain insurance proceeds, together with disbursements, in lieu of offsetting them against the final supplemental deposits to the Trust Account. We further conclude that the Regional Director properly denied the disbursement of Trust Account funds for rig downtime costs related to the decommissioning of the Mississippi Canyon Blocks 20/21 and South Pass Block 73 platform, wells, pipeline, and other offshore facilities, situated on its OCS oil and gas leases.

---

[79] Answer at 3-17.
[80] *See* Reply at 2 ("[T]here are over $10 million of funds in the Trust Account allocated to the performance of none of the remaining obligations in Schedule A"), 5.

193 IBLA 185

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, we affirm both the 2009 Decision and the 2011 Decision.

James K. Jackson
Administrative Judge

I concur:

James F. Roberts
Acting Chief Administrative Judge

# EXHIBIT  C

| From: | Rosenblum, Carl |
|---|---|
| To: | Roberson, John (CIV) |
| Cc: | William (Will) Pecue II |
| Subject: | Fwd: [EXTERNAL] Activity in Case 1:18-cv-01949-NBF TAYLOR ENERGY COMPANY LLC v. USA Complaint |
| Date: | Thursday, December 20, 2018 1:03:07 PM |

John- Attached is a courtesy copy of a suit filed today.

Sent from my iPhone

Begin forwarded message:

From: <uscfc_cmecf@cfc.uscourts.gov<mailto:uscfc_cmecf@cfc.uscourts.gov>>
Date: December 20, 2018 at 11:56:27 AM CST
To: <uscfc_cmecf@cfc.uscourts.gov<mailto:uscfc_cmecf@cfc.uscourts.gov>>
Subject: [EXTERNAL] Activity in Case 1:18-cv-01949-NBF TAYLOR ENERGY COMPANY LLC v. USA Complaint

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

US Court of Federal Claims

United States Court of Federal Claims

Notice of Electronic Filing

The following transaction was entered on 12/20/2018 at 12:56 PM EST and filed on 12/20/2018
Case Name:     TAYLOR ENERGY COMPANY LLC v. USA
Case Number:   1:18-cv-01949-NBF<https://ecf.cofc.uscourts.gov/cgi-bin/DktRpt.pl?38091>
Filer:  TAYLOR ENERGY COMPANY LLC
Document Number:     1<https://ecf.cofc.uscourts.gov/doc1/01503146095?caseid=38091&de_seq_num=5&magic_num=51505603>

Docket Text:
COMPLAINT against USA (DOI) (Filing fee $400, Receipt number 9998-5112487) (Copy Served Electronically on Department of Justice), filed by TAYLOR ENERGY COMPANY LLC.Answer due by 2/19/2019. (Attachments: # (1) Civil Cover Sheet, # (2) Exhibit 1, # (3) Exhibit 2, # (4) Exhibit 3)(ac7)

1:18-cv-01949-NBF Notice has been electronically mailed to:

Carl D. Rosenblum    crosenblum@joneswalker.com<mailto:crosenblum@joneswalker.com>,
ahainkel@joneswalker.com<mailto:ahainkel@joneswalker.com>,
jfcooney@venable.com<mailto:jfcooney@venable.com>,
lmastio@joneswalker.com<mailto:lmastio@joneswalker.com>,
padebolt@venable.com<mailto:padebolt@venable.com>,
rbourg@joneswalker.com<mailto:rbourg@joneswalker.com>

1:18-cv-01949-NBF Notice will NOT be delivered to:

The following document(s) are associated with this transaction:

Document description:Main Document
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1131461693 [Date=12/20/2018] [FileNumber=2836719-
0] [0fb4ea6a610b38582445f0678252f50dc733a25a4bc2a9a741d1e57f77f5f7af62
6ccd6d8de32c7d5438d3c66d7b6c204ed701b21fe38461ed305e6d8b4a24d7]]
Document description:Civil Cover Sheet
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1131461693 [Date=12/20/2018] [FileNumber=2836719-
1] [94ae017d5e5f65e25a1a5cb7c8c6139c2871e1939ae768c3aeb424380e53a07d58
131f2a31f316aa12bc244d3e450ab012d2f18ad0596f9a978903128f361695]]
Document description:Exhibit 1
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1131461693 [Date=12/20/2018] [FileNumber=2836719-
2] [6d1f460cd8be6098085d907e3b92f7aaa19dca122154d43d565a4de66f56900d1f
ca6931ffa60469205ad24eb40aa674dbbc5af57c111577d1c472032693ab9c]]
Document description:Exhibit 2
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1131461693 [Date=12/20/2018] [FileNumber=2836719-
3] [5fdabf3500a0dab7119a00b0ff0e84a410488c10573f849afabf481c4a34423007
44385328263eebae3376f8df395dfe716dcf3109258b685ea44d1411000121]]
Document description:Exhibit 3
Original filename:n/a
Electronic document Stamp:
[STAMP dcecfStamp_ID=1131461693 [Date=12/20/2018] [FileNumber=2836719-
4] [1f96e9936ceba47d92074fa23ac2cde2f602813dbf33ef100a77dc7e4f8ce22f43
3c37171fc18d7fc4795f5ab23f8986078f75c8859c479a16a2ef06f0af6c9c]]