## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TAYLOR ENERGY COMPANY LLC,** | * | **CASE NO.: 2:18-cv-14065** |
| | * | |
| **Plaintiff,** | * | **JUDGE GUIDRY** |
| | * | |
| **V.** | * | **MAGISTRATE NORTH** |
| | * | |
| **UNITED STATES DEPARTMENT OF THE** | * | **SECTION: T(5)** |
| **INTERIOR, RYAN ZINKE, IN HIS OFFICIAL** | * | |
| **CAPACITY AS SECRETARY OF THE** | * | |
| **UNITED STATES DEPARTMENT OF THE** | * | |
| **INTERIOR, AND THE BUREAU OF** | * | |
| **OCEAN ENERGY MANAGEMENT,** | * | |
| | * | |
| **Defendants** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### <u>JOINT PRETRIAL ORDER[1]</u>

1.      The date of the Pretrial Conference is December 19, 2019 at 2:45 p.m.

2.      **Appearance of Counsel:**

        **A. Plaintiff:**

                Carl D. Rosenblum, T.A. (La. Bar No. 2083)
                Edward D. Wegmann (La. Bar No. 13315)
                Alida C. Hainkel (La. Bar No. 24114)
                Lauren C. Mastio (La. Bar. No. 33077)
                Allison B. Kingsmill (La. Bar. No. 36532)
                JONES WALKER LLP
                201 St. Charles Avenue, 49th Floor
                New Orleans, Louisiana 70170-5100
                Telephone:  (504) 582-8296
                Facsimile: (504) 589-8296
                Attorneys for Taylor Energy Company LLC

---

[1] This filing on behalf of Taylor Energy is with reservation of all procedural and substantive rights and is expressly subject to Taylor Energy's pending Motion to Transfer Case in the Interest of Justice (Rec. Doc. 30).  This filing on behalf of Federal Defendants is with objection as expressed herein and in their Motions to Transfer and for a Conference (Rec. Docs. 52 & 65).

**B.  Defendants:**

> Thomas W. Ports, Jr. (Va. Bar No. 84321)
> 150 M Street, NE
> Washington, D.C.  20002
> Telephone:  (202) 305-0492
> Facsimile:  (202) 305-0506
> Attorney for United States Department of The Interior, David Bernhardt, In His
> Official Capacity as Secretary of The United States Department of The Interior,
> and The Bureau of Ocean Energy Management

The identity of the parties to this proceeding is correct with one exception.  Since filing of this proceeding on December 20, 2018, the Honorable David Bernhardt has been confirmed as the Secretary of the United States Department of the Interior.  He should be substituted in place of defendant Ryan Zinke.[2]

**3.      Description of the Parties**

**A.  Taylor Energy Company LLC**

Taylor Energy Company LLC ("Taylor Energy") is a Louisiana limited liability company with its principal place of business in New Orleans, Louisiana.  Its sole member is Phyllis M. Taylor, a Louisiana resident domiciled in Orleans Parish, Louisiana,  Taylor Energy is a party to the three contracts at issue in this proceeding: (1) a March 19, 2008 Trust Agreement ("Trust Agreement"); (2) a March 19, 2008 Agreement To Provide Additional Bond ("Bond Agreement"); and (3) a November 20, 2008 Agreement Between Taylor Energy and an agency of the Federal Government to Implement Article IV – Disbursements of the Trust Agreement ("Disbursement Agreement") (collectively referred to as the "Agreements").  It is Taylor Energy's position that the Agreements provide the basis for its breach of contract claim in the principle amount of $10,433,905 (approximately $12.5 million with interest) against the Federal Government.

---

[2] *See* Fed. R. Civ. P. 25(d)

**B.1.  United States Department of the Interior**

Defendant United States Department of the Interior ("DOI or "Interior") is the federal agency with authority, through the Secretary, to supervise and manage the Bureau of Ocean Energy Management ("BOEM"),[3] a successor agency to the Minerals Management Service, the party that executed the Agreements.

**B.2.  David Bernhardt, replacing Ryan Zinke, in his official capacity as Interior Secretary**

Defendant David Bernhardt ("Bernhardt") is sued in his official capacity as Interior Secretary.  He is the chief officer of Interior charged with overseeing the proper administration and implementation of the Outer Continental Shelf Lands Act ("OCSLA").  The Interior Board of Land Appeals ("IBLA") makes decisions final for Interior on delegated authority from the Secretary. 43 C.F.R. § 4.1.

**B.3.  The Bureau of Ocean Energy Management**

Defendant BOEM is the bureau with authority, pursuant to regulations promulgated pursuant to section 5(a) of OCSLA to ensure performance of lease and regulatory obligations, and to ensure the financial state of lessees and to administer the Agreements.

Interior, Bernhardt and BOEM are collectively referred to as "Federal Defendants".

**4.     Statement of Jurisdiction**

It is Taylor Energy's position that this Court does <u>not</u> have subject matter jurisdiction over this proceeding.  Taylor Energy has formally asserted the basis for this position in its Motion to

---

[3] The predecessor to BOEM is the Minerals Management Service ("MMS") of the DOI. In mid-June 2010, DOI renamed MMS the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").  On October 1, 2011, DOI replaced BOEMRE with BOEM and another Bureau.

Transfer Case in the Interest of Justice and Reply (Rec. Docs. 30 and 40) ("Motion to Transfer"). The legal and jurisdictional basis for Taylor Energy's claim is that it seeks only monetary relief and damages as a result of Federal Defendants' breach of the Agreements.  It therefore arises under the Tucker Act, 28 U.S.C. § 1491, *et seq*.  Since filing this action on December 20, 2018, the United States Court of Federal Claims, in a Decision addressing the same Trust Agreement at issue here, found subject matter jurisdiction to be under the Tucker Act.  *See Taylor Energy Company LLC v. The United States*, previously pending as proceeding No. 16-12C on the docket of the United States Court of Federal Claims.[4]  The Tucker Act provides the <u>exclusive</u> subject matter jurisdiction for breach of contract claims in the United States Court of Federal Claims. Accordingly, this Court lacks jurisdiction.

Federal Defendants oppose Taylor's Motion to Transfer and argue this Court has jurisdiction because the crux of the jurisdictional test under the Tucker Act is whether the Court of Federal Claims can provide an adequate remedy through a money judgment.  (Rec. Doc. 34) Because Taylor seeks more than a one-time payment—Taylor seeks to prospectively alter the way the Bureau of Ocean Energy Management exercises its regulatory authority concerning the disposition of Trust Account funds for decommissioning and remediation efforts—the Court of Federal Claims cannot provide the requested remedy.  The decisions Taylor challenges lie primarily with Interior, subject to judicial review in the appropriate district court. For these reasons, in the same case Taylor cites in support of its Motion to Transfer, CFC Case No. 16-12C, the Court of Federal Claims dismissed Taylor's suit and ruled it could not grant Taylor the relief it requested.

---

[4] Similarly, the IBLA recognized the contractual nature of this proceeding.  *See* AR Bates 630.

5.     **Motions and Pleadings**

**A.**  Taylor Energy has filed a Motion to Transfer seeking to transfer this proceeding to the United States Court of Federal Claims pursuant to 28 U.S.C. § 1631.

**B.1.  Defendants' Motion to Vacate Trial Schedule**

On October 18, 2019 Federal Defendants moved to vacate the trial scheduling order. Rec. Doc. 52.  Defendants argue binding precedent from the Supreme Court and Fifth Circuit establish that trial is not appropriate in cases for judicial review of agency action under the Administrative Procedure Act, and cite examples of cases from the Eastern District of Louisiana that proceed in the usual way—without trial.  *See* Rec. Doc. 52-1 at 5-7.  Taylor Energy opposed.  Rec. Doc. 54. Taylor Energy argues Federal Defendants' Motion to Vacate is aimed only at delay, that if Federal Defendants truly believe this is a case for judicial review they would have filed the administrative record, and argue there is no reason to delay lodging of the administrative record until after the Court rules on Taylor Energy's Motion to Transfer.  Rec. Doc. 54-1 at 1-3.

**B.2.  Defendants' Motion for Conference**

On December 5, 2019, Federal Defendants moved for a conference to discuss the Pretrial Notice in this case, arguing it is inappropriate because trial is inappropriate in this case.  Rec. Doc. 65.  Federal Defendants maintain that the Trial Schedule, the Pretrial Notice, and this Pretrial Order are inappropriate, but their motion for a conference to discuss is now moot since this objected-to pre-trial order is now filed and the parties are scheduled to appear before the Court on December 19.

6.        **A Brief Summary of Material Facts**

**A.  Taylor Energy**

In this proceeding Taylor Energy seeks: 1) monetary relief through disbursement of its own funds in the amount of $10,433,905 currently in a Trust Account being administered by J.P. Morgan Chase Bank N.A.; and 2) monetary damages comprising lost interest on said funds accruing from 2011 estimated at over $2 million.  Taylor Energy seeks to reverse, set aside and vacate the October 29, 2018 Decision of the IBLA upholding BOEM's failure to follow "common-law principles of contract law" and the express requirements of the Trust Agreement, the Bond Agreement, and the Disbursement Agreement.

Specifically, Taylor Energy seeks review and reversal of the IBLA Decision that affirmed two BOEM decisions related to BOEM's interpretation of the Agreements: (1) BOEM's August 28, 2009 decision ("2009 Decision") in which BOEM took the position that Taylor Energy was required to: (a) deposit supplemental funds into the Trust Account; and (b) "reimburse" the Trust Account for "duplicative" insurance proceeds received; and (2) BOEM's November 7, 2011 decision ("2011 Decision") denying Taylor's Energy's request for disbursement of Trust Account funds related to rig downtime costs, a necessary cost related to securing a continuous contract for a drilling rig required to decommission the wells.

The net effect of the IBLA's affirmance of BOEM's 2009 and 2011 Decisions was to improperly deny Taylor Energy a $10,433,905 disbursement of its own funds from the Trust Account.  The Trust Account presently and incorrectly retains Taylor Energy's funds deposited to "secure" "Obligations" that Taylor Energy has underlined already performed. The IBLA Decision is therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Taylor Energy was the lessee and operator of: (a) the Outer Continental Shelf (OCS) lease covering MC20, Lease OCS-G 04935 ("MC20 Lease"), on which a platform, 28 wells and associated facilities were located.  On September 16, 2004, Hurricane Ivan struck the MC20 Site resulting in a massive seafloor shift that toppled the MC20 platform, scattered debris on and under the seafloor and severely damaged all of Taylor Energy's oil and gas wells at MC20.

Taylor Energy, in collaboration with the responsible federal agencies, including BOEM, and the United States Coast Guard, promptly began efforts to identify a technologically feasible, safe, and unprecedented plan to decommission the MC20 facilities.  This plan involved drilling intervention wells which provided the only means of plugging and abandoning the wells.

In furtherance of this goal, Taylor Energy and the United States, acting by and through the MMS, entered into the Agreements in 2008 to secure a source of funds for Taylor Energy's performance of certain discrete and particular "Obligations" under the Trust Agreement to decommission the oil and gas facilities at MC20.

Under the terms of the Agreements, Taylor Energy deposited $666,280,000 of its own funds into a Trust Account to cover the specific enumerated decommissioning "Obligations" at MC20 listed on Exhibit A to the Trust Agreement.  The Agreements specifically allocated the $666,280,000 to 29 separate discrete and particular activities to: plug and abandon 25 wells; decommission pipelines; remove the platform deck and flare boom; remove seafloor debris; and remove contaminated soil.

Upon the completion of each of the specified 29 discrete and particular activities, Taylor Energy would seek a disbursement of its deposited funds for actual costs up to a designated amount: $25.5 million per well to plug and abandon (for a total of $637.5 million for all 25 wells);

$6.245 million to remove the platform deck and flare boom; $6.535 million to remove seafloor debris; $3 million to decommission pipelines; and $13 million to remove contaminated soil.

The Agreements provided that Taylor Energy would make the $666,280,000 deposit in several installments.  To account for the fact that Taylor Energy might complete some of the specified decommissioning work before the later installments were due, and consistent with the clear wording under the Trust Agreement that Taylor Energy deposit a maximum of $666,280,000 into the Trust Account, the Bond Agreement provided for an "offset" or reduction of later installment deposits for any work completed prior to the date those deposits were due.  The offset provision recognized that there would be no need to "secure" funds to guarantee performance of specified decommissioning work that Taylor Energy had already completed.

The Agreements also required Taylor Energy to seek reimbursement from Taylor Energy's insurance policies for work performed at MC20.  The Agreements specifically provided that while Taylor Energy would not be entitled to disbursements from the Trust Account for costs reimbursed by insurance, for any work performed prior to the due date of the final installment deposits, using money from any source (including insurance), Taylor Energy would be entitled to a reduction or offset in the amount it was required to deposit into the Trust Account equal to the designated amount stated in the Trust Agreement for the already completed work.

In compliance with the Agreements, Taylor Energy secured contracts to begin the required work, and submitted invoices to its insurance underwriter as well as disbursement requests to BOEM for its completion of these commitments.  In most instances, BOEM concurred with Taylor Energy's certification of the completed work on a per well basis and released Taylor Energy's corresponding funds from the Trust Account.  However, as to a certain disbursement request, BOEM erroneously denied Taylor Energy's request.

In August of 2009, BOEM maintained, contrary to the clear and plain terms of the Agreements, that because Taylor Energy received proceeds from insurance which BOEM believed may have been for the same work as the disbursement, Taylor Energy was not entitled to an offset from its remaining supplemental deposits for that work.  This was notwithstanding that the work had been performed and was "completed" prior to the due date of the supplemental deposit.

Thereafter, on August 13, 2009, Taylor Energy documented its process to follow the Agreements so that it would fully fund the Trust Account, but retain its lawfully-procured insurance proceeds.  Taylor Energy acknowledged that the Trust Account should be fully funded and, therefore, deposited all the supplemental deposits to the Trust Account, but notified BOEM that the final deposits were made "under protest" pending resolution of BOEM's erroneous and unlawful interpretation of the Agreements.

On August 28, 2009, BOEM issued a decision denying Taylor Energy's protest and declared that Taylor Energy was required to: (a) deposit supplemental funds into the Trust Account; and (b) "reimburse" the Trust Account for "duplicative" insurance proceeds received. (AR Bates 356-358)

Essentially, BOEM's 2009 Decision required Taylor Energy to provide a "supplemental" deposit to the Trust Account to refund money for work Taylor Energy had already paid for and completed.   BOEM's 2009 Decision required Taylor Energy to deposit the full amount ($666,280,000) into the Trust Account plus "reimburse" the Trust Account for insurance proceeds received.  This determination by BOEM would have required Taylor Energy to "over fund" and double-pay for a commitment already completed, and denied Taylor Energy's request for even one disbursement for the same commitment.

By correspondence dated August 15, 2011, September 6, 2011, and November 2, 2011, Taylor Energy requested disbursements of its own funds from the Trust Account for rig downtime costs in accordance with express procedures set forth in the Disbursement Agreement.  Taylor Energy submitted a disbursement request for the rig downtime costs to BOEM because the total costs for five intervention wells (IW4, 10, 11, 13 & 17) had not reached the maximum cap of $25.5 million per well.  On November 7, 2011, BOEM denied Taylor Energy's request for disbursement of Trust Account funds related to rig downtime arising out of the inability to continue operations during hurricane season, a necessary cost related to securing a continuous contract for a drilling rig required to plug and abandon certain of the 25 wells.  (AR Bates 0024-0027)

BOEM's 2011 Decision applied the same flawed logic as the 2009 Decision.  It requires Taylor Energy to "ensure" the availability of funds to pay for the commitment to plug and abandon one well multiple times—first by paying to drill the intervention well, second by paying into the Trust Account via a supplemental deposit after work on that well was already complete, and a third time because BOEM denied Taylor Energy's disbursement for work completed.

Contrary to the 2011 Decision, Taylor Energy has not been "overcompensated" or received "excess disbursements" or "overpayments" for this obligation under the Trust Agreement.  In fact, contrary to the Agreements Taylor Energy has actually received disbursements of <u>less than</u> the allocated $25.5 million for each of the wells that it successfully decommissioned.

In essence, the IBLA's endorsement of the 2009 and 2011 Decisions, like the 2009 Decision, retain Taylor Energy's funds in the Trust Account to "secure" the completion of "Obligations" that Taylor Energy already fulfilled.  This conclusion runs contrary to the clear and plain terms of the Agreements.  The net effect of the IBLA's Decision was to improperly withhold $10,433,905 of Taylor Energy's funds.

Like BOEM, the IBLA rendered meaningless the deposit "offset provision" contained in the Bond Agreement through its interpretation in connection with the 2009 Decision. Further, in connection with the 2011 Decision, its conclusions that Taylor Energy had been "overcompensated" on one well (IW-21) and that the Trust Account needs to "remain fully funded" is erroneous. This conclusion improperly requires that funds remain in the Trust Account despite "not currently allocated to any future decommissioning work."

### B. Federal Defendants

There are no facts "claimed" in the sense that phrase is used in a typical pretrial order. The agency has already found the facts and summarized them in its decisions. The Court's role is to determine whether the agency's decision was arbitrary and capricious based on the record before the IBLA, not to decide whether any agency fact finding was "correct." Federal Defendants summarize the background of this case as follows:

Following the destruction of Taylor Energy's platform at Mississippi Canyon Block 20, the expiration of leases that triggered Taylor Energy's regulatory decommissioning obligations, and Taylor Energy's sale of all of its other leases and assets, Interior issued 'Bonding Orders' requiring Taylor to post security in the amount of $666,280,000 in accordance with 30 C.F.R. § 556.56 (2015). Interior and Taylor entered into a series of agreements (the "Trust Agreement") as the mechanism by which Taylor is complying with its regulatory bonding requirements. 30 C.F.R. § 556.901(d). The Trust Agreement required Taylor Energy to fund a lease-specific abandonment account, and allowed for disbursements from that account to Taylor Energy after the completion of certain work for which Taylor Energy was not reimbursed by insurance, up to certain caps.

On August 13, 2009, Taylor sent a letter to the Minerals Management Service proposing that Taylor "make the full final deposit into the Trust Account, required under Section 2.3, by

September 21, 2009, without any offsets, and that [Taylor] be permitted to retain all insurance proceeds it has received and will receive in the future as reimbursement for work performed." Rec. Doc. 1-2 at 1. The Minerals Management Service declined Taylor's proposal on August 28, 2009 (the "2009 Decision"). *Id.* It stated Taylor would need to (1) make the full deposit due the next month because Taylor had "not yet completed any phase of the 'work,' as defined by the Trust Agreement," and (2) reimburse the Trust Account for any disbursements Taylor received that duplicated reimbursement from Taylor's insurance company. *Id.* at 2. Taylor timely appealed to the Interior Board of Land Appeals. Rec. Doc. 1-4 at 7.

On August 15, September 6, and November 2, 2011, Taylor requested disbursement for rig down time from the Bureau of Ocean Energy Management, a successor agency to the Minerals Management Service, which was then responsible for overseeing the Trust Account. The Bureau denied Taylor's request on November 7, 2011 (the "2011 Decision"). The Bureau agreed that rig down time was a reimbursable cost and that Taylor was entitled to reimbursement totaling $14,039,766 for work decommissioning five wells. Rec. Doc. 1-3 at 2. It explained, however, that Taylor had received reimbursements and insurance proceeds that exceeded the per-well cap allowed for one of its other wells by $17,920,228.74 and that Taylor also owed the Trust a Rig Credit of $2,623,489. *Id.* at 2-3. Accordingly, on net, Taylor owed the Trust over $6.5 million, although the Bureau did not request reimbursement at that time. *Id.* Taylor timely appealed the 2011 Decision to the Interior Board of Land Appeals. Rec. Doc. 1-4 at 12.

In a single consolidated opinion, the Interior Board of Land appeals affirmed both the 2009 and 2011 Decisions. Rec. Doc. 1-4. Taylor Energy seeks judicial review of that decision under the Administrative Procedure Act. Compl. Rec. Doc. 1 ¶ 1, 2, 8-15.

7. **A Single Listing of Uncontested Material Facts[5]**

1) The Disbursement Agreement contains express procedures for making Trust Account disbursements for rig downtime by adjusting their daily rig dayrate "on an equal proportionate basis to each day the rig operated on a [Taylor Energy] well," and authorized "additional disbursements for the daily rig dayrate for each day the rig operated on that well, provided, that the total disbursement for any well shall not exceed $25,500,000."

2) The Bond Agreement expressly addresses the treatment of insurance proceeds in connection with Taylor Energy's rights to reimbursements from the Trust Account.

It states:

Taylor will seek reimbursement from available insurance policies of all funds it spends performing the work required under the [approved plan to complete the Obligations set forth in Schedule A]. Taylor will not be entitled to payment under the Trust Agreement for costs reimbursed by insurance companies, but the amount of the deposit required in section 2.3 shall reflect an offset equivalent to the amount designated for work in Schedule A when that work is completed with funds from any source. (§ 2.4)

3) The Trust Agreement expressly addresses the treatment of insurance proceeds in connection with Taylor Energy's rights to reimbursements from the Trust Account.

It states:

Upon receipt of notice from the Beneficiary, disbursements may be made by the Trustee from the Trust Account to the Settlor based upon a corresponding reduction of the Obligations in accordance with Schedule A, except as necessary to hold back the Trust Funds required by Section 4.7.  Any such disbursements are for the actual

---

[5] Federal Defendants do not contest any fact found or affirmed by the Interior Board of Land Appeals in the decision under judicial review.  Federal Defendants object to any finding of fact by the Court, and maintain the proper issue is whether the decision was arbitrary and capricious.  Nonetheless, Federal Defendants believe the facts as listed under this heading are consistent with that decision.

costs of the Work performed and costs incurred to satisfy the Obligations, and cannot exceed the cost estimates shown in Schedule A.   No disbursements will be given for amounts reimbursed to the Settlor by insurance proceeds.  (§ 4.1)

4)    The Agreements provided that Taylor Energy would make the $666,280,000 deposit in several installments, and to account for the fact that Taylor Energy might complete some of the particular activities before the later installments were due, the Bond Agreement provided for an "offset" of later installment deposits for work already completed.

5)    Taylor Energy made the following deposits in the following amounts on the following dates to fund the Trust Account:

| | |
|---|---|
| March 30, 2008 | $400,000,000 |
| June 3, 2008 | $38,250,000 |
| March 23, 2009 | $150,000,000 |
| September 8, 2009 | $3,000,000 |
| September 21, 2009 | $75,030,000 |
| TOTAL | $666,280,000 |

## 8.    A Single Listing of Contested Issues of Fact[6]

1)    The Trust Agreement was to provide security for performance of 29 discrete and particular activities.

2)    The 29 discrete and particular activities under the Trust Agreement and the allocated amounts are:

---

[6] Federal Defendants do not contest any fact found or affirmed by the Interior Board of Land Appeals in the decision under judicial review.  Any fact "contested" in this proceeding is necessarily contested by Taylor.  Federal Defendants object to any finding of fact by this Court, and maintain the proper issue is whether the agency decision was arbitrary and capricious or contrary to law.  All contested issues of fact listed in this section were drafted and included by Taylor; Federal Defendants do not agree with their characterization and framing.

- 25 wells at $25.5 million per well - $637,500,000

- deck/flare boom removal - $6,245,000

- debris removal - $6,535,000

- pipeline removal - $3,000,000

- contaminated soil removal - $13,000,000

TOTAL - $666,280,000

3) The Trust Agreement established a maximum of $666,280,000 in security for performance of the 29 discrete and particular activities.

4) No wording in the Trust Agreement contemplates security beyond the total $666,280,000 for the 29 discrete and particular activities.

5) The Trust Agreement recognized that insurance proceeds, in lieu of other cash payments, could be used by Taylor Energy to fund the $666,280,000 deposit into the Trust Fund.

6) Between 2008 and 2011 Taylor Energy performed 12 of the discrete and particular activities under the Trust Agreement.

7) Taylor Energy received reimbursements from the Trust Account of $233,756,278 as a result of performing 12 of the discrete and particular activities under the Trust Agreement, leaving $432,523,718 in the Trust Account.

8) The $233,756,278 disbursed to Taylor Energy from the Trust Account is as follows:

| Work Description | Amount Distributed from the Trust Account |
|---|---|
| Pipeline decommissioning | $3,000,000 |
| Deck removal | $6,245,000 |
| Seafloor debris removal | $6,427,555 |

| | |
|---|---|
| Intervention of Well A-21 | $25,500,000 |
| Intervention of Well A-19 | $25,500,000 |
| Intervention of Well A-16 | $25,500,000 |
| Intervention of Well A-4 | $23,224,312 |
| Intervention of Well A-13 | $21,732,818 |
| Intervention of Well A-1 | $25,500,000 |
| Intervention of Well A-11 | $24,927,583 |
| Intervention of Well A-17 | $23,949,726 |
| Intervention of Well A-10 | $22,249,284 |
| TOTAL | $233,756,278 |

9)  The amounts disbursed to Taylor Energy for the drilling of the following wells was less than the $25.5 million cap per well as follows:

Intervention of Well A-4 - $23,224,312

Intervention of Well A-13 - $21,732,818

Intervention of Well A-11 - $24,927,583

Intervention of Well A-17 - $23,949,726

Intervention of Well A-10 - $22,249,284

10) The funds in the Trust Account allocated to the remaining 17 discrete and particular activities under the Trust Agreement is a follows:

- 16 wells at $25.5 million per well - $408 million

- removal of contaminated soil -     $13 million

TOTAL -                          $421 million

11) Of the $432,523,718 of funds remaining in the Trust Account, $421,000,000 are attributable to the 17 discrete and particular activities so far not performed under the Trust Agreement ($25.5 million per well for 16 wells plus $13 million for contaminated soil removal).

12) The Trust Account presently has an additional $11 million of Taylor Energy's money for no remaining decommissioning activities under Schedule A of the Trust Agreement, as the designated work has already been performed.

13) As a result of the total intervention well costs attributable to five wells being below the $25.5 million cap per well, $11,523,718 is presently in the Trust Account but not attributable to any discrete and particular activities yet to be performed under the Trust Agreement.

14) After the "agreed to adjustments" of $1,089,817 ($107,445 for seafloor debris removal, $980,052 for IWA-13, and $2,319 for IWA-11) are applied to the $11,523,718 in funds in the Trust Account, $10,433,905 remains in the Trust Account but not allocated to any of the remaining 17 discrete and particular activities.

15) On August 15, 2011 Taylor Energy submitted its disbursement request for rig downtime adjustments on its successful drilling of five intervention wells (IW-4, IW-10, IW-11, IW-13, and IW-17) because total costs for the five intervention wells had not reached the allotted $25.5 million per well.

16) The total rig downtime costs in connection with the applicable five intervention wells are $13,057,394.12 less a reduction of $2,623,489 already distributed to Taylor Energy for a net disbursement of $10,433,905.

17) While Taylor Energy would not be entitled to disbursements for costs reimbursed by insurance proceeds, any work performed prior to the due date of the final installment deposits, using money from "any source" (including insurance), would be entitled to a reduction (offset) in deposits equal to the designated amount stated

in the Trust Agreement Schedule A for the completed work.

18) In its May 22, 2009 letter to Taylor Energy, Federal Defendants conceded that if Taylor Energy's "actual costs exceed the maximum amount of Trust Fund disbursements permitted by the Trust Agreement for a particular activity, then TEC may retain insurance proceeds equal to the costs greater than the disbursement."

19) The principle amount Taylor Energy seeks in the proceeding is a portion of its own funds currently deposited in the Trust Account.

20) The purpose of the funds deposited into the Trust Fund was "to ensure a source of money sufficient to fund the specified decommissioning obligations in Schedule A to the Trust Agreement."  (Federal Defendants' Answer - AR Bates at 707, 710-711)

21) "[T]he Disbursement Agreement does not address what BOEM would be entitled to do when faced with an excessive disbursement…" (Federal Defendants' Answer – AR Bates at 711)

22) Whether Taylor Energy could be "overcompensated" by receipt of its own funds disbursed from the Trust Account.

23) Whether the IBLA erred in finding that Taylor Energy is required to repay disbursements it subsequently concluded Taylor Energy was not entitled to receive under the Agreements.

24) Whether the Agreements require Taylor Energy to "refund" insurance proceeds to the Trust Account for an "Obligation" already completed.

25) The amount of damages for lost interest attributable to the principle claim of $10,433,905 is in excess of $2 million accruing since 2011.

26)     Whether the Agreements executed in 2008 reflect a settlement of Taylor Energy's obligation to decommissioning an oil and gas platform and multiple wells destroyed in 2004 at MC20 in the Gulf of Mexico in the wake of Hurricane Ivan.  *See* AR Bates 644.

27)     Whether the Agreements support the IBLA Decision that BOEM can seek refunds or additional Trust deposits (above the $666,280,000 already made) for "over" payment for an "Obligation" already completed.

28)     Whether the Trust Account is presently "overfunded" since it contains funds deposited to "secure" Obligations already completed.

29)     Whether this "overfunded" amount of $10,433,905 is due to Federal Defendants' improper treatment of the offset provision in the Bond Agreement, the improper treatment of insurance proceeds under the Trust Agreement and the Bond Agreement, and the failure to reimburse Taylor Energy for rig downtime costs under the Disbursement Agreement.

30)     Whether the IBLA improperly categorized all of the work on the 25 wells as a single "phase" of work.

31)     Whether Federal Defendants' position that requires funds to remain in the Trust Account despite "not currently allocated to any future decommissioning work," which the IBLA adopted (AR Bates 648), causes the Trust Account to be "overfunded."

32)     Whether the express wording of the Disbursement Agreement and the parties' prior practice contradicts Federal Defendants' all 25 wells single "phase" construction. *See* August 19, 2011 internal email, where a BOEM employee notes that treating

all twenty-five wells as a "phase versus well-by-well changes the outcome, more in [Taylor's] favor" (AR Bates 277) and August 10, 2011 internal email that, "[t]here are advantages to us doing well by well as this is by phase. If go with phase, it is most prudent to treat the phase as 25 wells." (AR Bates 299)

33)   Whether the IBLA was arbitrary, capricious, abused its discretion or otherwise acted contrary to law by categorizing all of the work on the 25 wells as a single "phase" of work.

34)   Whether the IBLA erred by ignoring Federal Defendants' admission against interest that they are manipulating the original "intent" concerning the language of the Agreements by its use of a single "phase" to cover multiple particular activities, all to Taylor Energy's prejudice.

35)   Whether the IBLA erred by ignoring Federal Defendants' admission against interest that they are playing a "game" with the construction of the Agreements. AR Bates 0300-0301 (referencing the treatment of disbursements to Taylor as a "game").

36)   Whether the IBLA was arbitrary, capricious, abused its discretion or otherwise acted contrary to law by adopting the 2009 position of BOEM that the offset provision in the Bond Agreement did not apply because Taylor Energy had not completed a "phase" of work – i.e., the plugging and abandonment of all 25 wells, prior to the time the supplemental deposit was due.

37)   Whether the IBLA was in error in its reading of the offset provision in the Bond Agreement in isolation and without regard to the provisions of the Trust Agreement and Disbursement Agreement entitling Taylor Energy to partial disbursement upon

entering into a drilling rig contract for a particular well.

38) Whether the IBLA was arbitrary, capricious, abused its discretion or otherwise acted contrary to law by adopting the 2011 position of BOEM that Taylor Energy's request for rig downtime cost disbursement is improper, claiming that Taylor Energy had been "overcompensated" in Trust Account disbursements because the total insurance proceeds and prior disbursements for all nine wells, collectively, exceeded the total costs for all of those nine wells collectively.

39) Whether the IBLA's failure to address the disbursement request on a per well basis was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

40) Whether the IBLA's Decision is arbitrary, capricious, an abuse of discretion and otherwise contrary to law since it is contrary to BOEM's position as stated in its May 22, 2009 letter.

41) Whether the IBLA acted arbitrarily, capriciously, abused its discretion and otherwise acted contrary to law when it adopted BOEM's position that it could "recoup" what it believed was an over disbursement on one well – IWA-21 – through the denial of disbursement requests in connection with five other wells.

42) There is no basis in the Agreements for this recoupment or "self-help" by Federal Defendants.  Adopting this manipulative accounting is completely contrary to the clear and unambiguous wording of the Agreements and is therefore arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

43) Although the IBLA expressly adopted the position of BOEM in its Answer (AR Bates 687-715 at 704) that "BOEM has also consistently attributed disbursements

and insurance proceeds on a per-well basis," in fact the IBLA's decision to deny Taylor Energy a disbursement of $10,433,905 for rig downtime is the "recoupment" of the alleged over disbursement on one well – IWA-21 – against five other wells.

44) Whether the IBLA acted arbitrary, capricious, abused its discretion and otherwise acted contrary to law when it adopted the position of BOEM as stated in its Answer (AR Bates 706) that "[t]herefore, the fact that the IW21 over disbursement of $17+ million was higher than the $14+ million still available for disbursement on the five IWs precluded the disbursements that would have brought each of these five IWs up to a full allotment of $25.5 million."

45) Since Federal Defendants agree that Taylor Energy made the total deposits into the Trust Fund of $666,288,000, depositing any additional amounts from insurance proceeds received by Taylor Energy results in an "overfunding" of the Trust Account contrary to the express wording of the Agreements.

46) Whether the Disbursement Agreement provided for Taylor Energy to make additional deposits (above the $666,280,000) into the Trust Account of later insurance proceeds received.

47) Whether the Disbursement Agreement provided any right by Federal Defendants to "offset" any disbursements received for one well with an alleged "overage" on any other well.

48) Whether the IBLA was arbitrary, capricious, abused its discretion or otherwise acted contrary to law by requiring that funds remain in the Trust Account despite "not currently allocated to any future decommission work" provided by the Trust Agreement (AR Bates 648).

**9.     Single Listing of Contested Issues of Law**[7]

1)     Whether the United States Court of Federal Claims has proper and exclusive subject matter jurisdiction over this proceeding pursuant to The Tucker Act, 28 U.S.C. § 1491.

2)     Whether this Court has proper subject matter jurisdiction over this proceeding.

3)     Whether this proceeding should be transferred to the United States Court of Federal Claims pursuant to 28 U.S.C. § 1631.

4)     Whether the relevant wording of the Trust Agreement is clear and unambiguous.

5)     Whether the relevant wording of the Bond Agreement is clear and unambiguous.

6)     Whether the relevant wording of the Disbursement Agreement is clear and unambiguous.

7)     Whether the IBLA Decision dated October 29, 2018, which affirmed two Interior Department Agency decisions is arbitrary, capricious, an abuse of discretion or, not otherwise in accordance with law within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

8)     Whether application of this Court's review of the IBLA Decision establishes that it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  *See e.g.,* "Deference [to the agency's factual conclusions] does not mean acquiescence*." Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 508 (1992). "[W[hen review of an agency's action is "bound up with a record-based factual

---

[7] Federal Defendants agree issues 1-3 are contested issues of law addressed in the parties' briefs on Taylor's Motion to Transfer.  Federal Defendants agree issue 7 is the contested issue under the law on the merits of the challenged decision, all other issues listed are more properly characterized as potential arguments offered by Taylor, or as in the case of issues 14-17, basic statement of the law.

conclusion," the reviewing court must determine whether that conclusion "is supported by substantial evidence." *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 63 (D.D.C. 2016). "[A]n agency decision would be arbitrary and capricious if it is not supported by substantial evidence because it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense." *Id.* at 64. Therefore, courts "reject agency determinations under APA's substantial evidence standard when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action." *Id.* at 68; *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 70 (D.D.C. 2016) (finding that the two key factual findings underlying the agency's decision were incorrect or speculative. "In such circumstances the deference owed under the APA to the factual findings of an administrative agency are fundamentally undermined."); *Vidal v. Nielsen*, 279 F. Supp. 3d 401, 427 (E.D.N.Y. 2018) ("An agency decision is arbitrary and must be set aside when it rests on a crucial factual premise shown by the agency's records to be indisputably incorrect.") (quoting *Mizerak v. Adams*, 682 F.2d 374, 376 (2d Cir. 1982)); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency acts arbitrarily and capriciously by "offer[ing] an explanation for its decision that runs counter to the evidence before the agency"); *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev*., 923 F.2d 188, 194, 287 U.S. App. D.C. 365 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and

capricious standard.").

9)     Whether this Court's construction of the Agreements should be guided by application of Louisiana's contract interpretation principles pursuant to La. C.C. arts. 2045-2057.

10)     Whether this Court's construction of the Agreements should be guided by application of Federal common law standards for interpreting contracts as applied by the IBLA. (AR Bates 642-643).

11)     Whether Louisiana's contract interpretation principles are consistent with Federal common law standards for the interpretation of contracts.

12)     Whether the proper construction of the Agreements establishes that the IBLA's Decision is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.

13)     Whether Taylor Energy's obligations under the Trust Agreement are only a subset of its statutory and regulatory decommissioning and remediation obligations.

14)     The APA allows persons and organizations to challenge final agency actions in federal court. 5 U.S.C. §§ 702, 704.

15)     The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

16)     "[A]gency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

17)   The APA provides that a court shall hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

18)   Whether the IBLA's interpretation of the parties' contract must reflect the parties' intent without rendering any provision of the contract meaningless.  *Massie v. Inexco Oil Co.*, 798 F.2d 777,779 (5th Cir. 1986); *see also Cent. Louisiana Elec. Co., Inc. v. Dolet Hills Mining Venture*, 116 F. Supp. 2d 710, 716-19 (W.D. La. 1999) (noting that an interpretation of a provision of a contract that renders another provision meaningless is improper); *Sec. Ctr. Prot. Servs., Inc. v. Lafayette Sec. & Elec, Sys., Inc.*, 668 So.2d 1156, 1160-61 (La. Ct. App. 1996) (explaining that the Louisiana Supreme Court has clearly stated that meaning be given to every provision of an agreement).

19)   Whether the IBLA Decision is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law under both Louisiana law contract interpretation principles and Federal common law contract interpretation principles.  *See El Past Natural Gas Col*., 156 IBLA 330, 336 (2002); *Eason v. BLM*, 166 IBLA 292, 295 (2005) (*quoting Corbin on Contracts*, § 24.7 (1998); *PetroCorp*, 152 IBLA 77, 84 (2000); *ASARCO, Inc.*, 116 IBLA 120, 126 (1990); *Walch Logging Co., Inc. v. Ass't Area Director*, 90 I.D. 88, 95, 11 IBLA 85 (1983); *Mesa Air Group, Inc. v. Department of Transportation*, 87 F.3d 498, 503-04 (D.C. Cir. 1996); *Rosebud Coal Sales Co., Inc. v. Hodel*, 667 F.2d 949, 951 (10th Cir. 1982); *Linmar Petroleum Co.*, 153 IBLA 99, 106 (2000) (citations omitted); *Priority Energy, LLC*, 186 IBLA 363, 386 (2015); *Koniag, Inc.*, 135 IBLA 41, 47

(1996); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014),

*cert. denied*, 135 S.Ct. 477 (2014); *William J. Thoman*, 155 IBLA 266, 267 (2001).

**10.    Exhibit Lists**

   **A.  Taylor Energy**

| Exhibit | AR Bates # | Description |
|---------|-----------|-------------|
| 1 | 569-592 | March 19, 2008 Trust Agreement |
| 2 | 593-600 | November 20, 2008 Agreement between Taylor Energy and Minerals Management Service to Implement Article IV – Disbursements of the Trust Agreement |
| 3 | 601-610 | March 19, 2008 Agreement To Provide Additional Bond |
| 4 | 630-649 | Interior Board of Land Appeals ("IBLA"), October 29, 2018 Final Decision |
| 5 | 356-358 | Minerals Management Services' (now BOEM) August 28, 2009 Decision |
| 6 | 0024-0027 | Bureau of Ocean Energy Management's November 7, 2011 Decision |
| 7 | 369 | John Rodi email dated 05/13/2009 at 9:51 am |
| 8 | 366-368 | John Rodi email dated 05/22/2009 forwarding Mr. Herbst's letter dated 05/22/2009 |
| 9 | 300-301 | Cathy Moser email dated 08/10/2001 at 10:41 am with schedule – "the 'game' is" |
| 10 | 299 | Joshua Joyce email dated 08/10/2011 at 1:41 pm – manipulation of "phase" |
| 11 | 287-288 | Cathy Moser email dated 08/16/2011 at 12:04 pm – manipulative accounting |
| 12 | 285-286 | Joshua Joyce email dated 08/16/2011 at 4:05 pm – manipulative accounting |
| 13 | 0001-0921 | The entire administrative record lodged in this proceeding |

| Exhibit | AR Bates # | Description |
|---------|------------|-------------|
| 14 | | Taylor Energy's contemporaneously created schedule(s) supporting reconciliation or in support of proceeds received including a schedule reflecting the timing and amounts of funds deposited in the Trust Account |
| 15 | | Schedules reflecting Taylor Energy's monetary damages and lost interest income. |
| 16 | | Any documents needed for impeachment |
| 17 | | Any exhibits identified by Federal Defendants |
| 18 | | Any and all pleadings, orders, and/or judgments filed or entered in this matter |
| 19 | | Any and all documents attached to any pleadings filed in this matter |
| 20 | | Any and all demonstrative exhibits to be used at trial |
| 21 | | Timeline of significant events |
| 22 | | Rebuttal Exhibits |

Taylor Energy maintains that the following pages in the Administrative Record are the subject of confidentiality and protective orders previously entered by the IBLA:  AR Bates #s 7-11, 71-72, 76-83, 84-139, 143-150, 153-273, 318, 377-448 and 451-568.   These pages should remain subject to those same confidentiality limitations and restrictions in this proceeding.   The parties will discuss exhibits that Taylor Energy alleges to be privileged at the pre-trial conference.

### B.  Federal Defendants

If this Court rules it has jurisdiction, then this case will proceed as a case for judicial review of agency action "on the basis of the record before the agency at the time it made its decision."  *State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 327 n.8 (5th Cir. 1988) (internal citations omitted).   Accordingly, trial and the introduction of exhibits is not appropriate under

binding precedent.  *See id.*  ("[Plaintiff's] attempt to reopen the administrative record in this court are improper.  Under well-established principles of administrative law, *de novo* review is not the standard. . . . Nor are the courts permitted to consider evidence outside the administrative record." (internal citations omitted)).  Although no deadline has required that the administrative record be served and lodged, *see* Pl.  Response to Notice of Lodging and Serving the Administrative Record, Rec. Doc. 64 (asserting the lodging was "unprovoked."), Federal Defendants have served and lodged the administrative record in this case.  Rec. Doc 60.  Federal Defendants have also filed a Certified List of Contents of the Administrative Record, which contains a list of the documents that comprise the administrative record and a description of those documents.  Rec. Doc. 59-1.  To the extent deemed necessary, that list is incorporated here by reference—Rec. Doc. 59-1 at ECF page 3-13. If necessary, Federal Defendants reserve the right to introduce any exhibit identified by Taylor Energy by name or purpose.

### C.  Objections to Exhibits

Taylor Energy objects to any exhibits offered by Federal Defendants since Federal Defendants waived their rights to do so by not serving and filing its exhibit list in accordance with the Scheduling Order.

Federal Defendants object to the offering or consideration of any evidence not included in the Certified Administrative Record lodged in this case, including Taylor's Exhibits 14-22.  If this Court rules it has jurisdiction, then Taylor's claim will proceed as a case for judicial review of agency action "on the basis of the record before the agency at the time it made its decision." *State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 327 n.8 (5th Cir. 1988) (internal citations omitted). Since any exhibit offered in this Court that is not included in the administrative record would not have been before the agency, new exhibits are neither appropriate nor permitted under binding

precedent. *See id.*  ("[Plaintiff's] attempt to reopen the administrative record in this court are improper.  Under well-established principles of administrative law, *de novo* review is not the standard. . . . Nor are the courts permitted to consider evidence outside the administrative record." (internal citations omitted)).

**11.    Deposition Testimony**

None.

**12.    Description of Charts, Graphs, Models, Schematics Diagrams, and Similar Objects**

**A.  Taylor Energy**

Taylor Energy may use demonstratives that enlarge certain wording from exhibits or enlarge certain charts and schedules contained in the exhibits.  Taylor Energy may also use timelines of significant events and/or demonstratives quantifying certain work, deposits, disbursements or other matters.

**B.  Federal Defendants**

Federal Defendants object to any such documents, but reserve the right to present similar documents to those described by Taylor Energy if necessary.

**13.    Witness Lists**

**A.  Taylor Energy**

1.      Dina Bracci Riviere, Chief Financial Officer, Taylor Energy Company LLC
c/o Carl D. Rosenblum
Jones Walker LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170

Facts and circumstances concerning the overall purpose of the Agreements, discussion of the various accounting schedules and the basis for Taylor Energy's claims in this proceeding, including its monetary damages.  To rebut the factual allegations of the Federal Defendants, address other relevant matters in this litigation, and authenticate exhibits.

2.     William W. Pecue, II, President, Taylor Energy Company LLC
       c/o Carl D. Rosenblum
       Jones Walker LLP
       201 St. Charles Avenue
       New Orleans, Louisiana 70170

       Facts and circumstances concerning the overall purpose of the Agreements and
       the basis for Taylor Energy's claims in this proceeding, including its monetary
       damages.  To rebut the factual allegations of the Federal Defendants, address
       other relevant matters in this litigation, and authenticate exhibits.

3.     Lars T. Herbst, Regional Director
       Bureau of Safety and Environmental Enforcement
       1201 Elmwood Park Boulevard
       New Orleans, Louisiana 70123

       Facts and circumstances concerning the Agreements, including the "game" being
       asserted by Federal Defendants and their manipulative accounting contrary to the
       express wording of the Agreements in an effort to prejudice Taylor Energy's
       rights under the Agreements.

4.     John Rodi, former Regional Director Gulf of Mexico, OCS Region
       Bureau of Ocean Energy Management
       1201 Elmwood Park Boulevard
       New Orleans, Louisiana 70123

       Facts and circumstances concerning the Agreements, including the "game" being
       asserted by Federal Defendants and their manipulative accounting contrary to the
       express wording of the Agreements in an effort to prejudice Taylor Energy's
       rights under the Agreements.

5.     Joshua T. Joyce, Gulf of Mexico, OCS Region
       Bureau of Ocean Energy Management
       1201 Elmwood Park Boulevard
       New Orleans, Louisiana 70123

       Facts and circumstances concerning the Agreements, including the "game" being
       asserted by Federal Defendants and their manipulative accounting contrary to the
       express wording of the Agreements in an effort to prejudice Taylor Energy's
       rights under the Agreements.

6.      Cathy L. Moser, BOEM Technical Specialist and Advisor
        1201 Elmwood Park Boulevard
        New Orleans, Louisiana 70123

        Facts and circumstances concerning the Agreements, including the "game" being
        asserted by Federal Defendants and their manipulative accounting contrary to the
        express wording of the Agreements in an effort to prejudice Taylor Energy's
        rights under the Agreements.

7.      Any witness needed to authenticate third party records

8.      Any witness identified by Federal Defendants

9.      Any witness needed to authenticate documents

10.     Rebuttal witnesses

**B.  Federal Defendants**

If this Court rules it has jurisdiction, then this case will proceed as a case for judicial review

of agency action "on the basis of the record before the agency at the time it made its decision."

*State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 327 n.8 (5th Cir. 1988) (internal citations

omitted).  Accordingly, witnesses are neither appropriate nor permitted under binding precedent.

*See id.*  ("[Plaintiff's] attempt to reopen the administrative record in this court are improper.  Under

well-established principles of administrative law, *de novo* review is not the standard. . . . Nor are

the courts permitted to consider evidence outside the administrative record."  (internal citations

omitted)). If necessary, Federal Defendants reserve the right to call any witness identified by

Taylor Energy by name or purpose.

**C.  Objections to Witnesses**

Taylor Energy objects to any witness sought to be called by Federal Defendants since

Federal Defendants waived their rights to do so by not serving and filing witness lists in accordance

with the Scheduling Order.

Federal Defendants object to the offering or consideration of any witness whatsoever.  If this Court rules it has jurisdiction, then Taylor's claim will proceed as a case for judicial review of agency action "on the basis of the record before the agency at the time it made its decision." *State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 327 n.8 (5th Cir. 1988) (internal citations omitted).  Since any testimony provided before this Court would not have been before the agency, witnesses are neither appropriate nor permitted under binding precedent.  *See id.*  ("[Plaintiff's] attempt to reopen the administrative record in this court are improper.  Under well-established principles of administrative law, *de novo* review is not the standard. . . . Nor are the courts permitted to consider evidence outside the administrative record." (internal citations omitted)). If necessary, Federal Defendants will also seek a protective order with respect to certain witnesses.

**14.**   This case is a non-jury case.

**15.**   The issue of liability will not be tried separately from that of quantum.

**16.**   **Statement of Other Matters**

None known at this time.

**17.**   **Estimated Length of Trial**

Trial shall commence on January 21, 2020 at 8:30 a.m.  The non-jury trial is estimated to last approximately 3 days.

Federal Defendants objected to entry of the above trial date and estimate at the initial scheduling conference with the case manager because this is a case for judicial review of agency action that must be decided on the basis of the record before the agency when it made its decision, which record cannot be reopened in this Court.  Federal Defendants have maintained this objection throughout this case, and currently object to any trial.  Trial in this case would violate binding

precedent by reopening the administrative record before the agency at the time it made its decision. Federal Defendants therefore estimate zero (0) days for trial.

**18.    Conference of Parties**

This pre-trial order has been formulated after conference at which counsel for the respective parties have conferred telephonically.  Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing.  Hereafter, this order will control the course of the trial and may not be amended except by the consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

Federal Defendants do not agree to the statement in the Pretrial Notice at ¶ 18.  Federal Defendants object to any trial in this case, and object to this order controlling the course of trial in any case.  To the extent this Court rules it does not have jurisdiction and this case should proceed to trial in the Court of Federal Claims or any other forum, then the fact, law, witness, exhibit, and other representations made by Federal Defendants in this proposed order for the purposes of this Administrative Procedure Act case will not necessarily be the position of Federal Defendants in that case and cannot be cited as Federal Defendants' position because the legal framework and relevant disputes will change.

**19.    Settlement Negotiations**

Possibility of settlement of this case was considered.

Respectfully submitted,

By: *s/ Carl D. Rosenblum*
    Carl D. Rosenblum, T.A. (La. Bar No. 2083)
    Edward D. Wegmann (La. Bar No. 13315)
    Alida C. Hainkel (La. Bar No. 24114)
    Lauren C. Mastio (La. Bar. No. 33077)
    Allison B. Kingsmill (La. Bar. No. 36532)
    JONES WALKER LLP
    201 St. Charles Avenue, 49th Floor
    New Orleans, Louisiana 70170-5100
    Telephone:  (504) 582-8296
    Facsimile: (504) 589-8296
    crosenblum@joneswalker.com

    **Counsel for Taylor Energy Company LLC,**
    **Plaintiff**


By: *s/ Thomas W. Ports, Jr.*
    Thomas W. Ports, Jr. (Va. Bar No. 84321)
    150 M Street, NE
    Washington, D.C.  20002
    Telephone:  (202) 305-0492
    Facsimile:  (202) 305-0506

    **Attorney for United States Department of The**
    **Interior, David Bernhardt, In His Official**
    **Capacity as Secretary of The United States**
    **Department of The Interior, and The Bureau of**
    **Ocean Energy Management**


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 12th day of December, 2019, a true and correct copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record participating in CM/ECF by operation of the court's electronic filing system.

*s/ Carl D. Rosenblum*